# Exhibit 9

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

_____

```
                              )
ABDULLAH HAYDAR,              )
                              )
                              )
          Plaintiff,          )
                              )
     vs.                      )  Case No. 2:16-cv-13662
                              )
                              )
AMAZON CORPORATE, LLC, a      )
                              )
foreign limited liability     )
                              )
corporation; GARRET GAW, an   )
                              )
individual; PETER FARICY, an  )
                              )
individual; JOEL MOSBY, an    )
                              )
individual;                   )
          Defendants.         )
```
_____


DEPOSITION OF PETER FARICY

July 28, 2017

Seattle, Washington




Reported by:

Connie Recob, CCR, RMR, CRR, CLR

CCR No. 2631

Job No. 4590

```
 1                     APPEARANCES

 2

 3          For the Plaintiff:

 4                    DAVID NACHT

 5                    NachtLaw, P.C.

 6                    Suite 55

 7                    101 North Main Street

 8                    Ann Arbor, Michigan 48104

 9                    (734) 663-7550

10                    dnacht@nachtlaw.com

11

12          For the Defendants:

13                    ROBERT M. WOLFF

14                    Littler Mendelson, P.C.

15                    20th Floor

16                    1100 Superior Avenue East

17                    Cleveland, Ohio 44114

18                    (216) 623-6065

19                    rwolff@littler.com

20

21       Also Present:

22                    Tania Grant - Videographer

23                    Charles Wright - In-house counsel

24                                at Amazon

25                    Abdullah Haydar
```

Page 3

```
 1                    EXAMINATION INDEX

 2

 3   EXAMINATION BY:                          PAGE NO.

 4   BY MR. NACHT                                  6

 5

 6

 7                     EXHIBIT INDEX

 8

 9   EXHIBIT NO.        DESCRIPTION            PAGE NO.

10   Exhibit 1         Handwritten Chart          44

11   Exhibit 2         Investigative Interview with

12                     Jim Joudrey dated 4/2/15,

13                     Bates Nos. AMAZON_HAYDAR_00000411

14                     through 414                108

15   Exhibit 3         e-mail string, Bates No.

16                     AMAZON_HAYDAR_00002184     113

17   Exhibit 4         e-mail string, Bates Nos.

18                     AMAZON_HAYDAR_00002200 through

19                     2201                       116

20   Exhibit 5         e-mail string, Bates Nos.

21                     AMAZON_HAYDAR_00005668 through

22                     5670                       125

23   Exhibit 6         e-mail string, Bates Nos.

24                     AMAZON_HAYDAR_00000640 through

25                     642                        129
```

```
 1                    EXHIBIT INDEX CONTINUED

 2

 3   EXHIBIT NO.       DESCRIPTION                  PAGE NO.

 4   Exhibit 7         Marketplace Leadership OLR

 5                     February 10, 2014 Roxanne 05.200

 6                     Notes from Q1 2015 Marketplace

 7                     OLR, Bates Nos. AMAZON_HAYDAR_00003649

 8                     through 3656                 138

 9   Exhibit 8         Anne DeCleene Investigative

10                     Interview with Peter Faricy

11                     dated 3/31/15, Bates Nos.

12                     AMAZON_HAYDAR_00000415

13                     through 419                  165

14   Exhibit 9         Marketplace 2014 Q3 OLR Notes,

15                     Bates Nos. AMAZON_HAYDAR_00001914

16                     through 1921                 197

17   Exhibit 10        e-mail string, Bates No.

18                     AMAZON_HAYDAR_00005772       202

19   Exhibit 11        Level 8 Promotion Request

20                     Summary Form, Bates Nos.

21                     AMAZON_HAYDAR_0000413

22                     through 426                  203

23

24           CONFIDENTIAL - ATTORNEYS' EYES ONLY

25         TESTIMONY ON PAGE 25 - BOUND SEPARATELY
```

1            BE IT REMEMBERED that on Friday, July 28, 2017,

2     at 600 University Street, Suite 3200, Seattle, Washington,

3     at 7:29 a.m. before Connie Recob, CCR, RMR, CRR, CLR,

4     appeared PETER FARICY, the witness herein;

5            WHEREUPON, the following proceedings were

6     had, to wit:

7

8                      <<<<<<  >>>>>>

9

10           THE VIDEOGRAPHER:  Good morning.  We're now

11    on the record.  Today's date is July 28th, 2017.  The

12    time is now 7:29 a.m.  My name is Tania Grant your video

13    specialist here with Connie Recob your court reporter.

14    We represent Fortz Legal Support at 7125 Orchard Lake

15    Road, Suite 308, West Bloomfield, Missouri.

16           MR. NACHT:  Michigan.

17           THE VIDEOGRAPHER:  Michigan, sorry.

18       This is the video recorded deposition of Peter

19    Faricy in the matter of Abdullah Haydar v. Amazon

20    Corporate, et al. in the U.S. District Court Eastern

21    District of Michigan, Southern Division, Cause No.

22    2:16-cv-13662.  Our location today is 600 University

23    Street, Suite 3200, Seattle, Washington.

24       Will counsel please identify yourselves and state

25    whom you represent.

1          MR. NACHT:  David Nacht, counsel for

2     plaintiff, Abdullah Haydar.

3          MR. WOLFF:  Robert Wolff, W-O-L-F-F, counsel

4     for defendants.  The next person who will walk in the

5     room will be Charles Wright, W-R-I-G-H-T, who is an

6     attorney employed by Amazon.

7          MR. CHICHESTER:  Michael Chichester for the

8     defendants.

9          THE VIDEOGRAPHER:  The court reporter may now

10    swear in the witness.

11

12    PETER FARICY,              having been first duly sworn,

13                               deposed and testified as

14                               follows:

15

16                     EXAMINATION

17    BY MR. NACHT:

18         Q.   Mr. Faricy, am I pronouncing your name

19    correctly, sir?

20         A.   You are.

21         Q.   I'm David Nacht and we shook hands or

22    nodded just a short time ago, and we were originally

23    going to have this deposition at 9:30, I think, but we

24    moved it to 7:30 to accommodate your schedule.  I want

25    to make sure that just because we're meeting early in

1    the morning, you're alert enough that you can answer

2    the questions without any problem?

3         A.    I'm alert.

4         Q.    Great.  And you're not under any medication

5    or have any other issues that would impair your

6    recollection today or your reasoning skills today?

7         A.    No.

8         Q.    Okay.  It's your first deposition, sir?

9         A.    Correct.

10        Q.    Have you ever been a party to a lawsuit

11   before?

12        A.    No.

13        Q.    I'm sure your counsel has told you this,

14   but the court reporter is taking everything you say

15   down.  And even though you're on video, lawyers will

16   use the transcript, and so in order to accurately

17   capture your intent, don't say "uh-huh" or shake your

18   head.  Answer verbally with a "yes" or a "no" or a

19   "sure" or an "I think so" or an "I don't remember."

20        The effort here is not to trick you into saying

21   something you don't believe to be true.  The effort

22   here is to accurately capture what you believe to be

23   true.  To that end, our memories, even when working

24   well, are not equally perfect at all times for all

25   questions.  So there will be questions I will ask you

1    and you'll just know the answer off the top of your

2    head and you'll answer it.  There will be questions I

3    will ask you where you're pretty sure you know the

4    answer, you're pretty sure you've got it and you're

5    trying your best to answer honestly because you're

6    under oath and you're participating in this process,

7    and so you want to let me know that you're pretty sure

8    you know the answer because it wouldn't be accurate to

9    say "I don't know."  So say, "I'm pretty sure the

10   answer is this."  Just answer it like that.

11                    (Mr. Wright enters.)

12                    THE WITNESS:  Got it.

13   BY MR. NACHT:

14        Q.   In other words, actually capture the extent

15   of your memory in the answer if it's less than crystal

16   clear.

17            Also, I'm asking a mix of questions today, all

18   right?  Some questions are designed to know what

19   you've -- you have a clear recollection of thinking

20   something, you have a clear recollection of seeing

21   something or hearing something or reading something,

22   participating in a conversation.  Some questions are

23   more your opinion about things, and that's true in all

24   depositions I would say, but it's especially true in

25   depositions in employment law cases where we're looking

Page 9

1   at issues of, you know, what were you thinking and how

2   do you think about these kinds of things and how do

3   other people think about these kinds of things and how

4   does the organization approach these kinds of things.

5   And so to the extent you need to provide context, I'm

6   going to let you provide context, okay?

7         A.   Got it.

8         Q.   If you need a break, ask for a break, I'll

9   give you a break not while a question is pending.  It's

10  not like where in Godfather II and, you know, you're at

11  the senate table and I ask the question and you whisper

12  to your lawyer.  Wait until the question is done and

13  then you can do that.

14        A.   Got it.

15        Q.   Okay.

16        A.   Got it.

17             MR. WOLFF:  You don't have his brother from

18  Sicily sitting in the back row.

19             MR. NACHT:  All right.

20  BY MR. NACHT:

21        Q.   So why do so many graduates of Brother Rice

22  end up running companies or in positions of great

23  leadership?

24        A.   I don't know.

25        Q.   What do you think?

Page 10

```
 1          A.    I don't know.

 2          Q.    Well, what did you learn at Brother Rice --

 3   that's the high school you attended, right?

 4          A.    It is, yeah.

 5          Q.    What did you learn at Brother Rice that you

 6   carry with you today?

 7          A.    I don't know.  I'd have to spend some time

 8   thinking about it.  Brother Rice was a -- was a

 9   fantastic high school.

10          Q.    Did you play a sport?

11          A.    I did.

12          Q.    What did you play?

13          A.    I played a lot of different sports.

14          Q.    Okay.  What were you best at?

15          A.    Lacrosse.

16          Q.    And not good enough to play lacrosse at

17   Michigan State?

18          A.    Correct.

19          Q.    And --

20          A.    Possibly not good enough to play lacrosse

21   at Brother Rice.

22          Q.    I imagine it was a serious lacrosse team?

23          A.    Yes.

24          Q.    And you're a competitive guy, you have to

25   be in order to achieve what you've achieved; is that
```

1    fair?

2         A.    I think it's accurate to say I'm

3    competitive, yes.

4         Q.    And -- but you've publicly stated fairly

5    recently that one of the things that you really love

6    about working for Amazon is that the company is run by

7    leadership principles?

8         A.    Correct.

9         Q.    And you were talking in the speech I

10   listened to last night on YouTube about the leadership

11   principle of -- of customer satisfaction but I'm not

12   saying it right.  What --

13        A.    Customer obsession.

14        Q.    Customer obsession?

15        A.    Obsession, yeah.

16        Q.    But I was wondering when I heard you say

17   that, I was listening to you say that and there was a

18   way in which you said it that I didn't think you were

19   just making a sales pitch for Amazon.  I -- what I

20   thought I heard in your voice was that there was

21   something about principles that resonated with you and

22   was important to you.

23        Is that fair?

24        A.    That's fair.

25        Q.    And so I want to go back to my first

Page 12

1    question about Brother Rice and I want to ask you,

2    what -- what principles did you take coming out of your

3    family and coming out of your high school education

4    that you carry with you today that -- for work?

5              A.   It's -- I don't have an answer for you.  I

6    don't know.  I mean, I'd have to spend some time

7    thinking about it.  My high school days would be a

8    long time ago, so I'd have to go back and think about

9    that.

10             Q.   Do you -- I mean, integrity certainly

11   counts, right?

12             A.   Integrity is very important.

13             Q.   And integrity is not a leadership principle

14   at Amazon, right?

15             A.   There's not a leadership principle named

16   integrity, but I think many of the leadership

17   principles imply integrity of the work we do.

18             Q.   Okay.  Why don't you elaborate?

19             A.   I'm sorry.  What's the question?

20             Q.   Why don't you elaborate on your last

21   answer?

22             A.   Could you give me a more specific question

23   for me to answer?

24             Q.   Yeah.  Which leadership principles do you

25   believe imply integrity?

Page 13

1          A.    Customer obsession.

2          Q.    Okay.  How?

3          A.    We -- we have built a company that cares

4     about what customers need first over all other needs.

5     I view that as a very high integrity principle and I

6     view it as being a very different way to organize and

7     lead than other organizations I see around the world.

8          Q.    Any other leadership principles imply

9     integrity?

10         A.    I think there's probably some, yeah.

11         Q.    Can you name any?

12         A.    Insist on high standards.

13         Q.    Okay.  How is that linked to integrity?

14         A.    It's linked to integrity in the sense of

15    we expect people at all times to hold themselves to

16    high standards, to hold their teams to high standards

17    and to hold their colleagues to high standards.

18         Q.    Do you believe that the direct reports

19    you've had reporting to you have integrity?

20         A.    Absolutely.

21         Q.    And the -- so Mr. Joudrey, Joudrey?

22         A.    Joudrey.

23         Q.    Joudrey?

24         A.    Jim Joudrey, yes.

25         Q.    Jim Joudrey.  He has integrity?

Page 14

 1          A.    I believe Jim Joudrey has integrity.

 2          Q.    I want you to tell me about the Detroit

 3   office.  Was that your idea to have a Detroit office?

 4          A.    It was.

 5          Q.    You wanted to give back?

 6          A.    No.  I believe the State of Michigan and

 7   the City of Detroit have an enormous amount of talent,

 8   and I think it's in the best interest of Amazon in

 9   order to serve our customers better to build remote

10   dev centers where most of the talent is, and I believe

11   there's an enormous amount of talent in the State of

12   Michigan.

13          Q.    And you're very involved in the State of

14   Michigan even as you live in the State of Washington?

15          A.    Correct.

16          Q.    You've given service to Michigan State

17   University as an alum doing fundraising, right?

18          A.    That's correct.

19          Q.    You currently give service to the Ross

20   School of Business at the University of Michigan?

21          A.    That's correct.

22          Q.    Does your mother reside in Michigan?

23          A.    That's correct.

24          Q.    Do you have siblings who reside in

25   Michigan?

Page 15

```
 1          A.    I do.
 2          Q.    And you attended high school, college and
 3  graduate school in Michigan?
 4          A.    Correct.
 5          Q.    You also worked for Ford, right?
 6          A.    Correct.
 7          Q.    When you worked for McKinsey, was that out
 8  of the Detroit office or somewhere else?
 9          A.    I opened up the McKinsey Detroit office,
10  but when I worked for McKinsey, to answer your
11  question, it was in Cleveland, Stockholm, Sweden and
12  then I opened up the office in Detroit.
13          Q.    And you worked for -- for Borders in Ann
14  Arbor?
15          A.    Correct.
16          Q.    When you left Borders, what year was that?
17          A.    2005 or '6.  I don't remember the exact
18  year.  Roughly around that time.
19          Q.    Well, did you go directly to Amazon?
20          A.    Yes.
21          Q.    Did you have a noncompete agreement with
22  Borders?
23              MR. WOLFF:  Objection.  Relevance.
24          You can answer.  You can answer.
25  BY MR. NACHT:
```

Page 16

1          Q.   We have a dynamic where it's his job to say

2    certain things for the record, but he'll expect you to

3    answer the question and to stay focused on remembering

4    what the question is.  If he doesn't want you to

5    answer, he will -- he will instruct you not to answer.

6          A.   Can you repeat the question?

7          Q.   Sure.  And I'm explaining that because he's

8    going to do that a fair amount and I want you to

9    remember the question.  You don't need to worry about

10   his objection just whether he tells you not to answer.

11         The question is:  Did you have a noncompete

12   agreement when you were at Borders?

13         A.   I don't remember.

14         Q.   Did you consult with counsel when you got

15   the offer from Amazon about your obligations to

16   Borders?

17         A.   I don't remember.

18         Q.   Take a minute or two.  Try to remember.

19   You're under oath.  Take a minute or two.  You've got a

20   real good memory.  You're a serious person.

21         Did you have a noncompete agreement when you

22   were at Borders?

23         A.   I don't remember if I had a noncompete

24   agreement.  I've answered that question already.

25         Q.   What was your job at Borders?

Page 17

1          A.    Responsible for the music and movies

2    business.

3          Q.    And when you went to Amazon, what was your

4    first job?

5          A.    Responsible for the music business.

6          Q.    You helped to put Borders out of business

7    with your work at Amazon, fair?

8               MR. WOLFF:  Objection.

9               THE WITNESS:  Incorrect.

10   BY MR. NACHT:

11         Q.    I'm sorry?

12         A.    That's incorrect.

13         Q.    Why is that incorrect?

14         A.    Because that's totally incorrect.

15         Q.    How so?

16         A.    I don't --

17         Q.    The press --

18         A.    I don't know how --

19         Q.    The press has -- the press accounts of a

20   failure of Borders are all about Amazon beating

21   Borders.  Is that not true?

22         A.    That's not true.  I've read a lot of

23   different articles, and I think your characterization

24   is incorrect.

25         Q.    Okay.  So Amazon was a minor factor in

Page 18

1    Borders going out of business?

2          A.   I don't know.

3          Q.   You have an opinion?

4          A.   I don't have an opinion here.  I'm focused

5    on the customers that I serve and I'm focused on the

6    company that I'm with.  I don't have an opinion on how

7    other competitors perform.

8          Q.   You spend time doing things outside of work

9    right now and in the last, say, 2013, 2014, 2015, let's

10   focus on those three years, okay?

11         A.   Yes.

12         Q.   Thank you.  You have a family?

13         A.   Correct.

14         Q.   You coach your kid's church basketball

15   team?

16         A.   Correct.

17         Q.   I want you to know I spent all of one hour

18   on the web last night and that's where I come up with

19   these questions.  The web is an amazing thing.

20         You must travel a lot for work, don't you?

21         A.   I do travel some.

22         Q.   I mean, I know you're a former McKinsey

23   guy, so when I say "travel a lot," it's nothing

24   compared to working at a place like McKinsey, fair?

25         A.   I think -- I think the McKinsey travel

Page 19

1    was -- was more travel than the travel I've had at

2    Amazon, yes, that's fair.

3           Q.   How many -- how many weeks a year in your

4    current job or the job you had in 2013 through 2015 are

5    you traveling?

6                MR. WOLFF:  Which -- which time period do you

7    want him to answer?

8                MR. NACHT:  2013 to 2015.

9                THE WITNESS:  How many weeks total over that

10   three-year period?

11   BY MR. NACHT:

12          Q.   Right.

13          A.   I don't know.

14          Q.   Ballpark.  Give us your best estimate.

15   You're the one doing it.  We can subpoena your

16   calendars, but I mean, just -- I just want your best

17   estimate.

18          A.   Nine weeks.

19          Q.   Okay.  And that's traveling for work?

20          A.   Correct.

21          Q.   You also travel to Michigan for your

22   obligations with the University of Michigan?

23          A.   Can you be more specific?

24          Q.   Sure.  You visited Michigan -- let's just

25   say you visited Michigan for a variety of purposes

Page 20

1    involving University of Michigan, Michigan State and

2    family obligations during that time period?

3         A.   Correct.

4         Q.   And how many additional weeks on top of the

5    nine weeks that you traveled would you say was Michigan

6    travel time for those three reasons during those years?

7         A.   I was counting the Michigan travel for

8    business as part of that nine weeks.

9         Q.   Okay.

10        A.   So when I travel to Michigan, it's usually

11   for recruiting at University of Michigan and Michigan

12   State, and I usually tie in those events to any board

13   obligations or work I'm doing for either school.

14        Q.   What about family obligations in Michigan

15   during 2014, 2015?  Those are probably more extensive I

16   imagine.

17        A.   We probably traveled to Michigan as a

18   family one week per year each of those years.

19        Q.   On top of the nine weeks?

20        A.   On top of the total nine weeks of travel,

21   yes.  Total nine weeks is over three years, and the

22   one week is per year.  So three weeks total over the

23   three years.

24        Q.   Now, I didn't understand.  I'm sorry.  You

25   travel -- you only -- you're only away from Seattle

Page 21

1    three weeks a year or three weeks a year in Michigan?

2           A.    No.  I said -- you asked me to estimate

3    the number of weeks I traveled for business over those

4    three years, and I gave you an estimate of nine weeks.

5           Q.    So you meant only three weeks per year?

6           A.    Correct.

7           Q.    I see.  And how many weeks vacation do you

8    take in that time period?

9           A.    I don't know.  A couple.

10          Q.    Okay.  So that's, like, five weeks, fair?

11          A.    Roughly, yes.

12          Q.    You run the Marketplace organization and

13   you did during 2013 through 2015?

14          A.    Correct.

15          Q.    You have some other obligations for Amazon

16   as well these days?

17          A.    I'm sorry.  Can you be more specific?

18          Q.    I actually can't because I don't do your

19   job.

20          A.    Okay.

21          Q.    So I don't know what your job is.

22          A.    No, I still lead the worldwide Marketplace

23   business for Amazon.

24          Q.    Okay.  And do you have other obligations

25   besides running that business as part of your job for

Page 22

1    Amazon sitting on some sort of committees or having

2    other obligations?  You wear other hats in the company?

3         A.   You know, during that time I would have

4    been part of the consumer leadership group, but other

5    than that, I can't think of any other obligations.

6         Q.   Okay.  Did you have extra time for travel

7    with your wife or children for fun, for family fun

8    travel, European trips or whatever, Asian trips during

9    that three-year period?

10        A.   You're asking did I travel with my family

11   during that three-year period, yes, I did travel with

12   my family during that three-year period.

13        Q.   And do you take any one- or two-week trips

14   abroad?

15        A.   We -- we probably did, yes.

16        Q.   Okay.  And maybe you were working on some

17   of those and maybe you weren't.  Were you or were they

18   just pure family time?

19        A.   I -- I am always auditing and monitoring

20   the health and well-being of our business even when

21   I'm on vacation with my family.

22        Q.   Okay.  And the business that you're in

23   charge of is quite large.  Can you give us -- what's

24   the revenue of Marketplace?

25        A.   We don't share any of the revenue data

Page 23

1    externally.  The best metric I could give you is that

2    we talk about the Marketplace business selling almost

3    50 percent of the units sold on Amazon.

4            Q.   Without -- I don't need to know precise

5    numbers for my purposes of this lawsuit or anything

6    which would get in the way of Amazon's competitive

7    issues.

8            It is a publicly traded company, correct?

9            A.   Correct.

10           Q.   And you run a major unit of a publicly

11   traded company.  Is it more than $100 billion worth of

12   revenue?

13           MR. WOLFF:  I'm -- I'm going to designate

14   this part of the --

15           MR. NACHT:  Record as protective.

16           MR. WOLFF:  As protected and confidential,

17   and I'm not sure a division's revenue is -- is public

18   record.  I don't know if this is trade secret stuff or

19   not.

20           THE WITNESS:  It is trade secret.

21           MR. NACHT:  Let's agree to designate it as

22   protected, and I'm not looking for a precise number.  I'm

23   just looking for -- for an order of magnitude, sir.

24           MR. WOLFF:  Can we talk about this without

25   plaintiff in the room?  Is that permissible, the revenue

Page 24

1    information?

2                MR. NACHT:  Yes.

3                      (Mr. Haydar exits.)

4    (The following testimony on Page 25 is Confidential -

5    Attorneys' Eyes Only and bound under separate cover.)

6    /////

7    /////

8    /////

9    /////

10   /////

11   /////

12   /////

13   /////

14   /////

15   /////

16   /////

17   /////

18   /////

19   /////

20   /////

21   /////

22   /////

23   /////

24   /////

25   /////

Page 26

1    (Non-Confidential testimony resumes.)

2    BY MR. NACHT:

3         Q.   And how many people do you supervise in

4    Marketplace?  And when I say "supervise," I don't mean

5    directly.  I mean the full kit, cat and caboodle?

6              MR. NACHT:  Are we still protected?

7              MR. WOLFF:  No, Abdullah can come back in.

8    And I guess we need time frame for number of employees.

9              MR. NACHT:  Sure.  Let's --

10             MR. WOLFF:  I was assuming you were asking at

11   present.

12             MR. NACHT:  All right.  Let's keep him out

13   for a little bit.

14             THE WITNESS:  Sorry.  Number of employees on

15   my current team?

16   BY MR. NACHT:

17        Q.   Right.  How about today?

18        A.   Approximately 18,000.

19        Q.   And in 2013, how many, sir?

20        A.   Gosh, I am not going to be able to give

21   you an accurate number there.  Approximately 7,000.

22        Q.   Okay.  Plus or minus a thousand?

23        A.   Yeah, those numbers, I don't feel

24   confident that those numbers are accurate, but those

25   are probably ballpark correct.

Page 27

1          Q.    And ballpark in the range that we're

2    discussing.  I mean, it's one thing to have a ballpark

3    of 100 billion, right?  If we're talking about a

4    ballpark of 13,000 or a ballpark of 7,000 --

5          A.    Yeah.

6          Q.    -- then I assume your estimate is we're

7    talking give or take a thousand or give or take 1,500?

8    Just an outer limit for a 95th percent two standard

9    deviations confidence level.

10         A.    I think plus or minus a couple thousand

11   for both of those numbers would be -- would be fair.

12         Q.    Okay.  And in 2013 approximately how many

13   people were L7 or higher?

14               MR. WOLFF:  In Marketplace?

15   BY MR. NACHT:

16         Q.    Yeah, underneath you, sir.

17         A.    Gosh, I have no idea.

18         Q.    Well, you must have a better idea than I

19   would, so...

20         A.    I don't actually have a very good idea on

21   that number.  I mean...

22         Q.    More than 100?

23         A.    No.

24         Q.    And in 2015 was it more than 100?

25         A.    I don't know.

1      Q.   Okay.  Diversity is not a leadership

2  principle, right?

3      A.   There is not a leadership principle that's

4  called diversity, that's correct.

5      Q.   Well, are there any leadership principles

6  that incorporate the concept of diversity?

7      A.   I believe so.  I think the leadership

8  principles focus on the contribution that you make as

9  a person which is not about what school you went to.

10  It's really about the contribution that you make, and

11  I think those -- those leadership principles are

12  really strongly in line with creating a company and an

13  atmosphere that supports and values diversity.

14      Q.   You don't post positions, job openings, for

15  L8, L10, correct?

16      A.   Incorrect.  We post job openings, my

17  understanding is unless the actual title of the job

18  opening would reveal a confidential new business that

19  we plan to launch.  So we do post job openings for L7,

20  L8 and possibly for -- possibly for L10.  I'm not sure

21  on L10.

22      Q.   And that would certainly be true for

23  Detroit?

24      A.   I don't -- we treat all -- we treat all of

25  our offices and whatever the policies are on job

Page 29

1    postings, we would treat all the offices the same.

2         Q.   You're not guessing about this, you know

3    this, right?

4         A.   I don't -- I don't -- I could not repeat

5    what the policy is, but I see that we post these jobs

6    for jobs that are available regularly on the

7    Amazon.com job site.

8         Q.   What is an OLR?

9         A.   It's a twice a year process to re- --

10        Q.   I'm sorry.

11             MR. NACHT:  Are we off -- we've been out of

12   the protected, right?

13             MR. WOLFF:  Yes.

14   BY MR. NACHT:

15        Q.   Thank you.

16        A.   It's a twice a year process to review the

17   talent across our teams.

18        Q.   Organizational leadership review?

19        A.   An organizational leadership review would

20   be an accurate description, yes.

21        Q.   Is that what OLR stands for?

22        A.   I don't remember.

23        Q.   Okay.

24             MR. WOLFF:  It sounds familiar.

25   BY MR. NACHT:

Page 30

1      Q.    And the OLRs provide an opportunity for

2    your direct reports to give you information about their

3    direct reports?

4      A.    Correct.

5      Q.    And you defer to your subordinates'

6    assessment of people for the most part, correct?

7      A.    Can you repeat the question?  I'm sorry.

8    To make sure I clarify.

9              MR. NACHT:  Can you repeat the question to

10   the witness, please?

11                  (Question on Page 29, Lines 5

12                    through 6, read by the

13                    reporter.)

14              THE WITNESS:  Can you be more specific about

15   "for the most part"?

16   BY MR. NACHT:

17     Q.    No.  I'd like an answer to the question.

18     A.    Yes.

19     Q.    Occasionally you opine about someone who's

20   below your direct report?

21     A.    That's incorrect.  I participate in people

22   reviews for the people who I've had sufficient

23   experience with to assess their performance.

24     Q.    Was Abdullah Haydar such a person?

25     A.    I did not have sufficient experience to

Page 31

1    judge Abdullah Haydar's performance.

2          Q.    At any time in 2013, 2014 or 2015?

3          A.    Correct.

4          Q.    And by judging his performance that would

5    be an evaluation of his achievement of goals and his

6    performance on the leadership principles?

7          A.    I would have relied upon his manager to

8    develop the rating that assessed his performance

9    against his goals, his performance against our

10   leadership principles, and identify his growth

11   potential within Amazon and then develop his overall

12   rating within Amazon.

13         Q.    He was not someone you focused on?

14         A.    Can you be more specific on that?

15         Q.    Well, I mean, was there ever a time when

16   you focused on Abdullah Haydar?

17         A.    Abdullah Haydar was never a person who I

18   evaluated.  He never was a direct report.  He was

19   always two to three layers down in the organization,

20   so those people who he worked for evaluated his

21   performance.

22         Q.    Your human resources counterpart during

23   that time frame was that Madonna Cole, Michael Beary,

24   who was it?

25         A.    We had a couple of HR partners and I

Page 32

1    couldn't pinpoint which time period for which.

2         Q.   So at some point was Madonna Cole your HR

3    counterpart or not?

4         A.   Madonna Cole was involved with HR for my

5    team along with many other teams during that time

6    period, and I couldn't -- I couldn't give you the

7    exact years that she was doing that, but she was

8    involved, yes.

9         Q.   And Shelly Cerio, is -- she was dealing

10   more with Mr. Gunningham, correct?

11        A.   No, that's incorrect.

12        Q.   Okay.  Tell me about your relationship with

13   Ms. Cerio on a weekly or monthly basis.

14             MR. WOLFF:  Same time frame?

15             MR. NACHT:  Yes.

16             THE WITNESS:  Shelly Cerio was Madonna Cole's

17   boss, so she had the same role but for a much larger

18   organization.

19   BY MR. NACHT:

20        Q.   Shelly Cerio was the HR person for the

21   whole consumer group?

22        A.   Correct.

23        Q.   And Madonna Cole was underneath Shelly as

24   the HR counterpart for Marketplace and a few other

25   groups within consumers?

Page 33

1          A.    Correct.

2          Q.    And she was your counterpart with regard to

3    Marketplace, correct?

4          A.    Incorrect.

5          Q.    Okay.

6          A.    She had -- she would have had people who

7    worked for her whose responsibility was Marketplace.

8          Q.    Was Simmi your counterpart?

9          A.    For some period of time, yes.

10         Q.    Okay.  What is her last name?  It's

11   hyphenated.

12         A.    I don't know.  I'm going to have to look

13   it up.

14         Q.    Okay.  And how often would you meet with

15   Simmi when she was your HR counterpart in person?

16         A.    Every two to three weeks.

17         Q.    And how often would you have e-mail

18   interaction with her?

19         A.    If I were to guess, weekly.

20         Q.    I don't want to guess.  Would you say

21   that's a fair estimate?

22         A.    I would say that's a fair estimate.

23         Q.    Okay.  I really don't want you to guess?

24         A.    Yeah.

25         Q.    But I do want your fair estimates and I

Page 34

1    want you to -- as I said at the beginning of the

2    deposition --

3         A.   Got it.

4         Q.   -- I'm not trying to trick you into saying

5    you're absolutely sure about something if it's just a

6    best estimate.

7         Who else besides Simmi played the role of HR

8    counterpart to you in 2013, 2014 and 2015?

9         A.   Mike Beary.

10        Q.   Is there anyone else or just those two?

11        A.   I believe just those two.

12        Q.   During the OLR, would the HR person be in

13   the room?

14        A.   Yes.

15        Q.   So who's in the room?

16        A.   For -- there's multiple OLRs across my

17   team.  From my OLR, it would have been myself, my

18   direct reports and two or three or four

19   representatives from the HR team.

20        Q.   Is OLR an Amazon invention or is that

21   something that you've seen in other organizations?

22        A.   Having a people review process is very

23   common.

24        Q.   Tell me about the advantages of the OLR

25   process?  Let me put it this way:  I'm going to ask you

Page 35

1    a series of questions.  Amazon is an incredibly

2    successful, rapidly growing company; fair statement?

3         A.   I believe that others view us as a

4    successful and rapidly growing company, yes.

5         Q.   Well, don't you view it that way?  I mean,

6    I realize that you don't want to brag, but I mean, it

7    seems every week there's news about Amazon's

8    achievements in the capitalist Marketplace.

9         A.   I'm grateful to be part of Amazon.  I love

10   Amazon.

11        Q.   Okay.  Is it fair to say that part of what

12   makes Amazon successful is big thoughts, big ideas?

13        A.   Yes.

14        Q.   Is it fair to say that part of what makes

15   Amazon successful is a particular kind of corporate

16   culture that involves certain processes?  I'm going to

17   be very vague like that because we're going to get into

18   them.

19             MR. WOLFF:  Objection.

20        If -- if you can answer that question, go ahead.

21             THE WITNESS:  It seems -- it does seem rather

22   broad, I agree with you.  Is there a way to make it more

23   specific so I can give you an answer?

24   BY MR. NACHT:

25        Q.   Well, we're going to get into it.  But I

Page 36

1    mean, do you feel like the corporate culture of Amazon

2    contributes to its success?

3         A.   I do -- I do believe our leadership

4    principles which have formed our corporate culture

5    absolutely have had an impact on our success, yes.

6         Q.   And do you believe that your processes of

7    how you manage people including processes such as OLRs

8    and other processes contribute to that culture?

9              MR. WOLFF:   Objection to "other processes."

10        But you can answer whether the OLR process

11   contributes.

12             THE WITNESS:   I believe the OLR process does

13   contribute to helping us develop a strong team.

14   BY MR. NACHT:

15        Q.   Okay.  Let's talk about the OLR process and

16   how it -- what advantages it has.  I mean, you have a

17   pretty wide breadth of business experience.  You

18   haven't worked for that many companies, but you've

19   worked for real leader companies and you have a

20   position where you get a lot of exposure through to

21   companies in your job at Amazon and in your work for

22   the University of Michigan.  You have a sense of the

23   pulse of a lot of what's going on out there in the

24   marketplace.  And you don't need to comment.  That's a

25   very broad statement, but I believe it to be true that

Page 37

1    you're a very knowledgeable guy.  I want your

2    perspective on advantages that the OLR process brings.

3            A.   Leading people requires that you care

4    about those people and their careers and their

5    well-being, and a process like OLR allows leaders to

6    focus on how are the people on our team performing and

7    what is it that we can do to help them be successful

8    at Amazon, and I think that's an important process.

9            It's important from the leadership point of

10   view and I think it's very important for the people on

11   our teams to know that we spend dedicated time

12   thinking about their health, well-being and their

13   career.

14           Q.   Does the OLR process provide a feedback

15   mechanism for participants?

16           A.   I'm sorry.  Could you clarify that?

17           Q.   Well, there are people in the room and then

18   there are people who are not in the room, right?

19           A.   There are people in the room for the OLR,

20   correct.

21           Q.   Okay.

22           A.   And there's lots of people not in the room

23   in the OLR, that is correct.

24           Q.   Right.  And several billion of them in

25   fact?

Page 38

1        A.    Yeah.

2              MR. WOLFF:  They're everywhere.

3              MR. NACHT:  They're everywhere.

4                 (Laughter.)

5   BY MR. NACHT:

6        Q.    The people who are in the room are getting

7   direct feedback from each other or from you.  Is it an

8   interactive process or is it a top-down process?

9        A.    It's an interactive process.

10       Q.    Part of the whole leadership principle of

11  being vocally self-critical is to encourage people to

12  share their misses as well as their hits in order for

13  the group collectively to learn and for them

14  individually to learn so that continuous improvement

15  can occur, fair?

16       A.    Fair.

17       Q.    And so the OLR is a process by which people

18  are in the room and knowledge is being created in order

19  to improve the organization going forward, right?

20       A.    When you say "knowledge is being created

21  to improve the organization," I think we are

22  identifying actions that we believe will be helpful to

23  improve our performance and improve our team, yes.

24       Q.    And you're not just identifying actions,

25  you're making assessments about people and are you also

1   making assessments about projects in the OLR or not?

2         A.   No, we don't -- we don't assess projects

3   and programs in the OLR, and the assessment of people

4   is done prior to the OLR.  The OLR is a discussion of

5   the output of the performance evaluations that come

6   into that day.

7         Q.   So we have performance evaluations that are

8   drafted prior to the OLR?

9         A.   Correct.

10        Q.   The OLR is a conversation in which that

11  data is analyzed?

12        A.   Correct.

13        Q.   And --

14        A.   But maybe more accurately, we focus on the

15  people who are top performers to make sure we

16  understand how we can be helpful to them and give them

17  challenging work.  We focus on people who are

18  struggling and we focus on what is it that we can do

19  to help them become successful, and then we focus on

20  promotions.  Those are the three primary areas.

21        Q.   Now, there is a formal annual performance

22  evaluation that occurs in the spring, early spring,

23  late winter of the preceding calendar year; is that

24  fair?

25        A.   No.  The formal evaluation -- that's

Page 40

1    incorrect.  The formal evaluation process begins late

2    fourth quarter and continues into the beginning of the

3    first quarter and the perform -- the performance

4    reviews would be drafted and brought in with complete

5    ratings and reviews during the OLRs during February.

6            Q.    There are charts that are posted, at least

7    in the time frame of 2013 to 2015, which link ratings

8    on achieving goals and satisfying leadership principles

9    resulting in a cumulative evaluation of a person into a

10   category, correct?

11           A.    That is correct, and the only thing that's

12   missing is that the manager also assesses the

13   employee's growth potential as well.  So it's actually

14   three metrics during that time period that we would

15   have taken a look at.

16           Q.    Could you give me a rough drawing of that

17   chart that was routinely posted during that time

18   period?

19           A.    Can you be a little bit more specific

20   about the chart?

21           Q.    Sure, just that lists level of goal with

22   the outcome for the person.

23           A.    That's not enough information for me to

24   draw the chart you may have in mind.

25           Q.    Okay.

1          MR. WOLFF:  And it's not -- I'm not sure he's

2   acknowledged that there was a chart that was routinely

3   posted.  Maybe there was.

4          THE WITNESS:  No, I don't -- I don't know

5   what you're referring to.

6   BY MR. NACHT:

7          Q.   Okay.  Is there a chart -- forget about the

8   chart for a second.  Just is there a rubric, a metric?

9   I mean, clearly you were just talking about something.

10         A.   Yes.  So there was --

11         Q.   So what were you talking about?

12         A.   There was a performance rating for each

13   employee that was brought into that meeting.

14         Q.   Okay.  And --

15         A.   The performance rating includes the

16   performance against their goals.

17         Q.   Yes, could you please just -- just write

18   out the different levels for performance against goals?

19         A.   What the titles of the levels were?

20         Q.   Yeah.  There aren't that many, right?

21         A.   (Witness complies.)

22         Q.   And on the same page on the right side,

23   could you put the very big categories that are

24   cumulative reviews for people, right?  What is it, top

25   tier and then...?

1          A.    Well, that's -- you're -- you're -- that's

2     an incomplete characterization --

3          Q.    Okay.

4          A.    -- of the process.

5          Q.    Okay.  So I don't -- but you've got those

6     categories in your head, right?  You can put those.  I

7     didn't know if you had the other stuff that you were

8     able to put down.

9          A.    The leadership writings?

10         Q.    Yeah.

11         A.    Yes.

12         Q.    You can?

13         A.    I can.

14         Q.    Oh, great.  Thanks.

15         A.    (Witness complies.)

16         Q.    And at the -- what is the word you used?

17    Did you say "metric"?  I don't want to put words in

18    your mouth.  What is -- I said chart, you said no, not

19    a chart.  What are you thinking?  What's the word?

20         A.    You have to be more specific.

21              MR. WOLFF:  You're asking him what you would

22    call the information that he's documenting on --

23              MR. NACHT:  Right.

24              MR. WOLFF:  -- on the sheet?

25    BY MR. NACHT:

Page 43

1        Q.   There -- people come in and there's a
2   rubric, an algorithm seems too strong?
3        A.   Algorithm is incorrect.  I don't know what
4   rubric means.
5             People come in with leadership, with
6   performance ratings, leadership ratings, an overall
7   rating and a growth potential rating for each of the
8   people on their team.
9        Q.   Okay.  And what are the over -- can you put
10  the overall ratings on the piece of paper, please?
11       A.   (Witness complies.)  I may have the words
12  wrong, but the -- this is my best recollection of the
13  words tied to these buckets.
14       Q.   Okay.  And you have the concepts right,
15  correct?
16       A.   Correct.
17       Q.   And so on the upper left-hand corner from
18  your perspective, those are goals?
19       A.   This is your performance against your --
20  your goals, correct.
21       Q.   Okay.  Could you just write "performance
22  against goals" above that?
23       A.   (Witness complies.)
24       Q.   And in the upper right-hand corner, what's
25  that?

Page 44

1          A.    This is your performance against our

2     leadership principles.

3          Q.    Okay.  Did you write "leadership

4     principles" there?

5          A.    I wrote "leadership ratings."

6          Q.    Okay.  And in the bottom left-hand corner

7     or sort of the middle left-hand corner, what's that?

8          A.    I wrote down "overall ratings."

9          Q.    Okay.  And the other thing is growth

10    potential?

11         A.    Correct.

12         Q.    Okay.  And are those different categories?

13         A.    They are.

14         Q.    Do you remember those?

15         A.    I do.

16         Q.    Oh, could you add those, please.

17         A.    (Witness complies.)

18         Q.    When the OLR is going on, is there a

19    document which contains this information, words or

20    similar words about each person being discussed?

21         A.    Yes.

22         Q.    Okay.  Are there --

23               MR. WOLFF:  Can I point out for the record

24    that the written documents are probably the best evidence

25    of this, but with that said, go ahead.

Page 45

1    BY MR. NACHT:

2          Q.    And are there additional concepts captured

3    besides those?

4          A.    Can you be more specific?

5          Q.    Well, is there anything else on the piece

6    of paper besides giving a number or a comment about

7    each of those criteria with a particular person?

8          A.    No.

9          Q.    Okay.  Let's make this Exhibit 1.

10                    (Exhibit No. 1 marked

11                      for identification.)

12   BY MR. NACHT:

13         Q.    Now, under performance ratings you wrote

14   outstanding, exceeds, achieves and does not meet,

15   correct?

16         A.    Correct.

17               MR. WOLFF:  Can we take a quick break and

18   make a copy of that if you're going to be discussing it?

19               THE VIDEOGRAPHER:  We're now going off

20   record.  The time is 8:23 a.m.

21                    (Recess 8:23-8:32.)

22               THE VIDEOGRAPHER:  We're now back on the

23   record.  The time is 8:32 a.m.

24   /////

25   /////

Page 46

1                    EXAMINATION (Continuing)

2     BY MR. NACHT:

3          Q.   Going back to integrity not being an

4     explicit leadership principle, is integrity

5     sufficiently important that a lack of integrity would

6     mean that someone is not outstanding?

7                    MR. WOLFF:   Objection.   Calls for

8     speculation.

9                    THE WITNESS:   Can you make your question more

10    specific?

11    BY MR. NACHT:

12         Q.   Yes.   If you thought that a manager who was

13    an L7 or an L8 showed a lack of integrity, would that

14    prevent them from being rated as outstanding?

15         A.   I would need more information.

16         Q.   What kind of information would you need?

17         A.   I would need information about the facts

18    of the question about integrity.

19         Q.   So does it matter how important the issue

20    is that they're showing a lack of integrity?

21         A.   I don't know.   I would need more

22    specifics.

23         Q.   Well, you're running an organization.

24    Leadership principles govern the organization?

25         A.   Leadership principles govern how we run

Page 47

1  Amazon, correct.

2      Q.   Integrity is not listed, but you've said

3  you think it's important anyway, right?

4      A.   I said I do believe integrity is important

5  and I do believe integrity is woven throughout the

6  leadership principles.

7      Q.   And I'm trying to connect a lack of

8  integrity with evaluation.  So would -- would the

9  performance ratings -- are performance ratings

10 irrelevant to integrity unless the integrity has to do

11 with lying about whether you've achieved your goals?

12 In other words, would we look at it rather under the

13 leadership ratings rather than the performance ratings,

14 the integrity issue?

15     A.   I don't think your question is specific

16 enough that it could be answered.  I think we would --

17 we would not tolerate people lying about their

18 performance if that was your specific question.

19     Q.   Okay.  What about lying about things that

20 they're doing that are in response to common

21 understandings or directives?

22     A.   It's too ambiguous.  You need to give me a

23 more specific question.

24     Q.   Okay.  So as you sit here, can you think of

25 anyone who achieved an achieve on performance ratings

Page 48

1    or higher?

2              MR. WOLFF:  Can he think of any Amazon

3    employee who ever?

4    BY MR. NACHT:

5         Q.   Of L7 or higher who hit at least an

6    achieves on performance ratings --

7         A.   Is that your question?  Sorry.  You're

8    building.

9         Q.   I'm continuing.

10        A.   Okay.

11        Q.   -- and resulted in -- what did you write

12   here?

13        A.   Needs improvement, but I may have the name

14   wrong but it's the bucket of --

15        Q.   Is that least effective?

16        A.   Least effective, sorry.  I believe it's

17   called least effective, yeah.

18        Q.   Okay.  So where you wrote needs improvement

19   under overall ratings it's -- in the official parlance,

20   it's least effective?

21        A.   I believe that's correct.

22        Q.   Excuse me.

23             THE WITNESS:  Can I borrow your pen for a

24   second?

25             MR. WOLFF:  Yeah, absolutely.

Page 49

1    BY MR. NACHT:

2         Q.   So you are now crossing out on Exhibit 1

3    "needs improvement" and writing in "least effective"?

4         A.   Correct.

5         Q.   So my question is:  Can you think of anyone

6    who's an L7 or higher ever who's hit achieves in

7    performance ratings but been given a review of least

8    effective?

9         A.   You're asking just about their performance

10   rating not about their leadership rating not about

11   their growth potential and then you're asking if they

12   had achieves or higher and also had a least effective

13   overall rating?

14        Q.   Yes.

15        A.   Yes.

16        Q.   Okay.  And who?

17        A.   Abdullah.

18        Q.   Anyone else?

19        A.   Yes.

20        Q.   Who?

21        A.   There's other people on our team.  There's

22   other people on our team who've had those same

23   ratings.

24        Q.   As you sit here today, can you think of

25   them?

Page 50

1        A.    I can think of someone, yes.

2        Q.    Who?

3        A.    Nick Tawar.

4        Q.    Spell his last name.

5        A.    T-A-W-A-R.

6        Q.    Where is he?

7        A.    He's no longer with Amazon.  I don't know

8    where he's at.

9        Q.    Quit or fired?

10        A.    I don't remember the circumstances of his

11    departure.

12        Q.    What year?

13        A.    2014 to '16 is what I remember, but I may

14    be off a year in either direction.

15        Q.    Was he in Seattle?

16        A.    Yes.

17        Q.    Who was his manager?

18        A.    Peeyush Nahar.

19        Q.    What was the concern with Tawar, if you

20    remember?

21        A.    Poor listening, disrespectful, inability

22    to work with others, unproductive is what I recall

23    from memory, but I...

24        Q.    And Mr. Tawar was at what level?

25        A.    Level 8.

1          Q.   Is there anyone else that you can identify

2   who had an achieves or higher on performance ratings

3   but was given a least effective overall rating?

4          A.   Not that I remember off the top of my

5   head.

6          Q.   It's relatively unusual, right?

7          A.   Can you be more specific on "relatively

8   unusual"?

9          Q.   Sure.  Most people who do not meet their

10  performance ratings presumably are least effective,

11  right?

12         A.   I'm sorry.  Can you restate that again?

13  Most people who do not meet their performance ratings

14  are least effective?

15         Q.   I would presume, right?

16         A.   I don't know the facts on it, but yes, I

17  would say if you don't meet your performance ratings

18  it seems likely you would be least effective, but you

19  could also achieve your performance ratings and be

20  least effective.

21         Q.   Right.

22         A.   Both will possible.  Because it depends on

23  the leadership rating and the growth potential as we

24  talked about.

25         Q.   Sure.  Now, there are a whole bunch of

Page 52

1    different leadership ratings, right?

2           A.   I'm not sure what you mean by a "whole

3    bunch of different."

4                MR. WOLFF:   You mean principles?

5    BY MR. NACHT:

6           Q.   Principles, the principles.   Leadership

7    principles, how many of them are there?

8           A.   I don't remember offhand.

9           Q.   There is customer obsession?

10          A.   Correct.

11          Q.   Ownership?

12          A.   Correct.

13          Q.   Invent and simplify?

14          A.   Correct.

15          Q.   Are right a lot?

16          A.   Correct.

17          Q.   Hire and develop the best?

18          A.   Correct.

19          Q.   Insist on the highest standards?

20          A.   Correct.

21          Q.   Think big?

22          A.   Correct.

23          Q.   Bias for action?

24          A.   Correct.

25          Q.   Frugality?

Page 53

```
 1          A.    Correct.

 2          Q.    Vocally self-critical?

 3          A.    Correct.

 4          Q.    Earn trust of others?

 5          A.    Correct.

 6          Q.    Dive deep?

 7          A.    Correct.

 8          Q.    Have backbone; disagree and commit?

 9          A.    I don't -- yes, I believe that is a

10    leadership principle as well.

11          Q.    This is November 2013?

12          A.    Got it.  Yes.

13          Q.    Deliver results?

14          A.    Yes.

15          Q.    And they were the same in 2014, right?

16          A.    I don't know.

17          Q.    But in 2015 there was a change or 2016?

18          A.    I'm not certain on the timing.  There has

19    been changes over the last four or five years, yes.

20          Q.    What are the changes?

21                MR. WOLFF:  Objection for the record.

22          You can answer.  You can tell him.

23                THE WITNESS:  I don't recall.

24    BY MR. NACHT:

25          Q.    Do you have any idea what the changes are?
```

Page 54

1        A.    Well, I remember some of the changes, yes.

2        Q.    What -- what -- what do you remember?

3        A.    We added a leadership principle for

4    curiosity.

5        Q.    Okay.  Anything else?

6        A.    We made some other changes to the

7    leadership principles.  I'd have to take a look at

8    them to compare the two side by side.

9        Q.    You don't remember at this point?

10       A.    I don't.

11       Q.    Were any deleted?

12       A.    I don't recall.

13       Q.    Were any altered?

14       A.    I don't recall the specifics around it.

15       Q.    So there's no leadership principle about

16   diversity and there's no leadership principle about

17   integrity.  Is there a leadership principle about

18   treating people with respect?

19       A.    Treating people with respect is also

20   embedded in the leadership principles.

21       Q.    Please explain why you think that to be so.

22       A.    Earning trust of others means treating

23   them with respect, listening to others, having a bias

24   for action, having ownership, those are all ways that

25   you can build a trustful and respective relationship

Page 55

1   with people.

2          Q.    Some organizations are more hierarchical

3   and some are more collaborative.  Is that a fair

4   statement?

5          A.    Broadly across organizations, yes.

6          Q.    So the United States military might be an

7   example of a very hierarchical organizations?

8          A.    I don't know.  It might be.  I don't know

9   the military well enough to -- to be able to comment

10  on that.

11         Q.    Okay.  Even from just common understanding

12  as an American, you don't have an opinion?

13         A.    I don't have an opinion, no.

14         Q.    Ford Motor Company, is Ford more or less

15  hierarchical than Amazon, in your experience?

16         A.    I think it would depend on the specific

17  situation.  Can you give me some specifics?

18         Q.    Manager has concerns about the direction

19  projects are going?

20         A.    It's too broad and ambiguous.  I wouldn't

21  be able to evaluate hierarchal or not.

22         Q.    Okay.  Doesn't follow chain of command?

23         A.    I can't -- I can't give you -- I can't

24  give you an answer.  We would need to have a specific

25  example.

1      Q.    There's no rule against not following chain

2   of command at Amazon, correct?

3      A.    There is no rule.

4      Q.    You have stated that you believe that the

5   most important determinant in determining the success

6   of whether people will stay with an organization is the

7   on-board process, correct?

8      A.    I don't recall.  I do believe the on-board

9   process is very important.

10     Q.    Is it something you believe whether you've

11  said it or not?

12     A.    I do believe the on-boarding process is

13  important.

14     Q.    And what does "on-boarding process" mean to

15  you?

16     A.    I believe it means the orientation and the

17  integration of new people into Amazon.

18     Q.    Is there anything in the on-boarding

19  process that informs people that they have to follow

20  chain of command?

21     A.    I don't know.

22     Q.    In the on-boarding process, the leadership

23  principles which I you just articulated are taught,

24  correct?

25     A.    I believe they're reviewed, yes.

Page 57

1          Q.    So they're not taught but they're reviewed?

2          A.    I don't know.

3          Q.    Okay.  The leadership principle of have

4     backbone; disagree and commit, inherent in that one

5     leadership principle is contrary directions implying

6     that you engage in the contrary directions at different

7     times, fair?

8          A.    Can you be more specific about "contrary

9     directions"?

10         Q.    Why don't you explain the leadership

11    principle of show backbone; disagree and commit in your

12    own words instead of me just asking specific questions

13    that you're not sure what I mean?

14         A.    Disagree and commit is focused on we

15    want -- during the time that direction for a program

16    to serve customers is being discussed and debated, we

17    want participation from all people who would be close

18    to the customer and expert in that area to

19    participate, and then at some point a direction is

20    determined and we would like everybody who's part of

21    that program and team to align together to serve

22    customers great.

23         Q.    Have you spoken to Garret Gaw since his

24    deposition?

25         A.    Not -- not one on one, no.  He was on a

Page 58

1    video conference for a meeting that I had either this

2    week or last week as part of a larger group.

3         Q.    Broadly, what was the subject?

4         A.    We're doing a innovation program this

5    coming fall that's like a technology hack-a-thon so we

6    were having a meeting about our plans for that.

7         Q.    Okay.  Have you spoken to Derek Oehler

8    since his deposition?

9         A.    No.

10        Q.    Have you spoken to Joel Mosby since his

11   deposition?

12        A.    No.

13        Q.    When is the last time you had some sort of

14   social interaction, and that includes formal work

15   social interactions, with Stefan Haney?

16        A.    I've never had outside-of-work social

17   interactions and the last work social interaction

18   would have been a -- let's see, happy hour to

19   celebrate a number of achievements including

20   celebrating his new role at Amazon, and I would have

21   been there with him along with, you know, a couple

22   hundred people or whatever the number was.

23        Q.    And how many work social interactions

24   before that change in role did you have with Stefan

25   Haney on average per year?

Page 59

1          A.    During -- it's hard to estimate because it

2    would have varied widely.  Is there a particular year

3    that would be helpful for me to comment on?

4          Q.    Well, let's go through it:  2015?

5          A.    If I were to guess and this is a guess, I

6    would say 20.

7          Q.    2014?

8          A.    5.

9          Q.    Why do you believe that the number

10    increased significantly in 2015?

11          A.    Stefan reported to a vice president who I

12    hired and was on my team, Mark Mitchke.  During I

13    believe 2013 and 2014, Mark moved to a new role within

14    Amazon partway through 2015, and his direct reports

15    reported into me for some period of time before I

16    hired Mark's replacement.

17          Q.    Garret Gaw, how many work social

18    interactions did you have with Garret in 2014?

19          A.    Work social interactions?

20          Q.    Yes.

21          A.    Maybe a couple.  I wouldn't be able to

22    recall what they are but it's possible that we had,

23    you know, happy hours or something that he would have

24    been at.

25          Q.    And no pure social interactions?

Page 60

1      A.   No.

2      Q.   Joel Mosby, 2015, same question?

3      A.   Same one to two.  They would have been

4  part of whatever team social events we were doing.

5  Like, we have a picnic every year, so I'm counting,

6  you know, they would have been at the picnic and I

7  would have been at the picnic, but that's it.

8      Q.   Any going out for cocktails or going to a

9  ball game with 15 or 20 people or less with Haney in

10 2015?

11          MR. WOLFF:  Including work events?

12          MR. NACHT:  Yeah.

13          THE WITNESS:  Well, no personal events, and I

14 don't recall if we had a baseball game social event

15 across our team that year.  I know we have had -- I can

16 picture in my mind we've had Detroit Tiger/Seattle

17 Mariner team events, and there would have been -- there

18 would have been a lot more than 15 people there.  There

19 would have been a lot of people there, but it's possible

20 that I attended one of those and he was there.

21          So I see the Tigers and the Mariners every year,

22 so I have a hard time separating was there ever one of

23 those I was with the team as opposed to with my friends

24 and family.

25 BY MR. NACHT:

Page 61

1        Q.   So this is a very important question for

2   your deposition and this case which is, of course,

3   because you're raising children here and I understand

4   this concept because I grew up in Boston.  Who do you

5   root for because you're raising kids here, who do you

6   root for when it's Mariners/Tigers?

7        A.   I root for the Detroit Tigers.

8             MR. WOLFF:  Seahawks?  Lions?

9             THE WITNESS:  I root for the Detroit Lions.

10  When the Pistons came to play the Sonics, I rooted for

11  the Detroit Pistons.

12            MR. NACHT:  I root for the Tigers too.  It

13  took a little while.

14            MR. WOLFF:  If you grew up with the

15  Washington Senators like I did in the '60s, it was easy

16  to switch allegiances.

17                 (Laughter.)

18  BY MR. NACHT:

19        Q.   Now, with Mr. Simpson I assume there are

20  more work social and other social interactions?

21        A.   Ian Simpson?

22        Q.   Yes.

23        A.   I have probably -- can you give me a year,

24  I guess, time frame?

25        Q.   Sure, 2015.

Page 62

1      A.    2015, maybe three or four.  No personal

2  interactions but the work social interactions we would

3  have been part of happy hours, and I usually hosted

4  for my direct reports one -- one dinner per year and

5  he would have been part of that.

6      Q.    What about Mr. Gunningham?

7      A.    I'm sorry.  Could you ask me a question?

8      Q.    Same question.

9      A.    How many social interactions?

10     Q.    Yes.

11     A.    And the year is 2014?

12     Q.    Well, let's just say on average per year

13  because you've worked for Mr. Gunningham for a number

14  of years, right?

15     A.    That's correct.  Zero personal social

16  interactions and gosh, work -- work social

17  interactions, maybe -- maybe three per year, and I'm

18  guessing at those, but we must have had happy hours or

19  events we would have been at at the same time.

20     Q.    Okay.  And same with Mr. Bezos?

21     A.    No personal social interactions and no

22  work social interactions.

23     Q.    Do you remember the New York Times article

24  that came out that was critical of Amazon's workplace

25  culture?

1          A.   Can you show me a copy to make sure that

2     we're talking about the same article?

3          Q.   I'm only aware of one initial article which

4     then was followed by a second -- by a response by

5     Mr. Bezos and a response by someone from Amazon and

6     then there was a subsequent New York Times article.

7     That's all I'm aware of.

8               MR. WOLFF:  August 2015.

9               MR. NACHT:  Thank you, Counsel.

10              THE WITNESS:  Okay.

11    BY MR. NACHT:

12         Q.   Is that what --

13         A.   Yes, I'm aware of that article.

14         Q.   Okay.  Were you part of any groups,

15    conversations about how to respond to the New York

16    Times article?

17         A.   No.

18         Q.   Were you given any directives as a result

19    of any changes that you were told occurred as a result

20    of prompting by that article?

21         A.   No, not that I recall.

22         Q.   Do you remember that Mr. Bezos wrote an op

23    ed in the New York Times in which he invited Amazon

24    employees to send him e-mails?

25         A.   I don't recall that he wrote an op ed, but

Page 64

1   I do recall that he did encourage people to send an

2   e-mail to the head of HR or to himself.

3       Q.  Are you aware of any interactions by him

4   directly in response to any of those e-mails?

5       A.  No.

6       Q.  Are you -- you have an admin?

7       A.  Administrative assistant?

8       Q.  Yes.

9       A.  Yes.

10      Q.  And did you in 2015?

11      A.  Yes.

12      Q.  Who was your admin in 2015, sir?

13      A.  Jennifer Matthews.

14      Q.  Is she still your admin?

15      A.  Yes.

16      Q.  Do e-mails that might come to you from

17  Mr. Bezos or his office, would they first always come

18  through Mr. Gunningham or might they be directly from

19  Mr. Bezos or his office to you or your office?

20          MR. WOLFF:  And you're including his EAs when

21  you say "his office"?

22          MR. NACHT:  Yes.  EA's being executive

23  assistants or administrative assistants.

24          THE WITNESS:  Can you clarify the question?

25  BY MR. NACHT:

Page 65

1          Q.   Do you want to repeat it or you want to

2     clarify it?

3          A.   Well, just clarify because I didn't quite

4     understand the -- the nuance there between the two

5     scenarios.

6          Q.   Well, I'm just trying to understand the

7     process.  If -- and putting aside the prior

8     conversations about the New York Times.  Mr. Bezos has

9     an interest in something and it has to do with

10    Marketplace, has Mr. Bezos ever picked up the phone and

11    called you?

12         A.   No.

13         Q.   Has he sent you texts?

14         A.   No.

15         Q.   Has he sent you e-mails?

16         A.   Yes, I believe so.

17         Q.   It's unusual?

18         A.   Directly Mr. Bezos sending me an e-mail

19    alone, yes, that would be unusual.

20         Q.   Not you alone, you with three or four other

21    people?

22         A.   I don't know how to judge the frequency.

23    That has happened.  He has sent me e-mails with others

24    included as part of the e-mail.

25         Q.   Do you remember receiving any e-mails from

Page 66

1    Mr. Bezos concerning unhappy employees or workplace

2    culture issues?

3           A.    No.

4           Q.    Do you remember receiving any e-mails

5    from -- well, let's -- let's go backwards.

6           Does Mr. Bezos's executive assistants, do they

7    ever send you e-mails?

8           A.    Possibly, yes.

9           Q.    And they might also send Ms. Matthews

10   e-mails?

11          A.    Possibly, yes.

12          Q.    If it concerns a human resources type

13   question, the e-mails might go through the human

14   resources chain from Bezos's office to human resources

15   and then come over to you from a human resources

16   person?

17              MR. WOLFF:  Objection.  Foundation.

18          If you know the answer, go ahead.

19              THE WITNESS:  I don't know the answer, and

20   no, I have not received any e-mails as you described.

21   BY MR. NACHT:

22          Q.    Okay.  You receive e-mails from Shelly

23   Cerio or you did when she worked for Amazon?

24          A.    I did receive e-mails from Shelly Cerio,

25   yes.

Page 67

1          Q.    You received e-mails from Madonna Cole?

2          A.    Yes.

3          Q.    You received e-mails from Shelly Cerio's

4     admin?

5          A.    I believe that's possible, yes.

6          Q.    You received e-mails from Mr. Beary?

7          A.    Yes.

8          Q.    You received e-mails from Sima?

9          A.    Simmi, yes.

10         Q.    Simmi.

11         A.    Yes.

12         Q.    How does a manager know how to show

13    sufficient backbone but then disagree and commit at the

14    appropriate time?

15         A.    I think it's primarily through their work

16    experience and coaching and mentoring.

17         Q.    Is certain people -- certain people are

18    more important than other people in terms of one's work

19    relationship; is that fair?

20         A.    No.  I think that's completely false.

21         Q.    Okay.  Explain.

22         A.    I don't have anything to explain.  It's

23    just completely false.  We don't view people --

24    people's importance based on their -- whatever you

25    described, work relationship or whatever the words

Page 68

1    were you used.

2         Q.   And so a cumulative assessment by many

3    people is more important than one or two people's or

4    three people's assessments?

5         A.   I don't know if I can answer your

6    question.  It's too -- it's too ambiguous.  Can you

7    give me a specific example?

8         Q.   Yes.  If the majority of people believe

9    that a person is successful in achieving a leadership

10   principle but a minority of people have concerns, you

11   value equally the majority position, each person is

12   valued equally in their assessment?

13             MR. WOLFF:  Each piece of feedback is --

14             MR. NACHT:  Each piece of feedback.

15             MR. WOLFF:  -- is valued the same way?

16             THE WITNESS:  I don't -- I think that those

17   sounded like two different questions.

18        We value for the purpose of establishing a

19   performance rating the feedback from people on the

20   person's team, from their colleagues and from other

21   people who would know their work well, and then we expect

22   the managers to synthesize and develop a performance

23   rating based on that information.

24   BY MR. NACHT:

25        Q.   People who are rated least effective

Page 69

1  automatically go on a performance improvement plan or

2  generally go on a performance improvement plan?  Which

3  is it?

4          A.   If a person is rated least effective one

5  time, they would generally go on a performance

6  improvement plan.  If a person is rated least

7  effective two times in two years in a row, we would

8  automatically put them on a performance improvement

9  plan.

10         Q.   Did Joel Mosby tell you that he put

11 Abdullah Haydar on a performance improvement plan in

12 2014?

13         A.   I don't know.

14         Q.   As you sit here today, do you know if

15 Abdullah Haydar was on a performance improvement plan

16 in 2014?

17         A.   Well, I don't know if he was in 2014.  I

18 know he was on a performance improvement plan after he

19 was rated least effective for two years in a row.

20         Q.   Are you aware of a sex harassment complaint

21 that was made against Stefan Haney?

22         A.   No.

23         Q.   You've never heard of that?

24         A.   I've never heard of a sex harassment

25 complaint against Stefan Haney, no.

Page 70

1          Q.    Any kind of EEO, equal employment

2     opportunity-type complaint against Mr. Haney?

3          A.    Not that I recall, no.

4          Q.    Amazon has an open door policy, right?

5          A.    Correct.

6          Q.    Managers are told quote, "You are welcome

7     to discuss any suggestion, concern or other feedback

8     with any member of the company's management.

9     Associates are encouraged to bring their ideas to the

10    attention of management," correct?

11         A.    Correct.

12         Q.    That's something people are given in their

13    owner's manual when they join the firm, right?

14         A.    I believe that's correct, yes.

15         Q.    And you believe it to be true, right?

16         A.    I believe that to be true, yes.

17         Q.    And it's very important, isn't it?

18         A.    That people bring their ideas, yes.

19         Q.    And their concerns?

20         A.    And their concerns, yes.

21         Q.    And you support that, right?

22         A.    I do support that.

23         Q.    Before you came to Amazon you were at

24    McKinsey, you were at Ford, you were at Borders.  Did

25    you believe in that kind of open door policy based on

Page 71

1    those experiences even before you came to Amazon?

2         A.   Yes.

3         Q.   Why?  Why is it valuable?

4         A.   I think it demonstrates respect and care

5    for people and I think that's important if you want to

6    build a high-performing team.

7         Q.   Amazon respects failure, right?

8         A.   Yes.

9         Q.   Amazon encourages people to take risks and

10   think big and make choices, right?

11        A.   Correct.

12        Q.   Some organizations are known for punishing

13   failure primarily and as a result the organization has

14   a culture of timidity, fair?

15        A.   I can't assess other organizations, but it

16   is correct to say that Amazon, we do encourage people

17   to experiment on behalf of customers and we are

18   willing to fail in an effort to serve customers

19   better.

20        Q.   And individuals are encouraged to be bold,

21   to take action and consistent with the leadership

22   principles, right?

23        A.   The primary leadership principle that

24   everyone has to be centered on is customer obsession.

25   So yes, in -- in the focus of being bold and thinking

Page 72

1    big, we want people to be bold and think big about

2    things that would improve customer -- customer

3    experience.

4         Q.   Is part of being a good manager not being

5    prejudiced?

6         A.   I don't think there's any room for

7    prejudiced in leading people, period.

8         Q.   Why?

9         A.   Because it's not part of a professional

10   environment.  It would be completely unacceptable.

11        Q.   Now, if we take for a second the negative

12   connotation of the word "discrimination" because some

13   discrimination, discrimination against national origin

14   or religion as has been raised in this lawsuit is

15   illegal, right?

16        A.   Yes.

17        Q.   But some kinds of discrimination is normal,

18   right?  We discriminate in favor of better performers

19   over weaker performers, and that's not illegal or

20   disfavored, right?

21        A.   I don't think that's accurate.  The

22   characterization of discrimination here in any form or

23   fashion doesn't resonate with me.  We think of each

24   person as an individual person.  We care about what

25   they're able to contribute and we don't use labels on

Page 73

1    them to separate people.

2         Q.   Well, we -- we evaluate as part of -- as

3    part of being a manager, the OLR process you're

4    evaluating what people contribute and what they're

5    capable of contributing, right?

6         A.   We evaluate the past year's performance

7    against their goals, against our leadership principles

8    and their potential to grow in the organization and we

9    develop -- we use that to develop an overall rating

10   for them, that is correct.

11        Q.   And people are treated differently based

12   upon their job, their level in the organization in

13   terms of compensation, right?

14        A.   I don't -- I don't -- I don't agree with

15   your premise.  People are not treated differently.

16   Are you asking if people are compensated differently?

17        Q.   Okay.  I mean if I'm working in a warehouse

18   making 15 bucks an hour and you're making over a

19   million bucks a year and I'm the guy making 15 bucks an

20   hour, I think I'm being treated differently, right?

21        A.   No.  No.  I believe we treat everybody

22   with the same degree of respect regardless of what job

23   they have at Amazon.

24        Q.   I didn't use the word "respect."  There

25   is -- I'm not implying anything with -- in these

Page 74

1    questions about -- I'm just trying to get the very

2    basic concept established that management is all about

3    making decisions and assessments, let's start with

4    that, right?  Management is about decisions and

5    assessments?

6         A.   A part of being a manager certainly is

7    making decisions and assessing the talent of the team,

8    yes.  It's one -- it's one part of the role.

9         Q.   And decisions include assessing, this is

10   someone who's going to succeed at that particular task

11   or not, right?

12        A.   Correct.

13        Q.   This is someone who can succeed in our

14   organization or not?

15        A.   It's not about our organization.  I

16   believe that's incorrect.  It's whether or not this

17   person can be successful given the requirements to

18   serve customers and be productive at Amazon.  That's

19   the assessment.  Our bias is that we would like

20   everybody to be successful.

21        Q.   And so you have a bias in favor of finding

22   opportunities and places for people to succeed?

23        A.   We try -- our bias is to match the skills

24   and the experience of the people we hire to the role

25   that we put them in.  That would be correct -- it

Page 75

 1    would be correct to say that.

 2         Q.   But because you want people to succeed, you

 3    would look for opportunity to employ those human

 4    resources productively within the organization?

 5         A.   Yes.

 6         Q.   You might be really terrible as a person

 7    who has to ship packages out, you just might not have

 8    the skill set for that even though you have a terrific

 9    skill set for managing thousands of people, some of

10    whom do that, right?

11         A.   That is possible, yes.

12         Q.   You might not be successful at Jennifer

13    Matthews' position and she might not be successful at

14    your position, right?

15         A.   Correct.

16         Q.   And you would have respect for Jennifer

17    Matthews, but the organization treats you differently

18    in certain ways.  It's not about respect, but it's just

19    there are just objective differences in the jobs,

20    right?

21         A.   Are you asking if the jobs are different

22    between the job of my EA and my job?

23         Q.   Well, obviously they're different.

24         A.   Yes.

25         Q.   Obviously the jobs are different.

Page 76

 1          A.    Yes.

 2          Q.    And obviously the organization treats you

 3    differently in terms of -- not in terms of respect, but

 4    in terms of compensation and in terms of other factors

 5    that constitute terms and conditions of employment,

 6    some of them.  Some things are the same, some things

 7    are different, right?

 8          A.    I disagree with the word "treat."

 9          Q.    Okay.

10          A.    Do different jobs have different

11    compensation?  Yes.  But we don't treat people --

12    Jennifer Matthews is treated with the same respect

13    that people would treat me or anybody else across our

14    team.  If Jennifer Matthews had an idea about

15    something, people would be as interested to hear

16    her -- to hear her feedback as they would be on mine.

17          Q.    On all subjects, really?

18          A.    I don't -- I can't -- I can't answer in

19    the absolute, but I would say if it was a subject that

20    someone wanted to speak up on, we respect people's

21    opinions and we -- we listen to people and we're

22    respectful of others.

23          Q.    Are you familiar with the concept of

24    stereotypes?

25          A.    I'm familiar with what a stereotype is,

Page 77

1   yes.

2        Q.   Are you familiar with the concept of --

3   what is it?  What is a stereotype?

4        A.   I believe a stereotype is someone's

5   perception of you or an attribute about you.

6        Q.   Which may not be related to the truth,

7   fair?

8        A.   Fair.

9        Q.   But is associated in your mind with a

10  characteristic about that person?

11       A.   I believe that as a definition is correct.

12       Q.   Okay.  Are you familiar with the concept of

13  unconscious bias?

14       A.   Yes.

15       Q.   Would you agree with me that all of us as

16  human beings growing up in any country but certainly in

17  our country, we develop unconscious biases, every human

18  being, every single one of us?

19            MR. WOLFF:  Objection.  Foundation.

20       If you think as a general matter, you can answer,

21  go ahead.

22            THE WITNESS:  I think as a -- as a general

23  statement my opinion would be a yes, I agree with you.

24  People develop some unconscious biases, and I would say

25  all human beings do, yes.

Page 78

1    BY MR. NACHT:

2         Q.    And there are other habits which are bad

3    for managing people that we have to struggle with,

4    right, just as humans?

5         A.    I don't -- you have to be more specific

6    for me to...

7         Q.    Sure.  I guess part of being a good manager

8    is to impose self-discipline, right?

9         A.    You'd have to be more specific so I can...

10        Q.    Well, just as a general concept you'll

11   agree with that, right?

12        A.    Is self-discipline important to be

13   successful?  Yes, I believe self-discipline is

14   important.

15        Q.    And specifically as a manager it's

16   important to recognize what you individually bring to

17   the table that's helpful and that's harmful, right?

18        A.    I believe you do have to assess your

19   leadership skills in order to be an effective leader,

20   yes.

21        Q.    And one of the cool things about the Amazon

22   leadership principles is that it very much embodies

23   that concept of self-awareness and collective efforts

24   to help people achieve self-awareness, right?

25        A.    Our aim isn't -- isn't focused on what

Page 79

1    you're describing.  The leadership principles are

2    really focused on how do we build a culture and

3    organization that's focused on serving customers very,

4    very well.  That's our focus.

5         Q.   Okay.  Be vocally self-critical for a

6    second.  How could you -- how -- how -- not vocally

7    self-critical for you in the last 10 years.  Something

8    a long time ago.  What's something you had to overcome,

9    say, between 10 and 15 years ago, that you did overcome

10   that made you a better, more successful manager?

11             MR. WOLFF:  You can answer if you can think

12   of an example that far in the past.

13             THE WITNESS:  This is outside the

14   professional career?  Outside my current experience at

15   Amazon?

16   BY MR. NACHT:

17        Q.   No.  Well, I guess you've been at Amazon

18   more than 10 years, right?

19        A.   Correct.

20        Q.   No, I was just -- in other words --

21        A.   In general?  Yes.

22        Q.   I'm thinking actually about professional,

23   I'm not asking about your personal life.

24        A.   Got it.

25        Q.   I'm thinking about --

Page 80

1         A.    When I went back to business school at the

2    University of Michigan, I was really interested in

3    improving my analytic skills and I loved the

4    statistics course I took there, and I found it to be

5    very, very helpful to improve my analytic skills.

6         Is that the kind of example that you're looking

7    for?

8         Q.    I'm not sure I was looking for an answer of

9    a specific kind.

10        Are there -- that's a skill.  That's development

11   of a skill.  What about a -- what about a personal

12   characteristic?  Do you feel like you've ever had to

13   work on things in order to be a more effective leader

14   or a more effective manager?

15        A.    Uh-huh.

16        Q.    That's not so much a skill, although, there

17   may be skills in tackling the issue?

18        A.    Uh-huh.

19        Q.    We all have vices.

20        A.    Uh-huh.

21        Q.    We all have vices.  We all need to work on

22   our vices.  I'm not asking about your personal life.

23   I'm asking about your work life as a manager, about --

24        A.    Yes.

25        Q.    -- something like that.

Page 81

1        A.    What's the question?  I'm sorry.

2        Q.    Yeah.  So what comes to mind about

3    something you've worked on that makes you a better

4    manager?

5        A.    Would you like me to give you a specific

6    example this time?

7        Q.    Please.

8        A.    Okay.  I choose to during reviews of

9    programs on my team allow the other leaders in the

10   room to ask questions and participate first, and I

11   purposely save my questions and feedback for the very

12   end of the meeting so that I can ensure that other

13   leaders get a chance to participate and so that we get

14   the thinking out from all of the people in the room.

15       Q.    That's something you do now.  Are you

16   saying that you learned that?

17       A.    Yes.

18       Q.    Tell me more about that.

19       A.    Well, I think I love the work we do at

20   Amazon.  I love to participate.  I have high energy

21   and high engagement, and I try to maintain those

22   attributes but also create an atmosphere for other

23   leaders to have a chance to participate and speak up

24   and contribute to making the program better.

25       Q.    And I don't want to put words in your mouth

Page 82

1    or suggest something.

2           A.   Yeah.

3           Q.   But the original question was something

4    you've learned.

5           A.   Yes.  I've learned that at Amazon.

6           Q.   Okay.  So before you learned that, did you

7    talk too much at the beginning of the meeting?  Is that

8    the point?

9           A.   I wouldn't -- I wouldn't have been as

10   thoughtful at making sure that all the leaders got a

11   chance to contribute before I gave my feedback to the

12   team.

13          Q.   Would you agree that working to eliminate

14   unconscious bias is something all of us who manage

15   people need to work on?

16               MR. WOLFF:  Objection to "all of us who

17   manage people."

18   BY MR. NACHT:

19          Q.   All of us who manage people.

20          A.   I believe understanding and working on

21   unconscious bias is important, and we were the first

22   leadership team at Amazon to actually bring in

23   unconscious bias training and discussion into our

24   leadership off-sites, and so I do believe that is

25   important.

Page 83

1          Q.    Did you get trained in this?

2          A.    I participated in the review of

3   unconscious bias, yes.

4          Q.    Did you learn anything?

5          A.    I did.

6          Q.    Was it about race or gender or something

7   else?

8          A.    It was not about race or gender, no.

9          Q.    What did you learn?

10         A.    One of the things I remember learning was

11   there's academic research that suggests that all human

12   beings have some unconscious bias and there was a

13   Harvard study showing that people sometimes mistakenly

14   will use cues about what a person might be good at

15   that may or may not have anything to do with whether

16   they're good at it or not.

17         Q.    Are you a reasonably sensitive person in

18   the workplace?

19               MR. WOLFF:  Objection.

20               MR. NACHT:  Just for the record, Counsel,

21   what exactly is objectionable about the question?

22               MR. WOLFF:  I'm not sure what "reasonably

23   sensitive" means.

24               MR. NACHT:  All right.  Well, the witness may

25   answer.

Page 84

1              MR. WOLFF:  Yeah.  I'm not telling him not to

2       answer.

3              THE WITNESS:  I don't know what that means.

4       Could you be more specific?

5       BY MR. NACHT:

6              Q.   Do you think that you're thoughtful?

7              A.   I do think I'm thoughtful.

8              Q.   Do you try and avoid humiliating people?

9              A.   I would never humiliate someone.

10             Q.   You would never intentionally drive a car

11      into another car, but it might happen over the course

12      of a career in driving, right?

13             A.   Is your question do I think it's possible

14      for people to get into car accidents?

15             Q.   Where they don't consciously intend to get

16      into a car accident?

17             A.   I can't answer the question.  It seems too

18      ambiguous.

19             Q.   Well, people accidentally get into car

20      accidents all the time, right?

21             A.   I believe people do get into car

22      accidents, yes.

23             Q.   Okay.  And so if someone answered a

24      question in a deposition, I would never get in a car

25      accident, what they're really saying is I wouldn't

Page 85

1    intentionally drive a car into another car or person or

2    building, but that doesn't mean that they wouldn't

3    actually do it?

4              MR. WOLFF:  Objection.

5              THE WITNESS:  I don't know enough about the

6    deposition or the situation so I can't -- I can't really

7    comment, I guess.

8    BY MR. NACHT:

9         Q.   Well, it's certainly possible that you

10   unintentionally humiliated someone, right, at work?

11        A.   I would never humiliate somebody at work.

12        Q.   How about embarrass someone?

13        A.   I would -- I would never try to embarrass

14   somebody at work.

15        Q.   But that could happen accidentally?

16        A.   I think -- it's hard for me to answer in

17   the abstract.

18        Q.   At Michigan State were you in a fraternity?

19        A.   No.  Oh, actually, I'm sorry.  I was

20   briefly in a fraternity.

21        Q.   So you have this biosphere and at night you

22   put it up to 85 percent humidity and you lower the

23   temperature to 55 degrees, right?

24        A.   My understanding is something like that,

25   yes.  It makes it -- the plants be able to thrive, and

Page 86

1    yes, I believe when people leave, the evening

2    temperatures and humidity are focused on what makes

3    plant thrive -- plants thrive.

4         Q.   So I heard you say this on YouTube about

5    this Amazon biosphere, and something jumped out at me

6    which is this biosphere contains all of these different

7    kinds of plants, right?

8         A.   Correct.

9         Q.   And they come from different places in the

10   world, right?

11        A.   Correct.

12        Q.   But why would they all thrive in 55 degrees

13   at night and high humidity?

14        A.   I can't answer that.  I don't know.

15        Q.   I bet there's some plants that -- maybe

16   plants from the desert that want low humidity?

17        A.   I don't know.

18        Q.   Amazon is sort of a biosphere for people,

19   isn't it?

20        A.   I don't know.  I don't think it's -- I

21   don't think it's an appropriate analogy to compare the

22   people and the talent of Amazon to a place of

23   horticulture.  That doesn't sound right to me.

24        Q.   Okay.  Well, we get a diverse bunch of

25   people, right?  You've got hundreds of thousands of

Page 87

1    people working for Amazon, right?

2           A.    That's correct.

3           Q.    And -- but the leadership principles apply

4    to all of them, right?

5           A.    They do apply to all the people who work

6    at Amazon, yes.

7           Q.    And the corporate culture of Amazon

8    correctly handled can accommodate all kinds of people,

9    right, from all backgrounds?

10          A.    We care about the talent and the ability

11   for people to contribute at Amazon, and I think there

12   are millions of people across the world that can be

13   part of Amazon, yes.

14          Q.    Regardless of national origin or religion?

15          A.    We don't consider such things as origin

16   and religion as we think about people.  We don't label

17   people with those -- those labels.

18          Q.    But some degree of sensitivity is required

19   in order to make it an environment that's conducive for

20   everyone, right?

21               MR. WOLFF:  Objection.

22               THE WITNESS:  I don't know.  That's too

23   ambiguous a question.  I'm not sure I understand.

24   BY MR. NACHT:

25          Q.    Sure.  Do you have an office in Japan?

Page 88

1          A.    Yes.

2          Q.    Have you spent time in Japan yourself?

3          A.    Yes, I have.

4          Q.    Let's take the leadership principle of

5    expressing backbone.

6          A.    Yes.

7          Q.    Do you find that there are cultural

8    challenges in getting your Japanese team to get

9    comfortable with showing backbone when they come to

10   Amazon?

11         A.    I don't think of people based on the

12   country of the office they're in.  We do expect all

13   people who come to Amazon to understand the leadership

14   principles and to use the leadership principles to

15   guide their behavior.  It doesn't matter what country

16   they're in.  Using the leadership principles to guide

17   decisions you make and people you hire is the

18   expectation.

19         Q.    But there are cultural differences about

20   what's polite and what's socially normative, aren't

21   there?

22         A.    I don't know that I would describe those

23   as cultural differences.  I think when I visit Japan,

24   I do ask the team for feedback on what's the way to

25   dress respectfully and to organize the meeting

Page 89

1   respectfully and so -- but those are independent of

2   Amazon leadership principles.  We don't change the

3   leadership principles based on the countries we're in,

4   but we certainly would be respectful in whatever

5   countries we're in to how business is conducted there.

6           MR. NACHT:  Okay.

7           THE VIDEOGRAPHER:  We're now going off

8   record.  This is the end of Disc 1.  The time is

9   9:38 a.m.

10              (Recess 9:38-9:49.)

11              (Mr. Haydar re-enters.)

12          THE VIDEOGRAPHER:  We're now back on the

13  record in the continuing deposition of Peter Faricy.

14  This is the beginning of Disc 2.  The time is 9:49 a.m.

15

16              EXAMINATION (Continuing)

17  BY MR. NACHT:

18      Q.   Did you ever meet Nick Tawar face-to-face?

19      A.   Yes.

20      Q.   You found him irritating?

21      A.   No.

22      Q.   What was it you said about him, what was

23  his problem on the leadership principles?

24      A.   Can we go back to the -- pull up the

25  things I said before.  I don't recall exactly what I

Page 90

1    said.

2         Q.   I don't know what you said about it.

3         A.   Yes.

4         Q.   As you sit here today, what do you -- what

5    do you remember?

6         A.   Well, you asked me has there been someone

7    else that I can recall that had an achieves

8    performance rating but was least effective, and I said

9    yes, and Nick was the example of that.

10        Q.   I actually didn't ask you someone else, I

11   just asked you someone and first you said Abdullah

12   Haydar.  And you believe Abdullah did in fact hit an

13   achieve as you sit here today, on goals or you're not

14   sure?

15        A.   His performance ratings were, in the two

16   years he was there, least effective and least

17   effective.

18        Q.   Right.  But on the upper left-hand quadrant

19   of Exhibit 1?

20        A.   I don't remember --

21        Q.   You don't remember?

22        A.   I don't recall what the performance

23   ratings were0, no.

24        Q.   Okay.

25        A.   Yes.

Page 91

1          Q.   And it's fair to say that -- I mean, I

2   asked you this earlier, but -- then we don't need to go

3   over it.

4          Tell me about Mat Philipson.  Is he a good

5   leader?

6          A.   I believe he is, yes.

7          Q.   He's not a tech guy, right, he's a business

8   guy?

9          A.   I believe he's a product manager.

10         Q.   Can you picture him?

11         A.   I can picture him.

12         Q.   What are his strengths?

13         A.   I -- I don't know.

14         Q.   You have respect for Jim Joudrey, right?

15         A.   I do.

16         Q.   And for Avi Saxena?

17         A.   I do.

18         Q.   Do you remember making any comments about

19   Mr. Haydar and his wife --

20         A.   No.

21         Q.   -- at a meeting?

22         A.   No.

23         Q.   You sometimes use humor in meetings, right?

24         A.   Yes.

25         Q.   I do too.  Humor can be a very effective

Page 92

1    tool in order to find connection with people and break

2    down barriers, fair?

3         A.    I believe that's fair, yes.

4         Q.    But humor can also get you into trouble by

5    unintentionally offending people, fair?

6         A.    I think humor can offend people, yes.

7         Q.    You've reviewed documents before your

8    deposition, right?

9              MR. WOLFF:  You can answer that.

10             THE WITNESS:  Can you be more specific?  You

11   mean the documents related --

12             MR. WOLFF:  Did we look at documents

13   yesterday?

14             THE WITNESS:  The documents related to this

15   case?

16   BY MR. NACHT:

17        Q.    Yes.

18        A.    Yes.

19        Q.    You spent several hours yesterday preparing

20   for this deposition?

21        A.    Correct.  You were saying you're sorry

22   meaning that I had to spend a couple of hours

23   preparing for the deposition?

24        Q.    Yeah.  You know, I mean, you're a busy guy.

25   I'm sorry you have to spend time out of your day doing

Page 93

1    this.  You manage a lot of people and you have a lot of

2    responsibilities, and I appreciate your participation

3    in the process.

4           But you believe in our legal system, right?

5           A.   Can you be more specific?

6           Q.   Well, you're proud to be an American --

7           A.   Yes.

8           Q.   -- with our legal system, right?

9           A.   Yes.

10          Q.   It doesn't mean that you believe that every

11   case is decided correctly or that everything is

12   perfect, but as a general matter, you're proud to be an

13   American with our legal system, right?

14          A.   Correct.

15          Q.   And you believe that we should have laws

16   that allow people who believe they have been treated

17   unfairly to seek redress in the courts?

18          MR. WOLFF:  Objection to the extent it seems

19   a legal conclusion.

20          If you got an opinion, you can share it.

21          MR. NACHT:  I don't seek a legal conclusion.

22   BY MR. NACHT:

23          Q.   Just philosophically, you personally?

24          A.   Philosophically I like that our judicial

25   system allows people who feel like they have been

Page 94

1    harmed to -- to seek justice, yes.

2          Q.   Okay.  I appreciate you participating in

3    that process today and I guess yesterday to the extent

4    you had to prepare for today.

5          In preparing for the deposition, did it help

6    trigger your memory about any of the things we've been

7    talking about today?

8          A.   I'm sorry.  Can you be more specific?

9          Q.   Well, I kind of don't want to in order to

10   protect attorney/client privilege because I don't want

11   to get into the conversation you had with your lawyer

12   yesterday.  I just -- our memories are, we carry a lot

13   of things with us and some things pop up and some

14   things can take time to peculate up.  That's just the

15   way our memories are.

16         Is that your experience just as a human?

17         A.   I think that seems accurate, yes.

18         Q.   Okay.  And so I'm wondering if in looking

19   at documents and whatever discussions you had, without

20   characterizing those discussions, it was helpful in

21   terms of your memory?

22         A.   I -- I can't answer the question.  It's

23   too ambiguous.

24         Q.   Okay.

25         A.   When you say helpful to your memory I

Page 95

1   don't know how to -- how to judge it.

2          Q.   Yeah, just about the kinds of things I've

3   been asking today, about any of them?

4          A.   There has not been a question you've asked

5   today that I recall yesterday's documents being tied

6   to.

7          Q.   Did you spend a lot of time on Brother

8   Rice?

9          A.   I don't believe we spent any time on

10  Brother Rice.

11         Q.   When you are looking at reviews in the OLR

12  about a manager's performance, what steps do you take,

13  if any, to try to determine whether a particular person

14  has an agenda or a bias?

15         A.   I don't think that the description is

16  correct.  We don't look at the performance reviews

17  themselves in an OLR, and we do expect that the --

18  that the managers will bring in data to support the

19  performance rating, the leadership rating, the growth

20  potential and the overall rating.

21         Q.   When, if ever, besides -- did you read the

22  lawsuit in this case, the complaint?

23         A.   I'm sorry?

24         Q.   Did you read the complaint in this lawsuit

25  or not?

Page 96

1          A.    Yes.

2          Q.    And it makes reference to some e-mails to

3    Mr. Bezos?

4          A.    I don't recall if it does.

5          Q.    Okay.  Did you -- do you have any memory

6    that Abdullah Haydar had complained to Mr. Bezos?

7          A.    No, I was not aware until this lawsuit of

8    that.

9          Q.    It's hard to be sued because you're being

10   called a name.  You're being accused of something which

11   if you're a good person, you don't believe yourself to

12   be and so it's a painful process.  It's just the way it

13   is.  Surgery is painful.  Lawsuits are painful.  Some

14   things are just painful.

15          Getting criticism at work without being sued,

16   just getting criticism at work is a painful process

17   for -- for many people.  Is that a fair statement?

18          A.    I don't know how to judge the -- the

19   comment.  I don't think criticism is the way I would

20   view it.  If you're referring to is giving feedback to

21   others a helpful way to coach and improve people's

22   performance, I would say yes.  And --

23          Q.    Have you ever gotten negative feedback?

24          A.    Yes, I would guess.

25          Q.    Not guess?

Page 97

1          A.   Yes.

2          Q.   I mean, you got constructive criticism?

3          A.   Yes.

4          Q.   Or feedback at McKinsey?

5          A.   Yes, I believe so.

6          Q.   At Ford?

7          A.   Yes.

8          Q.   Some of it you agreed with, some of it you

9    didn't?

10         A.   I don't recall the specifics.

11         Q.   At Borders, did anyone give you any

12   feedback?

13         A.   I would guess the answer is yes.

14         Q.   I don't want you to guess.  Do you remember

15   or you don't remember?

16         A.   I don't specifically remember specific

17   feedback, but it seems like it was, you know, during

18   the time I was there, there must have been discussions

19   and feedback offered about things I could do to

20   improve.

21         Q.   You left Borders for the Amazon job, you

22   had it lined up?

23         A.   I left Borders to come to Amazon, correct.

24         Q.   Had Amazon recruited you or did you reach

25   out to them?

Page 98

1          A.    Amazon recruited me.

2          Q.    Who?  Wilke, Gunningham?

3          A.    Susan Harker.

4          Q.    You're a Michigan guy.  It was coming out

5     to the Pacific Northwest.  You must have had to think

6     really hard about it, yes?

7          A.    Yes.

8          Q.    And Borders had bookstores, brick and

9     mortar bookstores.  You had previously worked for the

10    leading management consulting firm in the country, in

11    the world really, and for a car company some people

12    have heard of called Ford?

13         A.    Correct.

14         Q.    This was a -- at the time while it was a

15    growing company, it was still a very different kind of

16    industry and it was in another part of the country.

17    What attracted you to come to Amazon?

18         A.    Growth.

19         Q.    Could you be more specific, please?  That

20    can mean a lot of different things.

21         A.    Yes.  I was very, very, very impressed

22    with the number of initiatives the Amazon leadership

23    team had lined up that they were focused on trying to

24    do to serve customers well, and I -- I love focusing

25    on growth opportunities and I thought this was just a

Page 99

1   great opportunity.

2         Q.   I'm one of those guys who loved Borders.  I

3   really -- I loved it, and then it's not that I started

4   buying books online, I just -- I stopped caring about

5   Borders because they killed the experience by thinking

6   about sales per square foot and taking out all the

7   books I wanted to browse and read and the interesting

8   salespeople who had Ph.D.s and things I knew nothing

9   about that I could talk to when I was in there.  And so

10  I would buy the book that one could buy online or from

11  Barnes & Noble or whatever, but I went in for the

12  experience, the intellectual exploration experience.

13  And I think I was a pretty classic Borders customer,

14  and I think the company wasn't paying attention to me

15  and a lot of people like me.

16        Does that ring true to you as a former Borders

17  person who went to Amazon?

18        A.   I can't say.  I do feel like Amazon

19  offered something in books that sounds like it

20  appealed to you which is that they didn't view the

21  selection boundary to be what could fit into a

22  physical store.  With -- with e-commerce it allowed

23  Amazon to offer every book possible all around the

24  world that they could find, and I think that's been

25  wonderful for customers.  It sounds like it resonated

Page 100

1    with you as well.

2         Q.   When did the concept of nudging or

3    suggesting, when did that come into play?

4         A.   I'm sorry.  Can you be more specific?

5         Q.   Yeah, with Amazon, you bought this or you

6    were looking at this, have you thought about this?

7         A.   The feature I think you're referring to

8    which is people who bought this or viewed this also

9    bought this recommendation feature, I couldn't tell

10   you the year, but it was in early Amazon days that

11   that was an important feature.

12        Q.   Before you joined them?

13        A.   Before I joined, correct.

14        Q.   Did you find that an attractive concept?

15        A.   As a customer, I do find that to be

16   helpful, yes.

17        Q.   You were excited to go to Amazon because of

18   the focus on the customer and the way that you imagined

19   correctly that it would lead to the growth of the

20   company; is that fair?

21        A.   Fair.

22        Q.   And it's really all about thoughtfulness

23   for the customer, right?

24        A.   I think thoughtfulness is part of the

25   customer obsession equation, yes.

1       Q.   I mean, it's not -- it's not that the

2   device or the experience of the online experience is

3   designed because a particular engineer thinks it might

4   be unimportant to wait or to have to figure something

5   out, it's all about what the actual customer

6   subjectively perceives the experience to be and

7   improving that, right?

8       A.   We do focus on what customers want and we

9   try to deliver exactly what they want and more,

10  correct.

11      Q.   Apple provides devices that are easy for

12  nontechnical people that have an intuitive design feel,

13  agreed?

14      A.   Agreed.

15      Q.   And Amazon does something with the online

16  experience that is similar, right?

17      A.   I believe so, yes.

18      Q.   And so people are happier engaging in the

19  shopping experience and spending money which is what

20  business is about on some level, right?

21      A.   I'm not sure I agree with that, but I

22  think customers -- I think it would be fair to say the

23  feedback is that customers do love shopping on Amazon.

24      Q.   And as I heard you say, they're spending

25  more time on the sites shopping than they used to, and

Page 102

1    you believe that's because you provide them with a

2    better experience, right?

3         A.   Correct.

4         Q.   What's the average length of time people

5    work at Market- -- in Marketplace?

6         A.   I don't know.

7         Q.   Is reducing turnover important or not?

8         A.   Retaining top talent is definitely

9    important.

10        Q.   So it's not overall retention, it's top

11   talent retention?

12        A.   I think it's very important that we retain

13   top performers at Amazon and that's definitely an

14   important focus.

15        Q.   When is the first time you remember having

16   a conversation with Ms. -- with Sima -- Simmi?

17        A.   Simmi.

18        Q.   -- with Simmi about Mr. Haydar?

19        A.   I don't recall any conversations with

20   Simmi about Abdullah.

21        Q.   And let's expand the definition of

22   conversation to include e-mails or any other kind of

23   interaction.  Do you have any recollection?

24        A.   I don't.

25        Q.   What about with Mr. Beary?  Do you have any

Page 103

1    recollection?

2           A.    Yes, yes.

3           Q.    And with Ms. Cerio, do you have

4    recollection?

5           A.    Yes.

6           Q.    And with Ms. Cole, do you have

7    recollection?

8           A.    Sorry.  Are these specific to e-mail or

9    any conversations?

10          Q.    Any.

11          A.    Yes.

12          Q.    Written or verbal or video chat or --

13          A.    Got it.  With Ms. Cerio, yes.  With

14   Ms. Cole, I don't remember.

15          Q.    Okay.  So let's just go through it with

16   Cerio and then with Beary, please.

17          A.    Yeah.

18          Q.    So Ms. Cerio.  Just all the interactions

19   you remember.

20          A.    With Ms. Cerio about Abdullah?

21          Q.    Yes.

22          A.    The only interaction that I remember with

23   Ms. Cerio about Abdullah was she gave me an update

24   between some meetings that was the result of an

25   internal investigation of some claims that Abdullah

Page 104

1    had made, and her report back to me was that the

2    internal investigation had revealed that all of those

3    claims were false and that the HR team and whoever

4    Abdullah would have been reporting to at that time

5    would be following up with him to communicate that.

6         Q.    Okay.  And with Mr. Beary, all interactions

7    that you remember as you sit here today about Abdullah.

8         A.    The only interactions I remember were

9    either Mike giving me an update on Abdullah,

10   Abdullah's progress on his performance improvement

11   plan or me asking Mike for an update about Abdullah's

12   progress on a performance improvement plan.

13        Q.    Why?  Why would you ask?

14        A.    I was worried -- when you have someone

15   who's performing poorly and is two years least

16   effective, that's extremely rare at Amazon, and for

17   that person to be a team leader and in a small remote

18   dev center, I really worried about the impact of his

19   performance on his team but also the broader office as

20   well.

21        Q.    Any specific worries about on his team?

22        A.    I don't recall specifics on his team.

23        Q.    Do you recall specifics about on the

24   broader office?

25        A.    I do.

1    Q.   What do you recall?

2    A.   I recall an incident where Abdullah shared

3  information that was misleading and confidential about

4  potential State of Michigan legislation that caused a

5  number of people in the office to worry about whether

6  or not the office would be shut down and whether or

7  not their jobs would be at stake.

8    Q.   Was Abdullah Haydar, did he have some sort

9  of site leader role in Detroit?

10    A.   No.

11    Q.   Had he built a team in Detroit?

12    A.   I don't know for certain.  It's possible

13  when he -- when we moved him to Detroit that he took

14  over an existing team, but it's also possible he would

15  have added to that team.  I don't know the facts

16  there.

17    Q.   Do you know if he was good at team building

18  in Detroit?

19    A.   I don't.

20    Q.   And the -- if he had heard something,

21  whether it was accurate or not accurate, wasn't it his

22  duty to share it?

23    A.   No.  His duty would have been to discuss

24  it with whoever his manager was and to certainly seek

25  more information about it, but to share it more

Page 106

1    broadly with people in the office, I know Ian Simpson

2    and Garret Gaw and a number of other folks thought

3    that was completely inappropriate.  And I agree with

4    their assessment.

5           Q.    And how do you know that he did that?

6           A.    I believe Ian and Garret mentioned it to

7    me.

8           Q.    And there's an e-mail where he's sharing it

9    with Garret Gaw about this is about the tax

10   negotiations with the State of Michigan at the time,

11   right?

12          A.    I'm not familiar with that e-mail.

13          Q.    Okay.  But -- are you sure that he shared

14   it with anybody else?

15          A.    I only know what was relayed to me from

16   Garret and Ian based on the concerns that other

17   engineers in the office expressed about finding this

18   out.

19          Q.    All right.  You have no -- you did no

20   follow-up to determine if Abdullah Haydar was spreading

21   discord or...?

22          A.    I did not follow up on that specific

23   issue.

24          Q.    Okay.

25          A.    But it was an example of something that

Page 107

1    worried me about his performance.  Certainly it

2    worried me.

3         Q.    Is there anything else that you can think

4    of as you sit here today just based on memory about

5    Abdullah Haydar's performance?

6         A.    I mean, the -- the -- the facts of someone

7    being least effective in their first year at Amazon

8    and least effective two years in a row, that's --

9    that's extremely rare and it would make you very

10   worried that this person isn't performing at the

11   standards that we require at Amazon.  So anyone who

12   would have been in that bill, I would have worried

13   about.

14        Q.    And you were relying on Joudrey's input in

15   rating him least effective in 2013?

16        A.    All of the people who contributed to his

17   ratings would include Kanda, Jim Joudrey, Curt Ohrt,

18   Ian Simpson, Joel Mosby, Garret Gaw, Avi Saxena, and I

19   may be missing someone in there, but whoever were --

20   whoever was his manager and whoever was that manager's

21   manager, I would have absolutely relied upon their

22   ratings, yes.

23        Q.    And you were describing earlier how you

24   listened to everybody before you give input, right?

25        A.    I said one of the lessons I've learned

Page 108

1    about program reviews is I've learned that I enjoy it

2    more and I think it's a more effective management

3    strategy to let others give their feedback first

4    before I give mine, yes.

5         Q.   So you did not give input or did you give

6    input or do you not remember if you gave input into

7    Abdullah Haydar's 2013 review?

8              MR. WOLFF:  That he would have received in

9    2014?

10             MR. NACHT:  Yes.

11             THE WITNESS:  I don't -- I believe the person

12   who would have been responsible for the review would have

13   been Kanda and he would have written the review with the

14   feedback he received from people across our team, and I

15   don't believe -- I don't believe I would have had any

16   feedback as part of that review.

17   BY MR. NACHT:

18        Q.   I'm going to show you a document you may

19   not have seen before, but it was produced to us from

20   Amazon Bates stamp 411 double-sided document, 411, 412,

21   413, 414.  Let's mark it as Exhibit 2.

22                  (Exhibit No. 2 marked

23                   for identification.)

24   BY MR. NACHT:

25        Q.   It's not to you or from you and you may

Page 109

1    never have seen it.  You may have seen it, I don't

2    know.  The document purports to be an investigative

3    interview with Jim Joudrey by Anne DeCleene, April 2nd,

4    2015.

5              Do you agree that's what it says it is?

6         A.   I do believe that's what it says it is,

7    yes.

8         Q.   Okay.  On the back of the first page under

9    ratings -- have you seen this document before?

10        A.   I don't believe so.

11        Q.   Okay.  If you look to Paragraph 2B Roman

12   numeral X and then down from there, I'd like you to

13   just take a little time and read this, please.

14        A.   (Witness complies.)

15        Q.   Okay.  So this is what Anne DeCleene wrote

16   that Jim Joudrey told her?

17        A.   Yes.

18        Q.   And Joudrey evidently told her that you

19   were not a fan of Abdullah Haydar, subparagraph X, do

20   you see it?

21        A.   I see what's written here, yes.

22        Q.   Okay.  Do you remember saying anything in

23   the OLR which would have given Jim Joudrey that

24   perception?

25        A.   No.

Page 110

1        Q.    Then No. 1, it says, "He wasn't an LE going

2    into the OLR."  LE would be...?

3        A.    Least effective.

4        Q.    And so that sounds like Joudrey is saying

5    that Haydar in Joudrey's mind was not going to be rated

6    least effective heading into the OLR?

7        A.    I don't -- I don't know the facts on that.

8        Q.    Okay.  But do you agree that that's what it

9    says?

10        A.    I agree the words here says he wasn't an

11    LE going into the OLR.  I don't know what the facts

12    were, though.

13        Q.    And then Paragraph 2, it says, "Avi" -- and

14    that would be Saxena?

15        A.    Correct.

16        Q.    "Avi" --

17        A.    I believe so, yes.

18        Q.    "Avi and I argued hard for him in the OLR

19    to not be an LE."

20        Do you have any recollection of that?

21        A.    No.

22        Q.    And then it says under 3, "If he really is

23    an LE, why move him to Detroit?"

24        Do you remember that subject coming up?

25        A.    I do.

Page 111

1    Q.   And then it says, "We had a big

2  discussion."

3         Do you remember there being a big discussion or

4  at least a discussion?

5    A.   I do remember there being a discussion

6  about the move to Detroit, yes.

7    Q.   Okay.  That's Abdullah Haydar moving to

8  Detroit?

9    A.   Correct.

10   Q.   Okay.  It says, "I think he was on the

11 bubble."

12        Any memories of that?

13   A.   I don't know what that refers to.

14   Q.   And then it says, "Peter pushed, made the

15 ultimate call."

16        Do you have any memory of that?

17   A.   I do.

18   Q.   Okay.  I'll ask you in a sec.

19   A.   Okay.

20   Q.   It said, "A, he referenced meetings he had

21 been in with Abdullah."

22        Do you have any recollection of referencing

23 meetings you had been in with Abdullah --

24   A.   No --

25   Q.   -- in the meeting?

Page 112

1          A.    -- I don't.

2          Q.    All right.  Now, I want to go back to the

3    discussion and tell me what you remember.

4          A.    I pushed and made the call on allowing

5    Abdullah to move to Detroit and restart and have

6    another chance at Amazon.  That's what that's

7    referring to and that's what I recall discussing in

8    the meeting.

9          It's unusual with someone's performance ratings

10   being so poor to start with and being so poor the

11   first year to move this person to another office to

12   another team, and that would have required my -- my

13   view because we hold senior leaders accountable if

14   they take people who are performing poorly and move

15   them to other teams in other offices, and I did think

16   from the meetings I had been in with Abdullah, which I

17   don't remember very many, but I do remember feeling

18   like he deserves an opportunity to go to a different

19   team in a different office and have a chance to be

20   productive at Amazon.

21         Q.    You certainly would not feel like after

22   spending some time with Abdullah after he had been with

23   the company some months that he was a -- not going to

24   work out?

25         A.    I don't know.  These ratings are -- they

Page 113

1    are alarming and they're poor, and I think the

2    feedback from the leaders on my team who managed

3    Abdullah from the beginning of his time at Amazon was

4    pretty consistent about this -- these performance

5    ratings.  And anyone who has these kind of performance

6    ratings when they first join Amazon, you absolutely

7    would worry about their opportunity to be successful.

8                   (Discussion off the written record.)

9                   MR. NACHT:  Bates stamp 2184.  Let's mark

10   this as 3.

11                        (Exhibit No. 3 marked

12                         for identification.)

13   BY MR. NACHT:

14        Q.   I don't know if you've seen this document.

15   It's another document produced by Amazon in this case.

16   It purports to be an e-mail from Jennifer JoHanson.

17        Do you know her?

18        A.   I do.

19                   MR. WOLFF:  Do you have a copy for me?

20                   MR. NACHT:  Oh, yeah.  I'm sorry.

21   BY MR. NACHT:

22        Q.   She's a human resources person?

23        A.   Yep.

24        Q.   Did you work with her?

25        A.   I did.

1          Q.   To Anne DeCleene.  Presumably this is in

2     connection with the DeCleene investigation of Haydar's

3     complaints based upon the timing because it was sent

4     April 1, 2015, and the subject is Abdullah Haydar

5     documents.  And there's -- Paragraph 4 states,

6     "Additionally I found in my Marketplace VP 2014 OLR

7     notes this entry for Abdullah.  Unfortunately I didn't

8     note the ratings prior to changing but my notes made me

9     think he came in with ADNMHV."  And the chart shows

10    Abdullah Haydar with a performance rating of achieves

11    and a leadership rating of DN.

12          So the acronym, A would be achieves?

13          A.   Correct.

14          Q.   DN would refer to the leadership ratings?

15          A.   I don't know.  I guess that is -- I don't

16    know what DN refers to.

17          Q.   Do you know what M refers to?

18          A.   I'm not sure in this context what it is.

19          Q.   And HV would be highly valued?

20          A.   I would believe so.

21          Q.   And highly valued is sort of the big

22    middle.  It's a passing score.  It's not a low

23    pass/fail.  It's not a high pass, right?  I mean, this

24    is what most people get?

25          A.   No.  I think the -- the -- the -- any part

Page 115

1    of the rating that would be does not meet or least

2    effective or needs improvement or low we would

3    separate out any performers who had those types of

4    indicators in their rating into a different bucket

5    theoretically.

6         Q.   Do you dispute Mr. Joudrey's account that

7    Abdullah Haydar was headed into the OLR with higher

8    ratings than he came out with?

9         A.   I don't know.

10        Q.   Do you think that it's possible that you

11   pushed not only for Abdullah Haydar to go to Detroit

12   but also pushed for him to be rated as least effective?

13        A.   No.

14        Q.   Do you dispute that you were not a fan of

15   Abdullah Haydar in the early 2014 period when the 2013

16   OLR was being conducted?

17        A.   I don't think words "not a fan" resonate

18   with me, so I don't think of people as fans of them or

19   not fans of them.

20        Q.   Did you have an impression that Haydar was

21   a bad fit for the culture of the company?

22        A.   I had an impression that his -- his

23   performance was struggling from the first few months

24   that he joined Amazon and Kanda and Curt Ohrt and Avi

25   Saxena and a number of people were very alarmed at the

Page 116

1    poor performance.

2              THE WITNESS:  Can I do a quick bio break

3    again?

4              MR. WOLFF:  Yeah, I need one too.

5              MR. NACHT:  Sorry.  What are we doing?

6              MR. WOLFF:  Quick bio break.  Bathroom break.

7              MR. NACHT:  Didn't we just break?

8              MR. WOLFF:  We broke at -- we broke

9    40 minutes ago.

10             MR. NACHT:  Oh.

11             MR. WOLFF:  We'll come right back.

12             THE VIDEOGRAPHER:  We're now going off

13   record.  The time is 10:33 a.m.

14                  (Recess 10:33-10:37.)

15             THE VIDEOGRAPHER:  We're now back on the

16   record.  The time is 10:37 a.m.

17                  (Exhibit No. 4 marked

18                   for identification.)

19

20                  EXAMINATION (Continuing)

21   BY MR. NACHT:

22        Q.   I'm showing you Exhibit 4.  It's an e-mail

23   chain.  This was produced to us.  It's a two-sided

24   document.  It's Bates stamped 2200, Counsel, and I

25   think it was produced at different -- with different

Page 117

1    Bates stamp numbers at different stages in the e-mail

2    chain.  This one has on top Abdullah Haydar forwarding

3    to Jennifer JoHanson June 9th, 2013, but I imagine that

4    you viewed in preparation for the deposition your

5    e-mail to Mr. Haydar from Sunday, June 9th, 2013?

6         A.   Correct.

7         Q.   Okay.  And what was in your mind, if you

8    can remember, when you informed Mr. Haydar to

9    understand and integrate with the Amazon leadership

10   principles and culture?

11        A.   Abdullah had gotten off to a rough start

12   in terms of his performance on Amazon.  The e-mail

13   that he sent, I guess, continued to worry me that he

14   wasn't taking responsibility for his performance, and

15   my response was focused on how can I help him be

16   successful at Amazon.  I would like him to be wildly

17   successful and what are the things as they have been

18   relayed to me that would help him the most turn his

19   performance around and be successful.

20        Q.   Is Kanda still with the company?

21        A.   I don't know.

22        Q.   That's Ramiah Kandasamy?

23        A.   Correct.

24        Q.   Did you ask Kanda to leave Marketplace?

25        A.   No.

Page 118

1          Q.    Did someone ask Kanda to leave Marketplace?

2          A.    No.

3          Q.    Was Kanda an effective manager, in your

4    opinion, in Marketplace?

5          A.    Yes.

6          Q.    In Abdullah Haydar's e-mail that's on this

7    dep exhibit, he says, "I take full responsibility for

8    my own actions regardless of any coaching and I am

9    definitely committed to learning from and not repeating

10   my mistakes."

11         On the next page he says, "My intention was

12   certainly not" -- this is at the bottom of the first

13   paragraph -- "My intention was certainly not to go

14   against your advice, so please accept my apology if I

15   misunderstood your direction.  If I am still

16   misunderstanding your advice, I would definitely

17   appreciate any clarifications you can provide."

18         Isn't -- aren't those words indicating his

19   willingness to be a better listener and vocally

20   self-critical, those words I quoted to you?

21         A.    I think the full context of the note

22   suggests, I guess, some level of disrespect or --

23   or -- or not working with the person that he reported

24   to directly and...

25         Q.    What -- what in the note exactly, given

1   that Amazon has an open door policy?

2          A.   Yes.

3          Q.   What in the note exactly indicates

4   disrespect to you?  Are you talking about disrespect to

5   Kanda?

6          A.   I believe so, yeah.

7          Q.   Okay.

8          A.   Yeah.  The tone of the note is has anyone

9   coached me, and part of being a responsible leader is

10  taking responsibility to learn about things yourself

11  in addition to benefitting from the learning that

12  others can give you.

13         Q.   But when he says he takes full

14  responsibility for his own actions regardless of any

15  coaching, did you not believe him?

16         A.   I think those are -- those are words that

17  are in line with someone who wants to improve their

18  performance but we don't rely upon e-mail words for

19  people's performance.  We rely upon people actually

20  performing.

21         Q.   Jim Joudrey and Anand Vardarajan also

22  complained about Kanda, right?

23         A.   No.

24         Q.   They didn't express concern about Kanda?

25         A.   Not to me.  In fact, I believe Jim really

Page 120

1   benefitted from working for Kanda and Kanda, if I were

2   to summarize Kanda, he's one of the most respected

3   engineers at that time that we had across our team.

4   He was the go-to person for most people across Amazon

5   to understand Amazon Marketplace technology better.

6           Q.    Is there anything else about this -- did

7   this e-mail bother you or offend you or trouble you?

8           A.    No, I viewed it as a gift to Abdullah to

9   try to clarify for him.  He asked at the end of this

10  e-mail for guidance, and so if I didn't care about his

11  performance, I guess I could have just forwarded this

12  e-mail to Kanda and the HR team or whatever it might

13  have been, but I -- I -- I did care and did want him

14  to be successful.  And so I took the time to think

15  about what is it that I could share with him that I

16  thought would be helpful for him.

17          Q.    And when you told him, keep your head down,

18  your mouth shut and do your job, you meant, please stop

19  sending me e-mails about your supervisor?

20          A.    Incorrect.

21          Q.    What did you mean?

22          A.    I meant, if you read these first

23  two points, it's really all about respecting others,

24  listening to others and building trust with the other

25  teams at Amazon.  And my -- my -- my top two

Page 121

1   priorities for him are meant to be very clear and very

2   specific and very actionable so that he could take

3   those on and really be successful at Amazon.

4        Q.   At some point did you decide that Abdullah

5   Haydar was a bad fit for the company's culture?

6        A.   I don't assess Abdullah's fit for the

7   company culture.  I take a look at his performance

8   ratings.  He was rated least effective in his first

9   year and he was rated least effective in the second

10  year, and what I do recall is that, you know, we have

11  a understanding that anyone who's rated least

12  effective two years in a row automatically goes on a

13  performance improvement plan.  And I wanted to make

14  sure that Abdullah was on a performance improvement

15  plan because least effective two years in a row is

16  very rare and -- and very poor performance ratings.

17       Q.   What you're saying is you're relying on the

18  ratings in assessing how you treated Abdullah Haydar,

19  right?

20       A.   What I'm saying is that in my

21  participation of people who don't report to me

22  directly, I rely upon their managers' assessment and

23  their managers' ratings to understand how well that

24  person's performing.

25       Q.   Since Jim Joudrey is a person of integrity,

Page 122

1    you don't dispute his perception that you are not a fan

2    of Abdullah Haydar whether in fact you said it or

3    didn't say it, whatever you said, you believe him that

4    he honestly felt that, that that was his perception of

5    your perception about Abdullah Haydar, correct?

6              MR. WOLFF:  Objection.  Form.  Foundation.

7              THE WITNESS:  Repeat the question.

8              MR. WOLFF:  Let's hear the court reporter

9    repeat the question, please.

10              (Question on Page 121, Line 25, and

11               on Page 122, Lines 1 through 5,

12               read by the reporter.)

13              MR. WOLFF:  Objection.

14              THE WITNESS:  That's extremely confusing.

15    BY MR. NACHT:

16         Q.   Then I'll ask it in a simple way.

17         A.   Okay.

18         Q.   You have no reason to dispute that Jim

19    Joudrey was being an honest reporter when he told Anne

20    DeCleene that he perceived you not to be a fan of

21    Abdullah Haydar in the OLR reviewing 2013 that occurred

22    in 2014?

23         A.   I wasn't in the discussion with Jim and

24    Anne, and I couldn't -- I couldn't begin to assess

25    what comments --

Page 123

1          Q.    That's not what I'm asking.  I'm not asking

2     about --

3          A.    Got it.

4          Q.    -- the discussion with Jim and Anne.

5     I'm -- I'm saying Amazon produced this document to us.

6     Let us assume that it is an accurate document.  I'm

7     not -- you can't tell me it's accurate.  I'm not asking

8     you to tell me it's accurate --

9          A.    Okay.

10         Q.    -- what Joudrey actually said to

11    Ms. DeCleene.  I'm saying if it turns out that

12    Mr. Joudrey said that to Anne DeCleene, you have

13    nothing to dispute that that was his perception?

14         A.    I don't think it's possible to answer the

15    question because I don't know what Jim's perceptions

16    are.

17         Q.    Okay.  Fine.

18         Are you aware of doing or saying anything that

19    might have given him a perception that you are not a

20    fan of Mr. Haydar?

21         A.    No.

22         Q.    Are you aware of doing or saying anything

23    that might have given Mr. Gaw the perception that you

24    are not a fan of Mr. Haydar?

25         A.    No.

Page 124

1          Q.    Are you aware of doing or saying anything

2    that might have given Mr. Mosby the perception that you

3    are not a fan of Mr. Haydar?

4          A.    No.

5          Q.    Is it possible, is it possible that your

6    comments resulted in Abdullah Haydar's performance

7    review becoming least effective instead of highly

8    valued in the 2013 OLR conducted in 2014?

9               MR. WOLFF:  Objection.

10         You can answer.  Is that possible?

11              THE WITNESS:  I don't believe so.

12   BY MR. NACHT:

13         Q.    Why not?

14         A.    Because I rely upon the manager to make

15   the final call about the performance rating, and I

16   don't know if I have the right time frame right, but I

17   believe this is referring to a time that Joel Mosby

18   managed Abdullah Haydar, and I would have relied upon

19   Joel to make the final decision about what the

20   appropriate performance rating was.

21         Q.    You made a decision by the spring of 2015

22   that Abdullah Haydar was not working out and he should

23   be coached out?

24         A.    Incorrect.

25         Q.    You still wanted him to succeed?

1          A.    The purpose of putting someone on a

2    performance improvement plan is to give them the

3    opportunity to improve their performance and that's

4    exactly what we wanted for Abdullah.

5          Q.    The biggest problem Abdullah had was his

6    relationship with Haney, right?

7          A.    I -- incorrect.

8          Q.    Is there any other interaction that

9    impaired his ability to get his job done, to get his

10   goals achieved that you're aware of?

11         A.    I would not be aware of those.

12         Q.    You blocked the transfer of Haydar

13   April 29th, 2015, April 30th, 2015, that he wanted to

14   take to AWS, right?

15              MR. WOLFF:  Objection.

16              THE WITNESS:  That's not correct.

17              MR. NACHT:  You see the results of me not

18   having my admin with me.

19              MR. WOLFF:  Or a stapler.

20                  (Exhibit No. 5 marked

21                    for identification.)

22              MR. NACHT:  This is 568 through 570, right?

23   I am not sure actually.  5 -- 5668, 5669, 5670.  It's all

24   right.  Let's just go ahead.

25   BY MR. NACHT:

Page 126

1      Q.    Take a look at the document, please.

2      A.    I've seen the document, thank you.

3      Q.    All right.  I just asked you if you blocked

4    the transfer.  You said no?

5      A.    Correct.

6      Q.    Can you please explain this e-mail then?

7      A.    I asked what the process would be for any

8    potential role that Abdullah would consider outside of

9    our team within Amazon.

10     Q.    That's all you were doing?

11     A.    Correct.

12     Q.    Just asking about the process?

13     A.    That's correct.

14     Q.    You weren't trying to influence the result?

15     A.    No.

16     Q.    Did you make that clear to Mr. Simpson that

17   you were not trying to influence a result?

18     A.    I don't believe Mr. Simpson was confused

19   on that point.

20     Q.    What's the basis for that belief?

21     A.    It's a longstanding policy at Amazon when

22   someone has a least effective performance rating two

23   straight years that they have to improve their

24   performance before they can move to another team at

25   Amazon.  The only exception to that is if the VPs in

Page 127

1    both organizations would agree to make an exception,

2    which I have never heard of at Amazon, so I was

3    confirming what the process would be here.

4         Q.   Did Abdullah Haydar become someone you were

5    very comfortable with, someone you were very friendly

6    with?

7         A.   I don't know how to answer that question.

8    I mean, I'm comfortable with everybody who works on

9    our team at Amazon and I wouldn't have felt any

10   difference about Abdullah than I felt about anybody

11   else.

12        Q.   He wasn't a friend, right?

13        A.   Most of the people that I work with, we

14   have a professional relationship and not a friend

15   relationship.

16        Q.   What made you think that it would be

17   acceptable to tell a joke on one or more than one

18   occasion about Mr. Haydar's relationship with his

19   wife --

20        A.   I did not.

21        Q.   -- to a group of people?

22        A.   I did not tell a joke about Mr. Haydar's

23   wife to a group of people.

24        Q.   You pulled Abdullah Haydar out in front of

25   a group of people and you made some comment referencing

Page 128

1    his marriage.  Do you have a recollection of this or

2    not?

3              A.    That's incorrect.

4              Q.    Okay.  What -- what did you do if you

5    remember?

6              A.    We had a team social dinner in Ann Arbor,

7    and I remember making two toasts that evening.

8              Q.    Where in Ann Arbor?

9              A.    A pub and I'm not going to remember the

10   name.

11             Q.    Irish pub on Main Street?

12             A.    I actually don't remember at all.

13             Q.    Okay.

14             A.    I seem to remember micro beer, good food,

15   new place and we had our own room so we could have a

16   team social event.

17             Q.    All right.

18             A.    At the beginning of the evening, I toasted

19   two things:  One was I toasted Dave Anderson

20   congratulations because he was about to leave and go

21   get married, and then I made a toast to Abdullah

22   thanking him for his big commitment to commute back

23   and forth between Detroit and Seattle in order to join

24   Amazon and -- and play a role on our team.

25             Q.    When's the first time you spoke to a lawyer

Page 129

1    about anything involving Mr. Haydar?  While he was

2    employed?

3              A.   Not that I recall.  I think the first time

4    I would have met counsel on this topic would have been

5    my first meeting with you guys which --

6              MR. WOLFF:  Are you including e-mail

7    correspondence in that question or no?

8              MR. NACHT:  Thank you --

9              MR. WOLFF:  I'm not sure if --

10             MR. NACHT:  -- for clarifying.

11   BY MR. NACHT:

12             Q.   Well, first of all, I'm including Amazon

13   in-house counsel, so...

14             A.   I don't recall having any conversations

15   with any one Amazon in-house counsel about Mr. Haydar

16   while I was employed at Amazon.

17             Q.   Okay.  And there were some e-mail

18   interactions though, right?

19             A.   I don't -- I don't recall.

20             Q.   Okay.

21                       (Exhibit No. 6 marked

22                        for identification.)

23             THE REPORTER:  Number 6.

24             MR. WOLFF:  Can I have a copy?

25             He'll give me one.  Thanks.

Page 130

1   BY MR. NACHT:

2        Q.   Directing your attention to Exhibit 6, you

3   sent an e-mail to Kanda and you cc'd Jennifer JoHanson,

4   June 10th, 2013, and then there was a follow-up e-mail.

5   This is Bates stamp 640.

6        Did you review this document before your

7   deposition?

8        A.   I reviewed this document yesterday, yes.

9        Q.   Okay.  The document speaks for itself.  Is

10  there anything you can add to provide context?

11       A.   No.

12       Q.   What was the off-site you referred to?

13       A.   I had an off-site of my direct report

14  leaders in Detroit.

15       Q.   You stated you got lots of feedback about

16  his behavior.  I'd like you to identify which

17  individuals gave you feedback about his behavior and

18  what the behavior was.

19       A.   It would have been --

20            MR. WOLFF:  Stop for a second.

21            THE WITNESS:  Sorry.

22            MR. WOLFF:  Are you asking as of this point

23  in time or more generally?  You're asking as of the date

24  of this e-mail?

25  BY MR. NACHT:

Page 131

1          Q.    On June 10th, 10:24, a.m., what did you

2    have in your mind when you said "I got lots of feedback

3    about his behavior"?

4                MR. WOLFF:   Okay.

5    BY MR. NACHT:

6          Q.    Both people and what they told you.

7          A.    The -- the people would have been among

8    the group of leaders who were coming to participate in

9    the off-site, so they would have been my direct

10   reports or --

11         Q.    Well, you used the phrase "would have" --

12         A.    Yes.   Sorry.   They are.

13         Q.    As you sit here, can you -- do you have a

14   recollection of comments that came to you?

15         A.    I have a recollection of the feedback that

16   I received about Abdullah during this time, yes.

17         Q.    Okay.   First, give me a list of everyone

18   that you're saying, I remember, I got a feedback --

19   feedback from this person in June or May of 2013 about

20   Abdullah Haydar.   Let's just have a list of those

21   people.

22         A.    I can't give you a list because I'm not

23   going to be able to remember the specific people four

24   years ago.

25         Q.    Okay.

Page 132

1          A.    I do remember the specific feedback.

2          Q.    Well, sometimes we form perceptions in our

3    mind and we think we've heard it from other people but

4    it in fact it's our own perception.  Sometimes we form

5    perceptions in our mind from other people and we think

6    we came up with it ourselves.

7          Do you have any contemporaneous notes from 2013

8    that would help us identify who gave you feedback about

9    Abdullah Haydar before June 10th, 2013, that influenced

10   your views?

11         A.    Sorry.  Can you clarify the question?

12         Q.    Notes.

13         A.    Do I have any notes --

14         Q.    Yeah.

15         A.    -- from these discussions, no, I don't.

16         Q.    Okay.

17         A.    I did initially propose adding Abdullah to

18   the off-site because I wanted to be inclusive of him

19   and I wanted to make this an opportunity for him to

20   listen and learn and see how we put the leadership

21   principles in -- in -- into production, and I was very

22   disappointed after we had made the effort to invite

23   him and include him that a number of people came up to

24   me and strongly disagreed that this would end up being

25   a productive session if he were participating.

1       Q.    But you can't tell me today who any of

2    those people were with any certainty?

3       A.    They would have been people who would have

4    been included in this meeting and they would have been

5    my direct reports and the senior leaders of the team.

6       Q.    But as you sit here today, you can't

7    remember Mr. Mosby came to me and told me X or

8    Mr. Saxena or Mr. Acint (phonetic).  You don't have

9    that recollection, you're just guessing, right?

10       A.    I'm not guessing.  I invited Abdullah to

11    the meeting, and the only thing that would have caused

12    me to change my mind is feedback from senior leaders

13    concerned about his participation and concerned about

14    his behavior.  I do listen to the leaders on my team

15    and I tried to respond to their feedback.

16       Q.    Can I see the exhibits, please?  The other

17    exhibits.

18       A.    (Witness complies.)

19       Q.    I want to direct your attention to

20    Exhibit 4.  What is the date Abdullah Haydar e-mailed

21    you?

22       A.    June 9th.

23       Q.    Now, directing your attention to Exhibit 6,

24    when did you suggest to Kanda that Abdullah Haydar not

25    attend the off-site?

Page 134

1          A.   Monday, June 10th.

2          Q.   You just said, The only thing that would

3     have changed my mind would have been I would have heard

4     from other people, but I'm wondering if it was your

5     reaction to the e-mail from the day before that might

6     have affected your opinion?

7          A.   No.

8          Q.   Besides Mr. Haydar, has anyone ever

9     complained internally about your decisions which

10    resulted in an investigation?

11         A.   Has -- to make sure I clarify the

12    question.

13         Q.   An internal investigation?

14         A.   Has there ever been an internal

15    investigation besides Mr. Haydar's?

16         Q.   About someone who was underneath you where

17    they were complaining in part about your decisions?

18         A.   I'm not aware that that was the complaint

19    in -- in -- in Abdullah's complaint, I'm not aware

20    that it's about that.  But no, I'm not aware of any

21    investigations or complaints about my decisions.

22         Q.   How did it feel?  You knew there was an

23    investigation.  You knew you were interviewed.  How did

24    it feel?

25         A.   I don't know how to answer the question.

1        Q.    How did you feel at the time about

2    participating in an investigation whether you believed

3    yourself to be a subject of it or not?

4        A.    I think as we talked about the judicial

5    process, I believe it's also important for companies

6    to have good processes internally as well.  So I'm

7    supportive of -- I would say broadly I'm supportive of

8    processes where employees get to raise concerns and

9    there's independent investigators.

10        Q.    But there's a difference between it being

11    theoretical and it being about us.  That's just human.

12    It's normal.  I mean I'm sure when you got notified

13    that you had been sued in this case, you didn't go,

14    Yippee, the United States judicial system is working.

15    I mean, it's a normal feeling to go, Ugh, I've been

16    attacked.  I feel like this is unfair.  That's --

17    that's normal.  It's human.

18        And so my question is:  If you can put yourself

19    back to the time, okay, there's an investigation,

20    Shelly Cerio sent it out to someone else.  Did you know

21    that person, DeCleene?

22        A.    No.

23        Q.    So DeCleene interviewed you, right?

24        A.    She did.

25        Q.    Did you have any feelings about it at the

Page 136

1    time or just another meeting?

2          A.    I mean, it's an important part of our

3    company process and our company ecosystem, so I don't

4    have any feelings other than that.

5          Q.    Okay.  Just so we're clear, you never

6    remember anyone talking in any OLR or at any other

7    point, whether it's Gaw or Mosby, Joudrey, anyone

8    talking about Abdullah's ability to hire a team?

9          A.    I don't recall discussions on that topic.

10         Q.    Is there anything actually you can recall

11   about Abdullah Haydar that's positive?

12         A.    I, at the request of Abdullah, did a

13   introductory one-on-one meeting when he first joined

14   Amazon and I thought we had a terrific discussion.  I

15   had a very favorable impression, and so that's one.

16         Q.    Anything else?

17         A.    I really -- I'm not familiar enough with

18   his performance to be able to identify the strengths

19   and weaknesses of his performance at Amazon.  I am

20   familiar with his performance ratings, and obviously

21   as we've discussed, those were very concerning, but

22   I -- I see, and our process throughout those two years

23   was focused on the good in people and how do we help

24   them improve, and I feel like we made a very big

25   effort to try to help Abdullah perform.

Page 137

1        Q.    If you had input into the performance

2    ratings, then the performance ratings are not simply

3    independent variables that can determine your

4    perception of Abdullah Haydar?

5        A.    That's incorrect.  I did not have input

6    into the performance ratings, and I don't for anyone

7    who doesn't report to me directly.  The manager of the

8    person determines those performance ratings.

9        Q.    At what point did Mr. Mosby share with you

10   that he did not think Mr. Haydar was going to last at

11   Amazon?

12       A.    I don't think Mr. Mosby ever shared such a

13   thought with me.

14       Q.    At what point, if ever, did Mr. Simpson

15   share that thought with you?

16       A.    I believe the only time that discussion

17   would have come up is when Abdullah failed to meet the

18   performance criteria in his performance improvement

19   plan.  I think that was the -- that was the first and

20   only time I remember having a discussion about the

21   performance improvement plan as failing.

22       Q.    Was it just the two of you or was it with

23   Beary or someone else?

24       A.    I don't -- I don't recall.

25       Q.    Was it in person?

1          A.   I don't recall.  I know Ian and Mike and

2     Derek and Garret were very involved and I don't

3     remember how they would have updated me.

4          Q.   Do you remember Garret Gaw ever sharing

5     with you any thoughts about Abdullah Haydar ever?

6          A.   No, not with me personally.

7               THE WITNESS:  Just planting the seed ahead of

8     time, when it's convenient between topics, I would like

9     another bio break, but I don't want you to interrupt you

10    if you're in the middle of a particular area that you

11    want to focus on.

12               MR. NACHT:  Take it.  Take it.

13               THE VIDEOGRAPHER:  We're now going off

14    record.  The time is 11:18 a.m.

15               (Recess 11:18-11:29.)

16               THE VIDEOGRAPHER:  We're now back on the

17    record.  The time is 11:29 a.m.

18               (Exhibit No. 7 marked

19                 for identification.)

20               MR. NACHT:  Could you hand the witness what's

21    been marked as Exhibit 7, please.

22               MR. WOLFF:  Oh, so if he has it, that's my

23    copy.

24               THE WITNESS:  Okay.  Sorry.

25               MR. WOLFF:  Thanks.

Page 139

1              EXAMINATION (Continuing)

2  BY MR. NACHT:

3         Q.   So the first page of Exhibit 7, again, this

4  was produced by Amazon.  It's Bates stamped 3649 to

5  3656 and the first page states that this is a

6  Marketplace leadership OLR, February 10th, 2014, and it

7  says, "Roxanne 05200 notes from Q1, 2015 Marketplace

8  OLR."

9              Who is Roxanne?

10        A.   Roxanne is a building name.

11        Q.   Got it.  Oh, it's a place?

12        A.   It's a place.

13        Q.   And a song?

14        A.   05200 is the room.

15        Q.   Got it.  And directing your attention to

16  3651, L7 discussion.

17        A.   Got it.

18        Q.   And it says, "Abdullah Haydar was doing

19  better but recently fell off the bus," in quotes "and

20  is being managed out.  How do we ensure his team

21  leadership structure is prepared for him leaving the

22  company?  Issues in earns trust, disagree and commit

23  and vocally self-critical.  We are working on coaching

24  him out."

25              Do you remember a discussion that contained that

Page 140

1    content?

2           A.   I believe -- this is -- this is not

3    consistent with my recollection of the discussion.

4           Q.   Okay.  And what's inconsistent about what's

5    written on Bates stamp 3651, Deposition Exhibit 7 for

6    Faricy with your recollection, sir?

7           A.   What I recall is the beginning of this is

8    correct.  In the midyear OLR, Abdullah was identified

9    as someone who had made improvement, but in this

10   yearend OLR was identified as someone who was least

11   effective for the entire year, and I believe it's

12   inaccurate to say is being managed --

13          Q.   I'm sorry, the word you just used, was it

14   "accurate" or "inaccurate"?

15          A.   It's -- what's written here is incorrect

16   about being managed out.  What I recall in the

17   discussion was anyone who has achieved least effective

18   performance ratings for two years in a row

19   automatically goes on a performance improvement plan.

20          Q.   How -- do you know who makes these notes as

21   a general practice?

22          A.   I don't.  The first time I saw the notes

23   was -- was yesterday.

24          Q.   Is there an admin person in the room to

25   take notes?

Page 141

1          A.    I don't know.

2          Q.    Whose job is it to take notes?  An admin or

3     human resources?  Who takes the notes?

4          A.    I don't know.

5          Q.    It's your meeting, right?

6          A.    It's actually a meeting led by the HR

7     team.

8          Q.    Okay.

9          A.    Which I participate.

10         Q.    So take your time.  Read the document

11    because you read it yesterday.  Is there anything else

12    in this document that is inconsistent with your memory

13    besides what you just testified to?

14         A.    (Witness complies.)

15              MR. NACHT:  Can you read the question to the

16    witness, please?

17                   (Question on Page 141, Lines 11

18                    through 13, read by the

19                    reporter.)

20              THE WITNESS:  I did not notice anything else

21    that's inconsistent.

22    BY MR. NACHT:

23         Q.    And this, as far as you're aware, is a

24    regular business record of Amazon?

25         A.    I don't -- I don't believe that it is.  I

Page 142

1    don't know what this is.  Until seeing the notes

2    yesterday, I haven't seen notes like this before.

3                MR. NACHT:  Counsel, do you happen to know

4    and want to share who wrote this thing?

5                MR. WOLFF:  I -- I don't know who wrote it.

6    I think it's somebody attached to HR, but I don't know

7    who or a title.

8                MR. NACHT:  Thanks.

9                MR. WOLFF:  Okay.

10   BY MR. NACHT:

11        Q.   Okay.  Do you have any contemporaneous

12   notes from this meeting which have a different account?

13        A.   No.

14        Q.   This meeting happened two and a half years

15   ago or so, three and a half years ago?

16        A.   Three and a half years ago.

17        Q.   Three and a half years ago.  If you don't

18   have contemporaneous notes and everything else in the

19   document is consistent with your memory, what is it

20   that jumps out at you that makes the part about

21   Abdullah Haydar inconsistent with your recollection?

22        A.   My -- my understanding of our policy that

23   we apply for any employee who's least effective rating

24   for two years in a row is that they automatically go

25   on a performance improvement plan, period.  So I don't

Page 143

1    recall there being a discussion about anything else

2    other than that in the meeting.

3         Q.    The OLR sets the rating for the person,

4    right?

5         A.    No.   The manager of the employee sets the

6    rating for the employee.

7         Q.    Following the discussion at the OLR?

8         A.    Incorrect.   That's not accurate.

9         Q.    Your company, not mine.  Can you explain it

10   to me, please?

11        A.    Managers set the rating for the employee's

12   performance review prior to the OLR that would roll up

13   to me.

14        Q.    And then?

15        A.    And then that performance rating is shared

16   during the discussion about the performance of all the

17   different people on our team.

18        Q.    And it would be unusual to alter the final

19   performance rating as a result of the OLR?

20        A.    It's -- it's -- it's possible that could

21   happen based on a discussion of people who would know

22   the candidate, know the employee well in the room.

23        Q.    But it would be unusual?

24        A.    I think it's pretty rare, yes.

25        Q.    And can you think -- if Mr. Joudrey's notes

1    are correct and that happened in the case of Abdullah

2    Haydar, can you think of any other example?

3         A.   I don't know that Mr. Joudrey's notes are

4    correct.

5         Q.   Can you think of any other person where it

6    happened?

7         A.   I don't -- I think the -- the context of

8    the discussion is Mr. Mosby was the manager for

9    Abdullah during the previous OLR we discussed, and

10   Mr. Mosby would have made the recommendation of what

11   his rating is and that includes prior to the OLR and

12   that would include during the OLR.

13        Q.   In 2015 after the OLR before Haydar was

14   terminated, are you aware of any issues that arose that

15   provided grounds for discharge?

16        A.   I'm sorry.  Can I go back one question?

17        Q.   Sure.

18        A.   The notes in front of me here show

19   a date --

20        Q.   You're looking at Exhibit 7 --

21        A.   I'm looking at Exhibit 7.

22        Q.   -- Page 3640 -- Bate stamped --

23        A.   Yes.

24        Q.   -- 3649?

25        A.   Yes.  I think the date on here looks like

Page 145

1    it's inaccurate.  It says notes from Q1 2015

2    Marketplace OLR.  That would not have taken place in

3    February of 2014.  So I think this is another -- I

4    guess this would be another thing that I see on here

5    that looks inaccurate on here.  I'm guessing the

6    actual date was February 10th, 2015, because that

7    would be the Q1 2015 OLR.

8         Q.   Thank you.  That makes sense.  In which

9    case it was two and a half years ago, not three and a

10   half years ago?

11        A.   Correct.

12        Q.   Okay.

13        A.   And I'm sorry; I interrupted your

14   question.  Would you mind repeating it again?

15             MR. NACHT:  Connie, thank you.

16                  (Question on Page 144, Lines 13

17                   through 15, read by the

18                   reporter.)

19             THE WITNESS:  My understanding of the process

20   after the OLR is the performance review was delivered to

21   Abdullah and that Derek and Garret worked with Abdullah

22   on a performance improvement plan and engaged in a

23   process to help Abdullah turn around his performance and

24   be successful.

25   BY MR. NACHT:

1          Q.   Did you have any conversations with Derek

2     Oehler or e-mails with Derek Oehler about Mr. Haydar

3     that you can recall?

4          A.   No.

5          Q.   Your contact was Beary in 2015?

6          A.   Mike was my -- my HR leader, correct.

7          Q.   And Simpson was between you and Gaw?

8          A.   That's correct.

9          Q.   Joel Mosby, do you know the guy?

10         A.   I do know Joel Mosby.

11         Q.   He was with the SSA team for a while.  Do

12    you remember that?

13         A.   I'm not familiar with SSA team, but he's

14    certainly been on the Marketplace team the entire time

15    he's been at Amazon.

16         Q.   He supervised a manager named Brian Powell?

17         A.   I don't -- I don't know.

18         Q.   You've never heard the name Brian Powell?

19         A.   I have not.

20         Q.   Do you remember that Joel's team was not

21    meeting project and operational goals in 2011, 2012?

22         A.   I don't.

23         Q.   Do you remember expanding Joel Mosby's

24    responsibilities in 2013 with the OLP team?

25         A.   I didn't.

Page 147

1          Q.    Who did?

2          A.    Whoever was responsible for Joel and that

3     part of our business.

4          Q.    Did you approve putting Mosby in a position

5     to manage other L7s including Mr. Haydar?

6          A.    I don't believe there would have been a

7     need to ask me for approval and I wouldn't have

8     participated in the process.

9          Q.    Were you aware of what was going on with

10    the seller central team in 2014?

11         A.    Can you be more specific?

12         Q.    Yes.  For a time it was not meeting project

13    operations or hiring goals, right?

14         A.    I don't know that to be true.

15         Q.    You've testified you weren't aware of

16    Haydar's goal performance, right?

17         A.    That would be accurate.  I'm aware of

18    the -- of the performance rating he received which I

19    believe was achieves and achieves the two years for

20    his -- for his performance rating.  I would be aware

21    of that, but I'm not aware of his goals and

22    performance against those goals.

23         Q.    Why reorganize him in December '14 if you

24    were not aware of Haydar's performance?

25         A.    I didn't reorganize him.

Page 148

1        Q.    Who did?

2        A.    I don't know.

3        Q.    You believed Mosby to be doing well in

4    2014?

5        A.    Yes.

6        Q.    Are there particular things that occurred

7    under his watch that you remember that gave you that

8    opinion?

9        A.    I wouldn't have been close enough -- close

10   enough to his performance other than the feedback I

11   received from Avi Saxena who he worked for.

12       Q.    Did you ever hear anything from Stefan

13   Haney about Mr. Haydar?

14       A.    Yes.

15       Q.    Tell me, please.

16             MR. NACHT:  Assume -- please, give me a

17   continuing please for all of my questions, Counsel.

18             THE WITNESS:  Noted.

19       I recall only one conversation, and I recall

20   Stefan indicating that there was a large problem in the

21   organization with what should have been a routine

22   transfer of an employee and that trust was broken and

23   teams were not -- were not able to work with Abdullah

24   effectively.

25   BY MR. NACHT:

Page 149

1          Q.   Who did Stefan report to at the time he

2     told you that?

3          A.   I don't recall.  Yeah, I don't recall.

4          Q.   He didn't report to you directly?

5          A.   I don't recall the timing.  There was a

6     period of time that he did report to me, but there was

7     a longer period of time he reported to either Mark

8     Mitchke or other folks on our team, so it could have

9     been -- I don't know which time period it was.

10          Q.   Did that affect your assessment about

11     Haydar's performance?

12          A.   It sounded like a relatively trivial issue

13     that I would have expected the leaders on my team to

14     handle with ease and joy.  I was disappointed to hear

15     that something as routine as an employee transfer

16     would erupt into something that sounded like it was a

17     bigger problem on our team, and I was disappointed

18     that that could happen.

19          Q.   Were you frustrated with Mosby?

20          A.   I want our team focused on serving

21     customers and innovating.  Anytime I hear that our

22     team is focused on not being able to work well

23     together, it means that they're not focused on serving

24     customers and innovating.  And anyone who would have

25     been not serving customers and innovating, I would

Page 150

1    have -- I would have want them to focus on serving

2    customers and innovating.

3         Q.   Haney was on the business side in Detroit,

4    right?

5         A.   No, that's not correct.

6         Q.   What side was he on?

7         A.   He was a product leader here in Seattle.

8         Q.   He was a product leader here in Seattle and

9    he was getting technical needs met by Mosby's people in

10   Detroit?

11        A.   I don't know that.  I don't -- I don't

12   remember the -- which teams were owned by whom and who

13   they were working together.

14        Q.   Well, at some point did you become aware

15   that Abdullah Haydar was on a team, was a manager of a

16   team under Mosby's leadership and that it was Haydar

17   who wanted the transfer of the employee?  Did someone

18   make you aware of that?

19        A.   I became aware that the perception of

20   Stefan was that Haydar had broken trust and lost trust

21   with the product and technical teams that he was

22   required to work with over this transfer of the

23   employee, and that's about the extent of my

24   understanding of the situation.

25        Q.   If Haydar reported to Mosby and Mosby

Page 151

1   reported to Simpson and Haydar is not in that chain of

2   command, did you direct Simpson or Mosby, Deal with

3   this?

4        A.   I would have -- I would have made sure

5   that Ian Simpson was aware of it and I would have

6   asked him to get involved and resolve it so that the

7   teams could get back to focusing on customers and

8   innovation.  And I -- and I -- that was the only

9   participation in that event I had.  I don't want to be

10  involved in that event.  I want to know that people

11  are going to focus on serving customers and focusing

12  on innovation.

13       Q.   You never asked Abdullah Haydar his side of

14  the story?

15       A.   I didn't ask Abdullah Haydar his side of

16  the story or anybody else their side of the story.

17       Q.   Did it assess -- did it affect -- the

18  hearing that from Haney, did it affect your assessment

19  as to whether Abdullar -- Abdullah Haydar was failing

20  to work his way effectively out of the performance

21  improvement plan?

22       A.   I don't know the timing.

23            MR. WOLFF:  Objection.

24            THE WITNESS:  Sorry.

25            MR. WOLFF:  Go ahead.

Page 152

1              THE WITNESS:  Were you going to say

2    something?

3              MR. NACHT:  You think it assumes a chronology

4    that's not right?

5              MR. WOLFF:  Yeah, but I think he was

6    addressing that.

7              THE WITNESS:  I was going to say the same

8    thing.  I don't think that chronology is right, but...

9    BY MR. NACHT:

10        Q.   Okay.  When did you hear about this from

11   Haney?

12        A.   I -- it would have been after -- after the

13   incident blew up into this problem, but I don't -- I

14   don't recall the timing.

15        Q.   But before performance improvement plan?

16        A.   Yes, that's my recollection.

17        Q.   Around the time of the OLR that we just

18   read the notes about?

19        A.   I don't think so.

20        Q.   You think it was before that?

21        A.   I do.

22        Q.   So you went into the OLR in early 2015 with

23   that incident in your head?

24        A.   Incorrect.

25        Q.   Okay.  Why?

Page 153

1      A.    Because I wouldn't come into an OLR

2   thinking about an incident that happened a couple

3   months ago as a primary piece of input into discussing

4   the talent of our team.

5      Q.    Haney was with Amazon for a number of years

6   and you actually saw him a fair amount in 2015, right?

7      A.    I think you asked how many times would I

8   have interacted with him in 2015.  I don't remember

9   the number I gave earlier, but I would have seen him

10  more than five times that year, yes.

11     Q.    And you had known him a number of years?

12     A.    Correct.

13     Q.    Haney -- let me ask you this:  If Haney's

14  perception that Haydar was a real problem and that it

15  was impairing the effectiveness of the team's working

16  together, if that was going to be an -- an issue that

17  was significant in affecting Abdullah Haydar's ratings,

18  that one incident, then it should have been

19  investigated to get Haydar's side of the story, right?

20     A.    I don't know that that incident had any

21  impact on Abdullah's ratings.

22     Q.    Okay.  And since it's just one incident

23  from one peer, it wouldn't strike you as it ordinarily

24  would?

25            MR. WOLFF:  Objection.  Form.  I didn't

Page 154

1   understand the question.

2            THE WITNESS:  Could you clarify the question?

3            MR. NACHT:  Could you please repeat it?

4   Thank you.

5                 (Question on Page 153, Lines 22

6                  through 24, read by the

7                  reporter.)

8            THE WITNESS:  I don't know what "ordinarily

9   would" means.

10  BY MR. NACHT:

11       Q.   In -- in determining the performance rating

12  of an L7?

13       A.   I don't determine the performance ratings

14  for L7s on our team, and I don't know whether Joel

15  Mosby would have used this incident as an input into

16  his performance ratings for Abdullah.

17       Q.   One way in which unconscious bias can

18  affect us is that we are less patient about a

19  particular behavior in a person from a particular

20  background than we might be with the identical behavior

21  in a person from different backgrounds?

22       A.   I don't know that to be true.  Are you

23  asserting that?

24       Q.   I'm -- it's a perfectly reasonable

25  response.

Page 155

1          You've never noticed that in other people?

2          A.   We don't label people on their

3     backgrounds.

4          Q.   Not Amazon, just you in life as an American

5     for the last 50 years.  You've never noticed that

6     sometimes people just hear -- hear the same words or

7     see the same conduct?  How about gender?  You ever

8     notice sometimes that younger employees in particular

9     may have a harder time hearing something from a female

10    boss than from a male boss?  Isn't that something

11    you've noticed as a manager over the years?

12         A.   No, no.  I think -- I think your -- your

13    description of stereotypes is completely inappropriate

14    in a professional environment.  We focus on people for

15    who they are and we treat people like we would want to

16    be treated, and I want people not to label me.  I want

17    them to value me for who I am and the contribution I

18    make, and that's how we think about people.  We don't

19    think about them per labels.

20         Q.   But how do we root out unconscious bias if

21    we're not at least aware that it exists?  You -- you --

22    you talked about an awareness of it.

23         A.   Well, I -- I view unconscious bias as

24    being different than the comment you made a minute ago

25    that sounded to me derogatory about women leaders or

Page 156

1    something.  That's how I interpreted your comment.

2         Q.   No, no, no, no.

3         A.   Okay.

4         Q.   My point is -- is exactly the opposite,

5    it's that -- is that it's harder sometimes for younger

6    employees to hear with patience and respect the exact

7    same words from a woman as they do from a man

8    sometimes?

9         A.   I disagree.

10        Q.   You've never seen this --

11        A.   I think --

12        Q.   -- phenomenon?

13        A.   I think the statements you're making to me

14   sound outrageous.  We don't judge people on their age.

15   We don't judge people on their gender.  We judge

16   people for who they are and their performance against

17   the leadership principles, period.

18        Q.   Have you ever seen an example of someone

19   making a comment about someone and you thought they

20   were being -- they were just out of line?

21        A.   In my time at Amazon?

22        Q.   Yeah.

23        A.   No.

24        Q.   How many years have you been there?

25        A.   11.

1      Q.   And you've never heard anyone talk about

2   someone in a way that you felt, Gee, I feel like

3   they're bringing bias into the situation?

4      A.   One of the reasons I love Amazon and I

5   really love how -- the fit for me -- for the -- for

6   the culture being a fit for me is it's not political.

7   People focus on the individual.  They focus on what

8   that person can contribute.  People don't talk about

9   other people like you're describing.  To me that has

10  no place in a professional environment.  It may exist

11  in other professional environments, but it's

12  completely unacceptable for that to exist in our kind

13  of environment.

14      People may disagree about how best to serve

15  customers, but people don't talk about each other in a

16  way that you're describing.

17      Q.   So the question is, if there exists a thing

18  called unconscious bias then -- and we don't talk about

19  the ways in which unconscious bias may affect the way

20  certain people view other people through a lens, then

21  how do we eliminate unconscious bias?

22           MR. WOLFF:  Objection.  It seems awfully far

23  afield of any facts that are in dispute in this case or

24  any factual dispute that's likely to lead to the

25  discovery of admissible evidence.

Page 158

1        Do you have an opinion of how we deal with

2   unconscious bias if we don't acknowledge that it exists?

3             THE WITNESS:  Well, the -- the -- no, I don't

4   have an opinion.  The step I took was to bring in the

5   person who's an expert on unconscious bias and have them

6   meet and present to my leaders, and we were the first

7   leadership team to do that at Amazon, and I think that's

8   a -- that's a step in the right direction.

9        But your question sounds very broad and very

10  ambiguous about something that's -- I think you called it

11  earlier an issue that exists across all human beings, so

12  I can't really comment on how to solve it across all

13  human beings.

14  BY MR. NACHT:

15        Q.   How many direct reports do you have?

16        A.   11.

17        Q.   And how many of them are women?

18        A.   Three.

19        Q.   And how many of them are people of color?

20        A.   I -- I don't know the answer to that.

21        Q.   If you created an impression among

22  Mr. Mosby and Mr. Gaw that you thought someone was not

23  a good fit for Amazon, do you think they would listen

24  to that and take that seriously?

25        A.   I wouldn't create such an impression.

Page 159

1          Q.    Creating an impression inherently involves

2    affecting someone else's state of mind, right?

3          A.    I haven't thought about what an impression

4    is very deeply but that sounds reasonable.

5          Q.    Remember we were talking about car

6    accidents earlier?

7          A.    Yes.

8          Q.    And I said a person in a deposition might

9    say, I would never cause a car accident?

10         A.    I remember you saying that, yes.

11         Q.    And I want to go back to that.  If I were

12   to ask you directly, Would you ever have a car accident

13   in the future, what's your answer?

14         A.    I would not like to have a car accident in

15   the future.

16         Q.    Right.  But you can't state under oath that

17   you would never have a car accident in the future,

18   right?

19         A.    You can't state under oath a prediction

20   about the future, correct.

21         Q.    You also could state, you could state your

22   opinion that you never intentionally caused a car

23   accident, right?

24         A.    I guess you're losing me a little bit

25   here.  The car accident doesn't seem like an analogy

Page 160

1    that I understand very well.

2            Q.   Okay.

3            A.   So opinions don't -- opinions don't cause

4    car accidents, so I can't really relate to that.

5            Q.   Okay.  I know you've got great analytical

6    skills so what I'm asking here is not very complicated.

7    I'm sure your analytical skills vastly exceed my own.

8            We know that in a population there are going to

9    be a certain number of car accidents, right?

10           A.   We know that there will be car -- we

11   believe there will be car accidents every year, yes.

12           Q.   Until all of our cars are run by you guys.

13           So we also know that except for a few very

14   strange people, people aren't trying to create car

15   accidents, right?

16           A.   Correct.

17           Q.   But a person may have experienced some car

18   accidents which they view as not their fault, right?

19           A.   Someone could be in a car accident and

20   view the car accident as not their fault, yes.

21           Q.   And someone else, the other person in the

22   other car or a police officer or a witness may think

23   it's their fault, right?

24           A.   I don't -- I don't want to speculate on

25   hypotheticals, but...

Page 161

1      Q.   Well, I'm asking you to, so I'm asking

2   you --

3      A.   I think that sounds theoretically

4   possible, yes.

5      Q.   Okay.  You ever been in a car accident,

6   sir?

7      A.   Yes, I have.

8      Q.   Okay.  Was it your fault?

9      A.   I don't recall.

10      Q.   Okay.

11      A.   I don't believe so.

12      Q.   Did you hit someone from behind?

13      A.   No.

14      Q.   Okay.  Someone hit you from behind?

15      A.   No.

16      Q.   You go off the road?

17      A.   No.

18      Q.   All right.  I don't really care about your

19   car accident.  But you didn't think it was your fault?

20      A.   I don't -- I don't remember thinking it

21   was my fault, correct.

22      Q.   And if I asked you what kind of a driver

23   you are, you might say, I'm a really good driver.  In

24   fact, is that what you would say?

25      A.   I would say I'm a good driver, yes.

Page 162

1          Q.   Yeah.  It's very rare to meet someone who

2    says, I'm a pretty lousy driver.  Bias exists in the

3    population, we discussed that?

4          A.   You -- you believe that, yes.

5          Q.   You believe it too?

6          A.   I -- I believe there is unconscious bias,

7    yes.

8          Q.   And there is some people with intentional

9    bias out there, right?

10         A.   I believe that might be true, yes.

11         Q.   You think it might be true or you think

12   it's true?

13         A.   I can't speak for those people, so it's

14   hard for me to say what's on their mind and how

15   they're feeling.

16         Q.   Well, you have an opinion -- you have an

17   opinion about what customers think?  I mean, this is

18   what you do for a living in part, correct?

19         A.   That is what I spend my time on.  My

20   opinion is on what's important to customers and how do

21   we innovate.  That's the time I spend.  I don't spend

22   my time thinking about car accidents --

23         Q.   Or bias?

24         A.   -- for sure.

25         Q.   Or bias?

Page 163

1          A.   I don't know.  I -- I -- I don't think of

2     people as bias.  I think of people as people and I

3     think about what they bring and what they're capable

4     of doing.

5          Q.   Has it -- let's just stick with the gender

6     thing for a moment because I don't think you understood

7     what I was asking before based on your reaction.

8          Let's take your entire professional career.  Not

9     just Amazon.  You can't think of a single incident

10    where some male reacted to something that a woman said

11    or did and you had the impression, I think he's

12    reacting that way in part because of her gender?

13               MR. WOLFF:  Objection.

14         You can answer it if you can.

15               THE WITNESS:  No.  That seems like a silly

16    scenario.  I mean, I wouldn't -- I wouldn't think of

17    someone's reaction as ever being based on gender.  That

18    seems -- I don't know.  It doesn't seem focused on who

19    the person is.  I view people for themselves as

20    individuals not for their gender or their reaction to

21    gender.

22    BY MR. NACHT:

23         Q.   I've heard you say that --

24         A.   Yeah.

25         Q.   -- and I appreciate that you would find it

Page 164

1    outrageous that someone else would think that.

2         A.   Yes.  And I don't think about other people

3    thinking that.

4         Q.   That's -- that gets at exactly what I was

5    trying to ask about.  Now we're there.

6         You manage a team of people and there is bias in

7    the population whether it's unconscious or conscious.

8    Don't you go through an annual online training about

9    bias?

10        A.   Yes.

11        Q.   Isn't one of the things you've learned from

12   that online training that to be sensitive to the

13   possibility that bias could be influencing

14   decision-making, we need to sometimes ask questions?

15        A.   Can you be more specific?

16        Q.   Sure.

17        If Haydar presents data that contradicts the

18   assessment of his performance, isn't it the company's

19   job to independently look into the validity of his

20   data?

21        A.   I'm not aware of any data of Abdullah's

22   performance that's contrary to the two performance

23   ratings that he received while he was at Amazon.

24             THE WITNESS:  I'm just planting the seed.

25   I'm not going to interrupt your topic.  But on the

Page 165

1    transition to the next topic, I would love to have a bio

2    break, please.

3              MR. NACHT:  Take it.

4              THE WITNESS:  Okay.

5              THE VIDEOGRAPHER:  We're now going off

6    record.  The time is 12:16 p.m.

7                   (Recess 12:16-12:37.)

8                   (Exhibit No. 8 marked

9                    for identification.)

10             THE VIDEOGRAPHER:  We're now back on the

11   record.  The time is 12:37 p.m.

12

13                   EXAMINATION (Continuing)

14   BY MR. NACHT:

15        Q.   Directing your attention to what's been

16   marked as Faricy Exhibit 8, do you recognize this

17   document, sir?

18        A.   I do.

19        Q.   It's Bates stamp 415 and runs through 419.

20   Did you review this yesterday?

21        A.   I did.

22        Q.   And these are Anne DeCleene's notes of her

23   interview with you?

24        A.   Yes.

25        Q.   And you told her the truth, right?

Page 166

1          A.    Correct.

2          Q.    You took it seriously?

3          A.    Correct.

4          Q.    Did she accurately report what you said?

5          A.    I don't have any reason to believe she

6     didn't.

7          Q.    I want to ask you about some things in this

8     document.  But before I do, Stefan Haney, his office

9     was right next to your office in Seattle for a couple

10    of years, right?

11         A.    No.

12         Q.    Was it close to your office?

13         A.    We were on the same floor in 2009 and I

14    believe part of 2010, but in the building of Varzea he

15    was never sitting close to me and never sat close to

16    me in -- in Amelia either, the building we're in now.

17         Q.    All right.  Looking at Bates stamp 419, the

18    last page, the letter E about 12 lines down:  "Do you

19    think Abdullah can be successful long term at Amazon?

20         "Answer:  No.

21         "Would you feel comfortable or uncomfortable if

22    he were to transfer to another team?

23         "Definitely not."

24         You have no reason to believe that she

25    mischaracterized what you said, correct?

Page 167

1      A.   Correct.  This interview took place

2   3/31/2015, yes.

3      Q.   Abdullah Haydar had not yet been put on a

4   performance improvement plan, right?

5      A.   I don't know what -- what the date of his

6   performance improvement plan was.

7      Q.   When was Abdullah terminated?

8      A.   I don't know.

9      Q.   I thought that you had an open mind as long

10  as he was on a performance improvement plan, that if he

11  did a good job he could get off of it and remain at

12  Amazon?

13     A.   That is correct.

14     Q.   Why didn't you say that?

15     A.   That wasn't the question I was asked.

16     Q.   What was -- the question you were asked,

17  how is that different?

18     A.   It's very different.  The question here

19  was, "Do you think Abdullah can be successful long

20  term at Amazon?"  When I see two straight years of

21  least effective performance ratings across, in my

22  opinion, a fairly large number of leaders that he

23  worked with and knew him well, that doesn't sound like

24  a very positive indicator from that data about his

25  ability to be successful long term at Amazon.

Page 168

1        Q.    Let's move on.  Thank you.

2        I want to talk about how you built teams.  You

3   took over Marketplace when or did you create

4   Marketplace?

5        A.    No, I took it over in I believe 2009.

6   That date may not be accurate, but it would be worth

7   checking, but I think it's 2009.

8        Q.    How many teams were there?

9        A.    I don't remember how many teams.

10       Q.    Ballpark?

11       A.    There was -- if people is helpful, there

12   was 40ish people.

13       Q.    40?

14       A.    4-0.

15       Q.    And ballpark how many now?

16       A.    18,000.

17       Q.    The number of people has increased

18   dramatically?

19       A.    Correct.

20       Q.    Is it the fastest growing part of the

21   company?

22       A.    I don't know that.  It is a -- it is a

23   fast growing business, that I can say.

24       Q.    So we've got the identification of a -- of

25   an idea.  Let's provide a marketplace for buyers and

Page 169

1   sellers to interact, right, that's the main concept?

2        A.   Yes.

3        Q.   And then the sub ideas, books, books and

4   movies, clothing, these kinds of products, those kinds

5   of products a couple years ago or you went into, what,

6   household products?  You keep expanding the

7   Marketplace, the store is essentially offering the

8   auction house or the flea market is having different

9   sections in it where different kinds of items are sold.

10  Is that a fair analogy?

11       A.   I -- I -- I don't think the

12  characterization -- you may have been trying to be

13  funny -- of flea market is correct.  It would also not

14  be fair to say that the product categories have

15  expanded.  The core product categories were there when

16  I took over this role.  So books, music, movies, soft

17  lines, hard lines, consumables.

18       What you may have been referring to is we have

19  launched new marketplaces, and I think what you're

20  referring to was this launch of Amazon Home Services

21  which is a marketplace for services.  So we have

22  expanded the number of marketplaces we offer

23  consumers.

24       Q.   A flea market is, I guess, used goods and

25  these are new goods.  But you also sell used goods,

Page 170

1    too, right?

2          A.    We sell new and used goods, new and used

3    products on Amazon, yes.

4          Q.    So I was trying to imagine some physical

5    geographical place where buyers and sellers interact

6    rather than it just being the place is a reseller, a

7    distributor such as a store where the transaction is

8    between the consumer and the -- the store.  I wasn't

9    trying to be funny.  I was trying to just imagine where

10   do you go where some people are buying and some people

11   are selling, but it's a physical geographical place and

12   maybe there isn't a good analogy.

13         What's the best analogy you can come up with?

14         A.    I don't think there is a good analogy.

15   It's unique because e-commerce doesn't have a physical

16   store limit, and so we have, you know, unlimited shelf

17   space for entrepreneurs and small businesses to reach

18   customers all over the world.  It's awesome.

19         Q.    And what are soft goods and what are hard

20   goods and what are consumables?

21         A.    Consumables are beauty products, toiletry

22   products.  Hard lines are any hard goods like toys,

23   sporting goods, electronics.  Soft lines includes

24   apparel, shoes, luggage, et cetera.

25         Q.    And why does it make sense to break it out

1    into those three categories?

2         A.   I don't know whether it does make sense to

3    break it out that way, but I wanted to address your

4    assertion that we had added those categories since I

5    took over.  That would be incorrect.  Those categories

6    existed on the Amazon Marketplace when I took over the

7    business.

8         Q.   Okay.  And the expansion has been partly

9    geographical to expand the sellers from different

10   countries?

11        A.   Yes.

12        Q.   And part of the expansion has been in

13   providing an additional technological services to make

14   the transaction easier for both seller and buyer?

15        A.   I think broadly that's -- that would be

16   accurate, yes.

17        Q.   How else?  I mean, you've gone from 40 to

18   18,000 so there are a whole lot of people doing stuff.

19   What -- what else -- does everything they do fit into

20   one of those two categories or are there other things

21   they do?

22        A.   Well, I guess the simplest way to describe

23   it is I own the Marketplace business end to end, and

24   that includes all of the functional areas of the

25   business, but it primarily focuses on how do we

Page 172

1    support small businesses and entrepreneurs in being

2    very successful.

3        Q.    So are many of those people involved in

4    storing and distributing the products?

5        A.    We offer a product to small businesses

6    called fulfillment by Amazon, FBA.  That team is not

7    part of my -- not part of my organization.

8        Q.    And the warehouses where -- when an

9    independent seller sells to an independent buyer, it

10   just goes direct from the seller to the buyer, right?

11       A.    That's one option.

12       Q.    Is another option that Amazon hangs on to

13   it and distributes it?

14       A.    Yes.  That's the fulfillment by Amazon

15   product.

16       Q.    And that's not your people either?

17       A.    Correct.

18       Q.    So the people who work for Faricy aren't

19   warehouse people and truck drivers, correct?

20       A.    I don't know if we -- if we have any

21   employees on my team who would be in warehouses or

22   part of delivery services like truck driving.  It's

23   possible we do.

24       Q.    Give me some rough sense of the breakdown

25   of what the people who work for you do, please.

1            A.    They focus on the product and technology

2      and the support that helps small businesses and

3      entrepreneurs join Amazon and reach customers all over

4      the world and be successful.

5            Q.    Right.  But there are 40,000 of them, so

6      how many --

7            A.    40,000 of who?

8            Q.    Of people who work for you -- or 18,000.

9      I'm sorry, 18,000?

10           A.    Yes, that's right.

11           Q.    So the 18,000, how many people would you

12     say write code or fix code or supervise teams of people

13     that write code and fix code, ballpark?

14           A.    4,000.

15           Q.    Okay.  And then what do the other 14,000

16     people do?

17           A.    Product, support, sales if I were to make

18     it simple.

19           Q.    So sales is selling to the small business

20     or large business community to get them to utilize the

21     Amazon Marketplace?

22           A.    Recruitment would be a more accurate word

23     to describe the team, yes.

24           Q.    And I'm sorry.  What else did you say

25     besides sales?

1        A.    Product and support I believe I also

2    identified --

3        Q.    Okay.

4        A.    -- yeah.

5        Q.    So support means I'm unhappy with what

6    happened and so I interact with Amazon about the -- the

7    transaction to get it fixed?

8        A.    No.

9        Q.    What does support mean?

10       A.    Support means we offer 24 by 7 coverage

11   helping support small, medium businesses and

12   entrepreneurs in any needs that they have in order to

13   serve customers effectively.

14       Q.    So Amazon Lending, is that part of you?

15       A.    Amazon Lending is part of my team, yes.

16       Q.    Okay.  How many people work for Amazon

17   Lending?

18       A.    I don't know.

19       Q.    Ballpark?  500, a thousand?

20       A.    Under 100.

21       Q.    Okay.  What other kinds of support

22   functions do you provide to the community of sellers

23   and entrepreneurs?

24       A.    Can you be a little bit more specific

25   because I told you we provide everything end to end.

Page 175

1    So every tool, every product they use to run their

2    business on Amazon, we build and own.

3          Q.   What kinds of tools?  Give me a sense of

4    what's out there.

5          A.   An example of a tool would be we build the

6    technology that businesses use to receive orders and

7    acknowledge the shipment of their order.

8          Q.   And is that a -- so that's a kind of

9    software or is it software and hardware together?

10         A.   It's software primarily.

11         Q.   So a company could go to a variety of

12   software solution providers for that kind of service

13   and you're in competition with them for that piece of

14   it?

15         A.   No.  I don't think that's accurate.

16         Q.   Why not?

17         A.   Because I don't think that people go see

18   other software providers for technology that they

19   would use on Amazon.

20         Q.   Oh, I see.  It's only for the Amazon sales

21   component?

22         A.   It's technology focused on serving orders

23   from Amazon customers in the previous example.

24         Q.   Okay.  So if I make nuts and bolts and I am

25   selling my nuts and bolts to people who -- companies

Page 176

1    who need nuts and bolts for their machines, I may sell

2    some of my nuts and bolts at conferences and some of

3    them where I have my own salespeople interact with my

4    traditional customers and then I sell some on Amazon

5    where companies perhaps in other countries can find me

6    to buy nuts and bolts?

7         A.   Yes.  As kind of a generic high level

8    example, that kind of exemplifies the kind of process

9    that takes place as part of the Marketplace.

10        Q.   So do you have a lot of people who work for

11   you that learn about different markets so that tailored

12   services can be provided?

13        A.   Can you be more specific on your example?

14        Q.   Sure.  I mean it sounds like in order for

15   you guys to do your job well, you need to understand

16   something about the seller, customer relationship in

17   every market you're in?

18        A.   Correct.

19        Q.   And that is a lot of knowledge?

20        A.   Correct.

21        Q.   And that knowledge is not intuitive.

22   Markets are handled differently in all kinds of ways.

23        A.   I don't think so.

24        Q.   You think it is intuitive?

25        A.   I think it is intuitive and I think the

Page 177

1    needs of most customers are really similar across the

2    world.  They're looking for great selection.  They're

3    looking for great prices.  They're looking for fast

4    delivery speeds.  They're looking for things that have

5    Prime offers and so we understand what customers are

6    looking for.  We also understand the needs of sellers,

7    and our goal is to help them be very successful at

8    serving those customers.

9         Q.   How does Amazon Marketplace -- do you

10   charge sellers?

11        A.   Yes.

12        Q.   And are the buyer -- do the buyers pay

13   anything to Amazon or they just pay the sellers and

14   the...?

15        A.   Buyers buy a product on Amazon and pay the

16   price for -- the product price and the shipping cost

17   if there is a shipping cost.  Amazon publishes a rev

18   share and we take a share of the product sale and the

19   shipping as our fee.

20        Q.   And does -- do Amazon Prime memberships,

21   does some of that revenue go to Marketplace or not?

22        A.   I don't know.  I don't believe so.

23        Q.   Okay.  So all of the revenue from Amazon

24   Marketplace is essentially a commission off of a sale

25   that occurs through your Marketplace you've created?

Page 178

1          A.    It is the rev share.  I did not create the

2    Marketplace, but yes, it is the -- it is the business

3    that I'm grateful to lead at Amazon.

4          Q.    When I said "you," I meant Amazon --

5          A.    Yes.

6          Q.    -- not you personally.

7          A.    Amazon, yes.

8          Q.    Okay.  And Mr. Haydar worked as a software

9    development engineer manager, right?

10         A.    Correct.

11         Q.    Which means he recruited and supervised

12   software developers, people who write code, in order to

13   respond to specific business needs?

14         A.    Customer needs.

15         Q.    Okay.

16         A.    Yes.

17         Q.    I mean, everything is indirectly a customer

18   need.  Some things are directly customer needs.

19   Customer need is a focus of the company, but I mean,

20   every company that exists has people who do things that

21   are less directly customer solving or customer facing,

22   right?  There are people who solve internal problems

23   for the company, accounting, getting the buildings

24   built or allowing work to get done, the HR people, the

25   lawyers, there are people who do things which may not

Page 179

1    directly serve the customers, but they --

2          A.   I don't agree.

3          Q.   Oh?

4          A.   I don't agree.

5          Q.   Tell me.

6          A.   I think that all of the activities that we

7    make investments in are focused on serving customers

8    well, and if we make an investment in a building or in

9    a legal team or an accounting team, we care about how

10   much that investment is because we want all of our

11   investments to focus on things that have a very direct

12   and meaningful benefit to customers.

13         And so I think we -- we don't think of the

14   world as direct and indirect.  We do think of this

15   leadership principle around frugality and this leader

16   principle for frugality is about focus the investment

17   you make on what makes customers most happy.

18         Q.   Now, at one point Mr. Haydar was running

19   the Nudge team.  Are you aware of that?

20         A.   No, I'm not aware of that.

21         Q.   So you don't really know what he did, do

22   you?

23         A.   I know that he was a software development

24   manager, but I did not track the individual jobs of

25   all the individual people on my team, no.

Page 180

1          Q.    How is the Nudge system working?

2          A.    Today?

3          Q.    Yes.

4          A.    Well.

5          Q.    How was it working in 2015?

6          A.    I don't know.

7          Q.    When you made the statement to Ms. DeCleene

8    that you didn't think Haydar was going to work out or

9    was not likely to succeed, I don't want to put words in

10   your mouth, but whatever you said to her along those

11   lines, you did so without a knowledge of what Abdullah

12   Haydar had actually contributed to the company, fair?

13         A.    No.  That's incorrect.

14         Q.    Well, you know what his rating was but just

15   now you couldn't answer what his job was?

16         A.    His rating is a reflection of the

17   contribution he made in that job.

18         Q.    Have you ever given thought to how

19   customers review products and sellers?

20         A.    Yes.

21         Q.    Are rating systems -- why do they require

22   thought?  Why isn't it just -- what thought is

23   required?  Tell me.

24         A.    Can you be more specific in your question?

25   I'm not sure I understand.

Page 181

1          Q.    I've never given any thought to this --

2          A.    Okay.

3          Q.    -- question.  I'm not even sure I have an

4     intelligent question to ask.

5          What should one think about in a rating system

6     of customers evaluating?

7          A.    I don't know.  I'd have to -- I'd have to

8     take time to think about it.

9          Q.    Okay.  Amazon provides a system for

10    customers to rate sellers?

11         A.    They provide a system for customers to

12    rate products and for customers to give sellers

13    feedback and ratings as well, yes.

14         Q.    And Amazon also seeks customer feedback

15    about Amazon all the time, right?

16         A.    Correct.

17         Q.    Has the rating system of customers rating

18    sellers, has that improved over the years you've been

19    running Marketplace?

20         A.    I believe so, yes.

21         Q.    Can you give me any examples of how?

22         A.    No, I'm not as familiar with those, but I

23    do believe that we have a team dedicated to making

24    improvements on those.

25         Q.    Ratings of employees -- ratings of

1   employees are based on perceptions and they're based on

2   some objective facts, they're based on both, right?

3          A.   The process we use for ratings is meant to

4   bring data for the performance rating, the leadership

5   rating and the growth potential.  Those three together

6   result in the overall rating.

7          Q.   But some of that data is perceptions?

8          A.   Can you -- can you be more specific and

9   give me an example?

10         Q.   Sure.  I mean, a goal such as produce a

11  piece of software that works is an objective fact

12  that's measurable, right?

13         A.   I agree.

14         Q.   Shows backbone but also -- what is it

15  before you commit?

16         A.   Disagree and commit.

17         Q.   But also disagree and commit, all we can

18  really do is ask people who interact with that person,

19  does this person show backbone and disagree and commit

20  and can you give any examples, right?

21         A.    I disagree.  I think we require for people

22  to have a view on how someone is doing on a leadership

23  principle for them to give a specific example of that

24  behavior.  And with those specific examples, they act

25  as a set of facts that I think are very helpful so

Page 183

1    that we can help people improve their performance.

2         Q.   Do you think there's a subjective component

3    to the leadership principles?

4         A.   By the time it results in a performance

5    rating, no.

6         Q.   Let's go back to analytical training.  The

7    leadership principle data has not been subject to

8    reliability or validity analysis, right?

9         A.   I'm sorry.  I don't understand the

10   question.

11        Q.   I mean in other words, there's no -- there

12   are no studies that you can point to that demonstrate

13   that there's some kind of objective they're there that

14   the leadership principles accurately capture, it's a

15   belief you have, but you can't prove that, right?

16        A.   We believe that being a principle-based

17   company is important to serve customers well and we

18   absolutely believe these leadership principles support

19   innovating, serving customers well and building great

20   teams.

21             MR. NACHT:  Can you read the witness the

22   question, please?

23                  (Question on Page 183, Lines 11

24                   through 15, read by the

25                   reporter.)

Page 184

1              THE WITNESS:  It's a super confusing

2     question.  The "they're there" I don't really understand

3     what you're trying to ask.

4              MR. WOLFF:  Can you rephrase it for him?

5              MR. NACHT:  Sure.

6     BY MR. NACHT:

7         Q.   I know that you believe that the leadership

8     principles work?

9         A.   Correct.

10        Q.   And I know that Amazon has grown and been

11    very successful while it has those leadership

12    principles?

13        A.   Correct.

14        Q.   I know that Marketplace in particular has

15    been very successful and grown while you have these

16    principles?

17        A.   Correct.

18        Q.   But the leadership principles to the extent

19    that they purport to accurately measure something,

20    there are no studies by which one can say this person

21    objectively shows a certain amount of backbone but

22    disagrees and commits and our system accurately

23    captures that?

24        A.   I don't agree with you.  I think the -- if

25    I go back to the Exhibit 1, for each leadership

Page 185

1   principle, there are very specific examples of the

2   behavior required to be role modeled, to be highly

3   valued and for needs improvement.  And so I think that

4   provides the level of specifics needed so that people

5   can develop a leadership rating that's tied to

6   something that's specific and factual.

7        Q.   Do you think that the leadership principles

8   can ever be manipulated by a person or people who are

9   conducting reviews?

10        A.   No.

11        Q.   Have you ever been told that you need to

12   develop, maybe early in your career, some of your

13   leadership principles?

14        A.   Have I been told that I have areas to

15   develop?  Yes.

16        Q.   Okay.  Can you give me an example?

17        A.   Yes.

18        Q.   Okay.

19        A.   One of the areas I've been told I need to

20   develop is encouraging others to participate and

21   seeking feedback from others before I give my own

22   point of view.

23        Q.   And you received that feedback early on in

24   your career at Amazon in connection with the leadership

25   principle?

Page 186

1          A.    Yes.

2          Q.    It came out of an annual review?

3          A.    I don't recall the discussion, but I do

4    believe it came out of an annual review, yes.

5          Q.    Do you believe that in the time you've been

6    running Marketplace that any annual reviews have ever

7    been incorrect?

8          A.    I don't have any reason to believe that.

9          Q.    You're a very sophisticated man.  You're

10   very well educated.  You run a very powerful company.

11   You're a real thought leader.  You travel in circles of

12   other thought leaders, but what I hear you testifying

13   to today is that in your organization there's no bias

14   and the ratings always work out.  And that seems

15   implausible based on the numbers of people in the

16   organization and human frailty.  It's a human system,

17   we're on earth not heaven, even the best possible

18   systems are still designed by people and people are

19   flawed.

20         A.    I don't believe your statement accurately

21   reflected my testimony today.

22         Q.    Okay.  How did I mischaracterize it,

23   please?

24         A.    You made --

25               MR. WOLFF:  Let's hear the question back so

Page 187

1   you have it fresh in your mind.

2              THE REPORTER:  "You're a very sophisticated

3   man.  You're very well educated.  You are" --

4              MR. NACHT:  That part?

5              THE WITNESS:  Let's skip over that part.

6              MR. WOLFF:  What, you were referring to him

7   and not me?

8                   (Laughter.)

9              THE REPORTER:  "...but what I hear you

10  testifying to today is that in your organization there's

11  no bias and the ratings always work out.  And that seems

12  implausible" --

13             THE WITNESS:  Hang on.  Sorry.  Can we take

14  each one of those one piece at a time?

15             MR. NACHT:  Please.

16             THE WITNESS:  Sorry.  Can you go through

17  them?  After the -- the nice words to the part where he

18  was --

19             MR. NACHT:  Being a lawyer?

20             THE WITNESS:  -- mischaracterizing the words

21  I had said throughout today.  Could you just go through

22  each --

23             THE REPORTER:  Yep.

24             THE WITNESS:  -- section of the phrase at a

25  time?

1              THE REPORTER:  "...but what I hear you

2    testifying to today is that in your organization there's

3    no bias" --

4              THE WITNESS:  Stop.  I don't believe you

5    asked me if there's any bias, and I'm not aware of any

6    bias.  That is accurate.

7    BY MR. NACHT:

8         Q.   Okay.  We'll do some follow-up in a bit but

9    let's keep going with this question because I

10   appreciate you breaking it down.  Thank you.

11             THE REPORTER:  "...and the ratings always

12   work out.  And that seems implausible based on the

13   numbers of people in the organization."

14             THE WITNESS:  So that sounds like your

15   opinion.  I don't believe I said that.

16   BY MR. NACHT:

17        Q.   That the rating -- I'm asking you if the

18   ratings, in your opinion, are always accurate?

19        A.   I -- I believe there's a high integrity

20   process behind our ratings and I do believe our

21   ratings are accurate.  For this case I believe the

22   two years' worth of ratings on Abdullah and the number

23   of senior leaders that he worked for who attempted to

24   help him and coach him and mentor him, I believe that

25   those ratings are an accurate reflection of what they

Page 189

1    believed his performance to be, and they believed his

2    performance to be least effective and least effective.

3    That's extremely unusual for anybody at Amazon, and

4    it's extremely unusual for anybody in the first

5    two years at Amazon, and it's even more unusual over

6    the number of leaders that he worked with.

7         Q.   And all of those leaders worked for you or

8    worked for someone who worked for you?

9         A.   They worked in my organization, correct.

10        Q.   Did Abdullah Haydar rub you the wrong way

11   with his e-mail on June 9th, 2013?

12        A.   No.

13        Q.   It's all business, you had no personal

14   feelings about the man?

15        A.   I don't have personal feelings about

16   business e-mails, no.

17        Q.   But you had no personal like or dislike for

18   Abdullah Haydar, you're just trying to put a good team

19   together, right?

20        A.   That question seems preposterous to me.

21   People don't have personal feelings about every work

22   e-mail they get.  I get thousands of e-mails a day.

23        Q.   Not about the e-mail, about the man.  You

24   had some interactions with the man.

25        A.   I don't have -- I don't have any -- any

Page 190

1   feelings about Abdullah.  I don't know -- I don't know

2   Abdullah that well.  I never did know him that well.

3   I still don't know him, so I don't have any -- I don't

4   have a point of view on Abdullah.

5          I do have a point of view on anyone who has a

6   least effective performance rating and if they have

7   least effective performance rating two years in a row,

8   that performance is very poor performance.

9          Q.   So the hypothesis that I will put to you is

10  that the performance rating is not an objective fact,

11  it is something which you influenced by your comments

12  and choices to the people who wanted to please you and

13  in turn made bigger deals over things that were not as

14  big?

15         A.   Incorrect.

16         Q.   I understand that's your position but --

17         A.   Those are the facts.

18         Q.   -- I wanted to share with you --

19         A.   Those are the facts.  Those are -- that's

20  completely incorrect.

21         Q.   Okay.  There are facts in this record that

22  we've discussed today that are inconsistent with your

23  contention that you had no input into providing

24  Abdullah Haydar a least effective rating?

25         A.   That's incorrect.

1          Q.    You dispute Mr. Joudrey's account?

2               MR. WOLFF:  Objection.  We've been over this,

3     David.

4               MR. NACHT:  Okay.

5               MR. WOLFF:  Several times.

6               MR. NACHT:  Let's take a break.

7               MR. WOLFF:  Okay.

8               THE VIDEOGRAPHER:  We're now going off

9     record.  The time is 1:20 p.m.

10                   (Recess 1:20-1:27.)

11               THE VIDEOGRAPHER:  We're now back on the

12    record in the continuing deposition of Peter Faricy.

13    This is the beginning of Disc 4.  The time is 1:27 p.m.

14

15                   EXAMINATION (Continuing)

16    BY MR. NACHT:

17          Q.    Before Simpson came on board, do you

18    remember a time where you had direct interaction about

19    the technical teams?

20          A.    I'm sorry.  Can you clarify the question?

21          Q.    Yeah.  You met with my client, Mr. Haydar,

22    to talk about technical issues before Simpson came on

23    board in the latter part of 2014?

24          A.    Incorrect.

25          Q.    You didn't meet with my client in August of

Page 192

1    2014 to do a technical deep dive 90-minute meeting

2    about SSA and SCA?

3         A.   I don't -- I don't know about such a

4    meeting.  It's possible that Abdullah could have been

5    part of a review that I did on technology and he would

6    have been in the room, but nothing that I recall.

7         Q.   You -- if you can't recall the meeting,

8    then you don't recall making a comment to the effect

9    of, Are you treating your wife any better at such a

10   meeting?

11        A.   I would never make a comment like that.

12        Q.   Okay.  Besides the one comment you made

13   which you think you made in a pub, is there any other

14   comment that you own making about Mr. Haydar's wife?

15        A.   Your characterization is incorrect.  I did

16   not make a comment.  I did, as I mentioned earlier,

17   toast Abdullah and thanked him for his commitment to

18   travel across country every single week in order to

19   work at Amazon.  I have never talked about Abdullah's

20   family ever.

21        Q.   I want to be very clear:  You absolutely

22   deny under oath that you ever made a comment about his

23   wife ever?

24        A.   If I -- if I in my toast said I'm grateful

25   that you fly across the country and leave your family

Page 193

1    every day to come to Amazon, I may have said something

2    around those lines, but I would have never referred to

3    Abdullah's family for any other reason other than

4    thanking him in this toast.

5         Q.   Is it a violation of the leadership

6    principle of disagree and commit to continue to push if

7    you believe you were treated unfairly and you're

8    escalating?

9         A.   I don't know.  I would need a more

10   specific example.

11        Q.   Mr. Haydar.

12        A.   What's your example?

13        Q.   He escalated and raised e-mails about his

14   own review.

15        A.   I'm not aware of such e-mails.

16        Q.   Well, you're aware that Shelly Cerio had

17   Ms. DeCleene initiate an investigation?

18        A.   I am aware of that, yes.

19        Q.   Did anyone ever inform you why there was an

20   investigation?

21        A.   Shelly told me why there was an

22   investigation and told me the results of the

23   investigation.

24        Q.   Well, what did she tell you why there was

25   an investigation?

Page 194

1        A.    She said there was an investigation

2   because Mr. -- sorry, because Abdullah made claims

3   about the way he was being treated at Amazon.

4        Q.    No more detail than that?

5        A.    There might have been more detail, but I

6   don't recall.

7        Q.    I'm going to go back to the question

8   because I didn't get an answer.  Is an employee

9   complaining about his own unfair treatment that he

10  perceives to be unfair, can that ever be a violation of

11  the disagree and commit leadership principle?

12       A.    I don't know.  That's my answer.

13       Q.    In your assessment?

14             MR. WOLFF:  The act of escalation alone?

15  BY MR. NACHT:

16       Q.    Why don't you know?  You run this group of

17  18,000 people.

18       A.    Because your question's not very clear.

19       Q.    What -- what's unclear about it to you?

20             MR. WOLFF:  Objection.

21             THE WITNESS:  It doesn't make sense to me.

22             MR. WOLFF:  He told you he doesn't understand

23  the question.

24             THE WITNESS:  It's a hypothetical question of

25  which you're asking for a very specific answer to a very

Page 195

1  broad hypothetical question, and you're asking if

2  anything could be a violation at any time.  It's a very

3  hypothetical question of which I don't believe there is a

4  specific answer.

5  BY MR. NACHT:

6       Q.   Okay.  I'm not trying to ask a hypothetical

7  question at this point.  I'm trying to ask a real

8  question about Mr. Haydar believed that the performance

9  ratings he got were unfair and he contested those

10  ratings to HR, to his boss, to his -- he went up the

11  chain with HR.  There was an investigation.  He

12  continued to object.  He wrote to Mr. Bezos.

13       A.   I'm not aware of that process.  I am aware

14  of the performance ratings and the performance

15  improvement plan.

16       Q.   Well, you're aware that there was an

17  investigation?

18       A.   I am aware there was an investigation.

19       Q.   And you're aware that the investigation

20  followed him complaining?

21       A.   I don't know what the allegations were

22  about, but I do know that he was making allegations

23  about something, yes.

24       Q.   So from what you know about what Mr. Haydar

25  did, and let's just limit it to that, did he do

Page 196

1    anything which warranted criticism on the leadership

2    principle of disagree and commit?

3         A.   I don't know.  I wasn't his manager and I

4    think his manager would have been able to assess his

5    performance on those leadership principles.

6         Q.   Is it ever appropriate to downgrade someone

7    on the leadership principle of disagree and commit for

8    contesting an evaluation of themselves that they

9    believe to be unfair?

10        A.   I don't believe that happened.

11        Q.   In this particular case?

12        A.   I don't believe that happens at Amazon,

13   period.

14        Q.   Ever?

15        A.   I can't speak for ever.

16        Q.   Okay.  But in Marketplace?

17        A.   I don't believe -- I don't believe that

18   would be allowed to happen on my team.

19        Q.   I understand that you're denying making

20   comments about Mr. Haydar's wife, in a joking or any

21   other fashion you're denying it?

22        A.   Those -- I did not make any statements

23   about Mr. Haydar's wife in any fashion.

24        Q.   Okay.

25        A.   Correct.

Page 197

1                    (Discussion off the written record.)

2    BY MR. NACHT:

3            Q.    Have you heard of a stereotype about Muslim

4    or Arab men treating their wives in a way that's less

5    than good?

6            A.    No.

7                    MR. NACHT:  Can I look at the exhibits,

8    please?

9                        (Exhibit No. 9 marked

10                         for identification.)

11                   THE REPORTER:  Number 9.

12   BY MR. NACHT:

13           Q.    You've been handed Deposition Exhibit

14   No. 9, Faricy No. 9, Bates stamp 1914 to 1921.  Do you

15   recognize this document?

16           A.    No.

17           Q.    Does it look like a business record?

18           A.    I'm not familiar with it.

19           Q.    Did you review this document yesterday?

20           A.    I don't recall if this is one I would have

21   reviewed.

22           Q.    What does this document purport to be?

23           A.    I don't know.

24           Q.    Take a look at the first page.  What does

25   it say at the top?

Page 198

1          A.    Marketplace 2014 Q3 OLR.

2          Q.    What date?

3          A.    Thursday, October 2nd.

4          Q.    Keep going.

5          A.    8:00 a.m. to 4:00 p.m. PST.

6          Q.    Keep going across the top.

7          A.    Conference room:  U.S. Seattle Roxanne

8    05200 agenda-notes.

9          Q.    And it lists you as an attendee?

10         A.    Correct.

11         Q.    Now, would this be October 2nd in 2014 to

12   evaluate the third quarter of 2014?

13         A.    No.

14         Q.    What?

15         A.    This would have been the midyear OLR that

16   would evaluate employees from the previous full year

17   OLR up until this point.

18         Q.    So you're looking at employees in your

19   group in 2013 and the first half or a little bit beyond

20   of 2014?

21         A.    This is between the period of the Q1 OLR

22   and this OLR, whatever those dates would have been,

23   roughly it would have been March, April, May, June,

24   July, August, September.

25         Q.    Okay.  So it doesn't involve the 2013

Page 199

1    period?

2            A.    Correct.

3            Q.    It's just the first chunk of previously

4    unreviewed time in 2014?

5            A.    People -- yes.

6            Q.    Okay.  Now, on Page 1915 under L8 promotion

7    recommendations, it talks about Joel Mosby?

8            A.    Correct.

9            Q.    It says, "The doc needs to match the great

10   work Joel is doing."  Does that sound like something

11   you would have said?

12           A.    No.

13           Q.    Who do you think said that?

14           A.    I don't know.

15           Q.    If we read somewhat down, and I would say

16   about -- about 10 lines up from the bottom, it says,

17   "Joel has turned around the performance of Abdullah."

18   Yes, did I say that right?

19           A.    Yes, that's what's written here, yes.

20           Q.    Okay.  Do you remember a conversation in

21   the context of promoting Joel Mosby where this subject

22   came up?

23           A.    I do.

24           Q.    What do you remember about that

25   conversation, sir?

Page 200

1        A.    I remember people being happy.  One, happy

2   that Joel was able to help Abdullah improve his

3   performance; and two, happy that Abdullah had improved

4   his performance.

5        Q.    And on Page 1918, do you see the comment

6   about Abdullah?

7        A.    I do.

8        Q.    "Turning the corner doing very well,

9   responded well to feedback."  Do you remember that --

10  did I read that accurately?

11       A.    You did.

12       Q.    Do you remember the conversation about

13  Abdullah?

14       A.    I do.

15       Q.    Does that accurately capture what was

16  stated?

17       A.    Yes.

18       Q.    Is there anything else you remember other

19  than what's written there?

20       A.    No.

21       Q.    Who was on Joel Mosby's senior management

22  team at the time this was written?

23       A.    I don't know.

24       Q.    Didn't it include Abdullah Haydar?

25       A.    I don't know.

Page 201

1        Q.    And how do you not know?

2              MR. WOLFF:  Objection.

3    BY MR. NACHT:

4        Q.    With this document in front of you?  It's

5    unclear to you?

6        A.    You're asking who was on Joel Mosby's

7    leadership team in October of 2014.  No, I don't know

8    for certain who was.

9        Q.    Okay.  All right.

10       A.    It does say that Joel has turned around

11   the performance of Abdullah.

12       Q.    What does that tell you?

13       A.    I think as I said before, I already

14   repeated.  I think it's -- I thought it was people

15   were happy for Joel and they were happy for Abdullah.

16       Q.    No, what does it tell you about -- about my

17   question about whether Abdullah was on Joel Mosby's

18   team?

19       A.    It doesn't necessarily tell me anything.

20   Joel could have been responsible for improving

21   someone's performance on his team or off his team.  My

22   guess is that he was on his team, but I don't know

23   that for certain.

24       Q.    Your guess or that's your belief but you're

25   not positive?

Page 202

1          A.   I'm not positive.  I don't know.

2                    (Exhibit No. 10 marked

3                      for identification.)

4               THE REPORTER:  Number 10.

5               MR. NACHT:  This is -- we handwrote Bates

6     stamp 5572.

7     BY MR. NACHT:

8          Q.   Not a whole lot going on on this page

9     because it's redacted.  It was produced by Amazon.

10    August 17th, do you remember sending an e-mail to

11    Mr. Faric- -- to Mr. Beary, "Do we have an update on

12    Abdullah?"

13         A.   I don't remember sending the e-mail, but I

14    do see the e-mail here.

15         Q.   Is it consistent that -- what -- do you

16    believe you did it?

17         A.   I do believe I sent this e-mail, yes.

18         Q.   Okay.  So a couple of things jump out at

19    me.  First is that the subject is confidential and the

20    second is that when Beary forwards your e-mail to Derek

21    Oehler, a big chunk is redacted presumably because it

22    concerns a bunch of lawyer involvement.  That's the

23    only reason why.  And there's a plan that's being

24    discussed.

25               Were you aware of a plan for Abdullah other than

Page 203

1    the performance improvement plan?

2         A.   I don't know what kind of plan you're

3    referring to, but I was definitely aware that he was

4    on a performance improvement plan.

5         Q.   How about a plan to manage him out?

6         A.   I'm not aware of any such plan.

7         Q.   Would that have been inappropriate because

8    he still could have succeeded on the performance

9    improvement plan?

10        A.   I don't know -- I don't know the timing --

11   I do recall that he did not succeed in his performance

12   review plan, but I don't know what the dates of that

13   would have been.

14        Q.   How do you succeed on a performance

15   improvement plan if the issues are earning trust, being

16   vocally self-critical and disagreeing and committing?

17   How do you succeed on that?

18        A.   I would think you work with your manager

19   and you work with HR and you put together a plan that

20   allows you to demonstrate those leadership principles.

21                  (Exhibit No. 11 marked

22                   for identification.)

23             MR. NACHT:  Thank you.  What are we up to?

24             THE REPORTER:  11.

25   BY MR. NACHT:

Page 204

1          Q.    Showing you what's been marked as Faricy

2     Deposition Exhibit 11.   What is S-team?   What does

3     S-team mean?

4          A.    Senior team.

5          Q.    And S-team direct means the person who

6     reports to someone on the S-team?

7          A.    Correct.

8          Q.    And then that -- so does the S-team approve

9     or just a particular S-team member approve all

10    promotions to Level 8?

11         A.    The S-team approves all promotions to

12    Level 8.

13         Q.    So you approved this document to go to

14    Mr. Gunningham, correct?

15         A.    I would have reviewed this document and

16    provided my feedback, which I think was reflected in

17    those OLR notes, yes, but Avi Saxena is the manager

18    for Joel Mosby, and Avi Saxena was the person who

19    would have presented the doc to Sebastian.

20         Q.    Saxena and his HR counterpart would have

21    drafted this thing?

22         A.    Correct.

23         Q.    Okay.  And I don't see Bates stamp numbers

24    on this, but you --

25               MR. HAYDAR:  One of the copies had --

Page 205

1  BY MR. NACHT:

2       Q.   You -- you recognize this document?

3       A.   I -- I don't remember it, but this looks

4  like Joel Mosby's promotion document.

5       Q.   Okay.

6       A.   I could not tell you if this was the final

7  version or anything else, but this -- the title would

8  lead you to believe this is Joel Mosby's promotion.

9       Q.   So there are problems in life where we --

10  we really try to solve them, and there are some

11  situations where we listen but we don't actually try to

12  solve them.

13       Since Mr. Haydar was reviewed as least effective

14  first once and then again and then put on a performance

15  improvement plan, is it fair to say that you viewed him

16  as a problem you were hoping would solve?

17            MR. WOLFF:   Objection.

18       Were you hoping that whatever problems surrounded

19  Abdullah would solve.

20            THE WITNESS:   I was hoping that Abdullah

21  would improve his performance, yes.

22  BY MR. NACHT:

23       Q.   So the alternate hypothesis is that you

24  didn't want him to succeed and that you engaged in

25  process and indicated to your people, Solve the problem

Page 206

1    by managing him out?  You reject that hypothesis,

2    you've made that clear with your testimony.

3         A.   I believe that is incorrect what you just

4    said, yes.

5         Q.   Let's take a minute and explore your heart

6    and think about your thoughts about Mr. Haydar when he

7    sent you that e-mail on June 9th, 2013, at the

8    different OLRs, when you heard from Stefan Haney about

9    him, just take a minute and really think.

10        Is it possible that there were times where you

11   just wished he would go away?

12        A.   No.

13        Q.   Is there anything you might have done that

14   might have communicated that sense even if you didn't

15   intend it to your directs who supervised Mr. Haydar?

16        A.   No.

17        Q.   Or to HR?

18        A.   No.

19        Q.   You don't remember meetings with Mr. Haydar

20   prior to Mr. Simpson coming into the role of

21   supervising Mr. Gaw, correct?

22        A.   I don't remember -- obviously I do

23   remember meetings before Ian Simpson joined our team,

24   but I couldn't tell you the topics or the -- or the

25   people involved.  We have a lot of meetings on a lot

Page 207

1    of different topics.

2         Q.   Okay.  Now, do you remember when you

3    testified that the only comment you might have made

4    about Mr. Haydar's wife was as part of a toast and you

5    don't think you said anything about his wife or about

6    his family but you might have, but it was just a toast

7    thanking Abdullah at a pub.

8         Do you remember that?

9         A.   I do.

10        Q.   Am I accurately capturing your testimony?

11             MR. WOLFF:  Objection.  Asked and answered.

12        Go ahead.

13   BY MR. NACHT:

14        Q.   Yes?

15        A.   It's already been answered I believe.

16        Q.   So I want to direct your attention to

17   Faricy Exhibit 8.  On the last page, Bates stamp 419,

18   at the top -- actually, let's -- it begins on the

19   previous page at the bottom of 418, and it states, "Can

20   you comment on the following or concerns ever brought

21   to your attention?  A, allegedly made inappropriate

22   comments during a June 2013 off-site.  Peter made AH

23   stand next to peer who was getting married soon and had

24   them recite lines that they could convey to their wives

25   to make them feel loved, allegedly done repeatedly at

Page 208

1   four-day off-site."

2          A.   That's incorrect.

3          Q.   "I do remember, not context."

4          Am I reading it correctly, what's written there?

5               MR. WOLFF:   That's not his answer you're

6    reading, though.   That's --

7               MR. NACHT:   That's her question.

8               MR. WOLFF:   Correct.

9               THE WITNESS:   Her -- her question is, This is

10   what's being alleged and I'm saying that's incorrect.

11   BY MR. NACHT:

12          Q.   Okay.  But could you read literally what --

13   what her notes are and then we'll discuss it?

14               MR. WOLFF:   What her notes of his response

15   are?

16               MR. NACHT:   Yes.

17               MR. WOLFF:   Starting with "I do remember."

18               THE WITNESS:   "I do remember... not context."

19   BY MR. NACHT:

20          Q.   Keep going, please:

21          A.   "We had an off-site in Detroit...  Dave

22   Anderson was about to get married...  Dave asked a

23   question like, For people around the table who are

24   married, what is your advice...  It was an evening

25   social event.  I think Abdullah was at the same

Page 209

1    table...  Everybody gave their funny/serious advice."

2           Q.   Keep going.

3           A.   Number one, "It was a mixture of sweet and

4    funny advice."  Number two, "Dave and his wife met on

5    our team."

6           Q.   And keep going on to the next page, please?

7           A.   This is not my comment.  This is an

8    allegation that Anne is asking about.

9           Q.   Okay.

10          A.   "B, allegedly made similar comments at two

11   all-hands meetings in Detroit over past 12 months.

12   Lucky to hire AH...  After he previously left his poor

13   wife behind and went to Seattle for a year."

14          Q.   And your answer to that allegation?

15          A.   What's listed here as I is, "I might have

16   said something like, 'We're lucky to have you here --

17   'We're lucky to have someone here like Abdullah who

18   has Seattle experience.'  And I might have said, 'I

19   bet your wife is happy too.'"

20          Q.   Okay.  So earlier when I asked you -- you

21   mentioned the first incident but you denied that there

22   were any other incidents.  Reading these notes, does

23   that refresh your recollection that you might have made

24   a comment consistent with what you told Ms. DeCleene at

25   another all -- at an all-hands meeting?

Page 210

1          A.    No.  My comment was, We're lucky to have

2    someone here like Abdullah who has Seattle experience.

3          Q.    But her notes on Bates stamp No. 419 say,

4    "And I might have said, 'And I bet your wife is happy

5    too.'"

6          Do you not remember that part or you deny saying

7    this to Anne DeCleene?

8          A.    I don't -- I don't remember.

9          Q.    Okay.

10          THE WITNESS:  Before you start a new topic,

11    can we do a bio break?

12          MR. NACHT:  Sure.

13          THE VIDEOGRAPHER:  We're now going off

14    record.  The time is 2:06 p.m.

15                    (Recess 2:06-2:10.)

16          THE VIDEOGRAPHER:  We're now back on the

17    record.  The time is 2:10 p.m.

18          MR. NACHT:  Mark this, please.

19                    (Exhibit No. 12 marked

20                     for identification.)

21          MR. NACHT:  I don't have copies of this yet

22    and we may not make this an exhibit.

23    /////

24    /////

25    /////

Page 211

1                      EXAMINATION (Continuing)

2      BY MR. NACHT:

3           Q.   So I just sketched out some names, and

4      earlier I asked you if your office was next to Haney's,

5      but what I've sketched out is that your office was next

6      to HR and Haney's was on the other side of HR, and on

7      the other side of Haney was Curt, and on the other side

8      of Curt was Pete.

9           A.   That's incorrect.

10          Q.   That's incorrect?

11          A.   Correct.

12          Q.   For 2014 or 2015, 2014?

13          A.   Any of these years.

14          Q.   Okay.  Was Haney along that row with you?

15          A.   No.

16          Q.   Okay.  We won't make it an exhibit.

17                    (Exhibit No. 12 unmarked

18                     for identification.)

19     BY MR. NACHT:

20          Q.   Did you ever meet with Mr. Haydar to help

21     him with his performance?

22          A.   No.

23          Q.   Did you find Mr. Haydar abrasive?

24          A.   I don't know.  I didn't have enough

25     interactions with him to know enough about his --

Page 212

1    enough to have a perception of his abrasiveness.

2         Q.   Have you been to any Arab countries?

3         A.   Can you define "Arab countries"?

4         Q.   Well, as close as -- instead of giving you

5    a list, why don't you tell me any Middle Eastern

6    country you've been to?

7         A.   I've been to -- let's see.  I flew through

8    the Middle East on my way to India, and I don't

9    recall -- I think it may be --

10        Q.   Dubai or something?

11        A.   It was Dubai, yes.

12        Q.   But you didn't spend time there, you were

13   just in an airport?

14        A.   Correct.

15        Q.   Okay.  Do you have any locations in the

16   Middle East for any of your people?

17        A.   I don't know.

18        Q.   Israel?

19        A.   I don't know.

20        Q.   Do you -- did you lose any friends on

21   September 11th?

22        A.   No.

23        Q.   Is Shelly Cerio an honest person in your

24   experience?

25        A.   Is Shelly Cerio an honest person?

1          Q.    Yeah.

2          A.    Yes.

3          Q.    Derek Oehler?

4          A.    What's the question about Derek?

5          Q.    Is he an honest guy in your experience?

6          A.    Yes.

7          Q.    Joel Mosby?

8          A.    Yes.

9          Q.    Garret Gaw?

10         A.    Yes.

11              MR. NACHT:  Let's take a break.  We may be

12    done.

13              MR. WOLFF:  Okay.

14              THE VIDEOGRAPHER:  We're now going off the

15    record.  The time is 2:16 p.m.

16                   (Recess 2:16-2:21.)

17              THE VIDEOGRAPHER:  We're now back on the

18    record.  The time is 2:21 p.m.

19              MR. NACHT:  I have no further questions.

20    Thank you very much for your participation.

21              MR. WOLFF:  And we will -- we will read.

22    Thank you very much.

23              (Discussion off the written record.)

24              MR. WOLFF:  So we've agreed that the very

25    limited portion of today's deposition that was marked

Page 214

1    confidential, Mr. Nacht just graciously agreed will be

2    attorneys' eyes only and we'll have that in a separate --

3    separate document, in its own.

4              MR. NACHT:  Agreed.

5              MR. WOLFF:  Thank you.  Thanks, David.

6              THE VIDEOGRAPHER:  This concludes the

7    deposition of Peter Faricy.  This is the end of Disc 4.

8    The time is 2:21 p.m.

9                    (Signature reserved.)

10                   (Deposition concluded at 2:22 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  STATE OF WASHINGTON )
                      ) ss
2  County of Snohomish )

3       I, the undersigned Washington Certified Court
   Reporter, pursuant to RCW 5.28.010 authorized to
4  Administer oaths and affirmations in and for the State of
   Washington, do hereby certify:

5

       That the annexed and foregoing deposition of PETER
6  FARICY was taken before me and completed on July 28, 2017,
   and thereafter was transcribed under my direction;

7

       I further certify that according to CR 30 (e) the
8  witness was given the opportunity to examine, read and sign
   the deposition after the same was transcribed, unless
9  indicated in the record that the review was reserved;

10      I further certify that I am not a relative or
   employee of any such attorney or counsel, and that I am not
11 financially interested in the said action or the outcome
   thereof;

12

       I further certify that the witness before
13 examination was by me duly sworn to testify the truth, the
   whole truth and nothing but the truth;

14

       I further certify that the deposition, as
15 transcribed, is a full, true and correct transcript of the
   testimony, including questions and answers, and all
16 objections, motions and exceptions of counsel made and
   taken at the time of the foregoing examination;

17

       IN WITNESS WHEREOF, I have hereunto set my hand this
18 3rd day of August, 2017.

19          *Connie Recob*

20  _____
        Connie Recob, Certified Court Reporter No. 2631
21            in and for the State of Washington,
                residing at Stanwood, Washington.
22        My CCR certification expires 4/8/18.

23

24

25

1        DEPOSITION ERRATA SHEET

2

3    Our Assignment No.  4590

4    Case Caption:  HAYDAR vs. AMAZON

5

6        DECLARATION UNDER PENALTY OF PERJURY

7

8            I declare under penalty of perjury

9        that I have read the entire transcript of

10       my Deposition taken in the captioned matter

11           or the same has been read to me, and

12          the same is true and accurate, save and

13          except for changes and/or corrections, if

14          any, as indicated by me on the DEPOSITION

15       ERRATA SHEET hereof, with the understanding

16       that I offer these changes as if still under oath.

17

18   Signed on the _28th_ day of _AUGUST_, 2017.

19

20   _____

21

22              PETER FARICY

23

24

25

Page 217

```
1                      DEPOSITION ERRATA SHEET

2

3    Page No. __90__ Line No. _23__ Change to: Replace "were0"

4     with "were" _____

5    Reason for change: Typographical error _____

6    Page No. _129_ Line No. _16__ Change to: Replace "I" with "he"

7    _____

8    Reason for change: Incorrect pronoun _____

9    Page No. _____ Line No. _____ Change to: _____

10   _____

11   Reason for change: _____

12   Page No. _____ Line No. _____ Change to: _____

13   _____

14   Reason for change: _____

15   Page No. _____ Line No. _____ Change to: _____

16   _____

17   Reason for change: _____

18   Page No. _____ Line No. _____ Change to: _____

19   _____

20   Reason for change: _____

21   Page No. _____ Line No. _____ Change to: _____

22   _____

23   Reason for change: _____

24        SIGNATURE: _____ DATE: _8/28/17_

25                   PETER FARICY
```