# Exhibit S-53

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


ABDULLAH HAYDAR,

    Plaintiff,

    -vs-                                    Case No. 2:16-CV-13662

AMAZON CORPORATE, LLC, a foreign

limited liability corporation;

GARRET GAW, an individual; PETER

FARICY, an individual; and JOEL

MOSBY, an individual,

    Defendants.

_____/



    DEPONENT:  ANNE DECLEENE  (VIA VIDEO TELECONFERENCE)

    DATE:      Tuesday, November 14, 2017

    TIME:      11:24 a.m.

    LOCATION:  LITTLER MENDELSON, PC

            200 Renaissance Center, Suite 3110

            Detroit, Michigan

    REPORTER:  Karen Fortna, CRR/RMR/RPR/CSR-5067

    JOB NO:    5396

Abdullah Haydar v. Amazon Corporate, LLC                                      90
Anne DeCleene 2/1/2018

```
                                                             Page 2
 1    APPEARANCES:

 2

 3         NACHT LAW, PC

 4         By:  Mr. David A. Nacht

 5         101 North Main Street, Suite 555

 6         Ann Arbor, Michigan  48104

 7         734.663.7550

 8         dnacht@nachtlaw.com

 9              Appearing on behalf of the Plaintiff

10

11         LITTLER MENDELSON, PLC

12         By:  Mr. Robert Wolff  (VIA VIDEO TELECONFERENCE)

13         1100 Superior Avenue East, 20th Floor

14         Cleveland, Ohio  44114

15         216.623.6065

16         rwolff@littler.com

17              Appearing on behalf of the Defendants

18

19    ALSO PRESENT:  Mr. Abdullah Haydar

20

21

22

23

24

25
```

Abdullah Haydar v. Amazon Corporate, LLC                              90
Anne DeCleene 2/1/2018

Page 3

1                          I N D E X

2

3    W I T N E S S

4

5        ANNE DECLEENE                                    PAGE

6

7    Examination by Mr. Nacht                                5

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

                                                              Page 4

 1                        E X H I B I T S

 2

 3    EXHIBIT                  DESCRIPTION                    PAGE

 4    Exhibit 1      4-15-15 report, Bates Nos.  . . . . 5

 5                   AMAZON_HAYDAR_00000358-375

 6    Exhibit 2      4-27-15 addendum, Bates Nos.  . . . 5

 7                   AMAZON_HAYDAR_00000666-675

 8    Exhibit 3      3-26-15 interview notes, Bates  . . 5

 9                   Nos. AMAZON_HAYDAR_00000376-380

10    Exhibit 4      4-2-15 interview notes, Bates Nos. 46

11                   AMAZON_HAYDAR_00000411-414

12    Exhibit 5      3-31-15 interview notes, Bates  . .49

13                   Nos. AMAZON_HAYDAR_00000415-419

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                  Page 5

 1                          Tuesday, November 14, 2017

 2                          Detroit, Michigan

 3                          11:24 a.m.

 4              *        *        *        *

 5                    ANNE DECLEENE,

 6      having first been duly sworn, was examined and

 7      testified as follows:

 8                    (Marked for identification:

 9                    Deposition Exhibit Nos. 1-3.)

10                    MR. NACHT:  I'm David Nacht.  I'm the

11      lawyer who represents Abdullah Haydar.  How are

12      you?

13                    THE WITNESS:  I'm well.  Thanks, David.

14      How are you?

15                    EXAMINATION

16  BY MR. NACHT:

17  Q.    Are you Anne DeCleene?

18  A.    I am.

19  Q.    And where are you?

20  A.    I'm in Denver.  Looks like we both went to

21        Starbucks.

22  Q.    And are you currently an Amazon employee?

23  A.    I am.

24  Q.    And where do you work?

25  A.    I work -- I currently work for AWS.
```

```
                                                          Page 6

 1   Q.    Okay.  And AWS stands for?

 2   A.    Amazon Web Services.

 3   Q.    And who -- are you in human resources in AWS?

 4   A.    I am.

 5   Q.    Who do you report to there?

 6   A.    I report to Colleen Lyons.

 7   Q.    And who does Ms. Lyons report to?

 8   A.    Jim Casey.

 9   Q.    And who does Mr. Casey report to?

10   A.    Michele Yetman.

11   Q.    And what is Michele Yetman's title?

12   A.    Vice president of human resources for AWS.

13   Q.    And who does she report to?

14   A.    Beth Galetti.

15   Q.    And what is her title?

16   A.    She's a senior VP of HR for Amazon.

17   Q.    And who does she report to?

18   A.    She reports to Jeff Bezos.

19   Q.    Okay.  And how long has -- what's her name again,

20         the woman who reports to Bezos?

21   A.    Beth Galetti.

22   Q.    How long has Ms. Galetti been in that position?

23   A.    In the position she's in right now, I would

24         guess --

25                 MR. WOLFF:  Don't guess, but if you have
```

Page 7

```
 1          an educated --

 2                   MR. NACHT:  Estimate.

 3                   THE WITNESS:  A year and a half.

 4   BY MR. NACHT:

 5   Q.    Okay.  And was she promoted to that position?

 6   A.    She was.

 7   Q.    And who did she follow?

 8   A.    Are you asking who held the position that she's

 9          currently in before her?

10   Q.    Yes.

11   A.    Tony Galbato held the position before her, but I

12          don't believe he was a senior VP.  I believe he was

13          a VP.

14   Q.    Okay.  Where are you from originally?

15   A.    I was born and raised in Indiana.

16   Q.    Northern or southern?

17   A.    Northern.

18   Q.    Close to Notre Dame?

19   A.    I was born and raised in Mishawaka.

20   Q.    That's close to Notre Dame.

21   A.    Very close.

22   Q.    And did you go to public high school there?

23   A.    I did.

24   Q.    And then where did you go?

25   A.    And then undergrad I went to St. Mary's College.
```

Abdullah Haydar v. Amazon Corporate, LLC                                90
Anne DeCleene 2/1/2018

                                                    Page 8

 1    Q.    You didn't go far from home.

 2    A.    I did to start, and then I transferred back close

 3          to home.

 4    Q.    Where did you go initially?

 5    A.    Initially I was at Mount Mary College, which is a

 6          small school in Milwaukee.

 7    Q.    And then you transferred to St. Mary's close to

 8          home and you got a degree in what?

 9    A.    My undergrad degree is in humanistic studies.

10    Q.    And what year did you obtain the degree from

11          St. Mary's?

12    A.    2003.

13    Q.    What did you do next professionally?

14    A.    I went to law school.

15    Q.    Where?

16    A.    At the University of Wisconsin.

17    Q.    Madison?

18    A.    Yep.

19    Q.    Did you obtain a JD?

20    A.    I did.

21    Q.    What year?

22    A.    2007.

23    Q.    And what did you do during your summers while you

24          were in law school?

25    A.    I interned.  My first summer, I interned with the

Page 9

1              Wisconsin Department of Justice in Madison, and

2              my second summer I interned with the National Gay &

3              Lesbian Task Force in Washington, DC.

4      Q.      And what did you do upon graduation?

5      A.      Upon graduation, I went to work for the City of

6              Minneapolis in their civil rights department.

7      Q.      Did you study for the bar exam?

8      A.      I did.  Wisconsin, at the time -- this might still

9              be the case -- was one of the few states that still

10             have bar privilege, so I was admitted to the

11             Wisconsin bar and studied and took and passed the

12             Minnesota state bar.

13     Q.      In other words, if you graduate from the University

14             of Wisconsin, you're automatically a lawyer in the

15             state of Wisconsin without taking a test?

16     A.      So long as you've taken certain courses, got

17             certain grades and passed the character and fitness

18             portion.

19     Q.      But you took a bar exam for Minnesota or you waived

20             in?

21     A.      I took the bar exam in Minnesota.

22     Q.      And are you currently a lawyer?

23     A.      No, I have never practiced law.

24     Q.      But are you a lawyer in good standing and member of

25             the bar in Wisconsin and Minnesota?

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

```
                                                     Page 10
  1   A.    I do not pay my annual bar exam fees anymore, no.

  2         I don't think I've passed that ten-year where I'm

  3         officially kicked out yet, but...

  4                  MR. WOLFF:  But looking forward to it?

  5                  THE WITNESS:  Yes.

  6   BY MR. NACHT:

  7   Q.    And so you did civil rights work for a government

  8         agency in Minnesota?

  9   A.    Right out of law school, that was my first job,

 10         working for the Department of Civil Rights for the

 11         City of Minneapolis, which is a FEPA, so I was

 12         doing EEO investigation work full time.

 13   Q.    I'm sorry, you used an acronym.

 14   A.    Fair Employment Practice Agency.  So they have a

 15         partnership with the EEOC.  I was essentially doing

 16         Title VII investigations.

 17   Q.    Okay.  And how long did you work for them?

 18   A.    Just under a year, and then I went and did the same

 19         work with the State of Minnesota for their human

 20         rights department.

 21   Q.    How long did you do that?

 22   A.    Again, just under a year.  And then I progressed in

 23         the public sector from city to state to feds, so

 24         once I left the State of Minnesota, I went to work

 25         for the federal government doing investigations,
```

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

Page 11

1          but not with the EEOC, with the Department of

2          Labor.

3    Q.    Which division, Wage & Hour?

4    A.    Wage & Hour, yep.

5    Q.    Okay.  So you did Wage & Hour investigations for

6          how long?

7    A.    Three and a half years.

8    Q.    All right.  And that brings us up to about 2012,

9          2013?

10   A.    2012.  At the end of 2012, I joined Amazon.

11   Q.    Okay.  And how did you hear about that or think

12         about that?

13   A.    Meaning how or why did I join Amazon?

14   Q.    Yeah.  You were working for the US Department of

15         Labor, Wage & Hour Division, and you jumped to a

16         major corporation.  Tell me about that process for

17         you.

18   A.    I had transferred to the Seattle district office

19         for the Department of Labor over the summer of

20         2012.  The government is a really great place to

21         learn, but I found myself getting frustrated and I

22         felt like I had plateaued in my career and was

23         essentially just repeating the same thing over and

24         over again and not growing professionally, so I

25         actually started looking for external opportunities

Page 12

1          and saw a job with Amazon's HR compliance team that

2          I applied for and ended up interviewing and being

3          offered the position and taking the position.

4                    So when I joined Amazon in November 2012,

5          I was doing wage and hour compliance for the

6          company.

7    Q.    So you started doing wage and hour compliance,

8          correct?

9    A.    Yes.

10   Q.    Is this your first deposition?

11   A.    Yes.

12   Q.    So I'll take a few minutes to go over the ground

13         rules.  I assume that you've heard this before, but

14         I'll remind you, and in case you haven't heard

15         before I'll inform you.

16                   It's important that you answer yes or no,

17         not uh-hum, for purposes of the record.  It's

18         important that when we get -- after the background

19         and we get into the heart of the deposition -- that

20         you wait a beat before answering so that Mr. Wolff

21         has an opportunity to object to my questions and

22         you're not talking over him and the court reporter

23         can get down what he has to say.

24                   Frequently Mr. Wolff will object, but he

25         will not instruct you not to answer.  He's just

                                                              Page 13

1          putting an objection on the record.  When that

2          occurs, please do your best to remember the

3          question and not be distracted by what he's saying.

4          He's just making his record and he's not trying to

5          coach you.

6                    So if you can stay focused on what the

7          question was, the deposition will go a lot faster

8          because then I won't have to repeat the question to

9          you after his objection because then you can just

10         answer unless he instructs you not to answer.

11         Fair?

12    A.   Yes.

13    Q.   There are going to be times when I ask you for a

14         yes or no answer.  I will provide you with the

15         opportunity, if you wish it, to explain if you

16         don't feel that a yes or no answer fairly

17         characterizes how you feel in response to the

18         question, but I want that yes or no on the record,

19         okay?

20    A.   Okay.

21    Q.   Anything impairing your memory today?

22    A.   No.

23    Q.   You seem relaxed and attentive and even curious, as

24         I would expect a law school graduate having her

25         first deposition to be.

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

```
                                                          Page 14
  1                     Any concerns with proceeding?
  2    A.    No.
  3    Q.    Okay.  So how long did you do wage and hour
  4          investigations for Amazon?
  5    A.    I did not do wage/hour investigations, I did
  6          wage/hour compliance.
  7    Q.    I see.  And you were making sure that Amazon paid
  8          overtime when it was supposed to pay overtime, that
  9          sort of thing?
 10    A.    An example would be we were rolling out a new
 11          timekeeping system for the non-exempt employees
 12          across the United States, so it was making sure
 13          that that system obviously not only did rudimentary
 14          things such as tracking time, but also what can we
 15          do as a company to throw flags, put the proper
 16          people on management, should people, for example,
 17          skip their meal period.
 18    Q.    How long did you do wage and hour compliance?
 19    A.    Until the summer of 2014.
 20    Q.    So a year and a half?
 21    A.    Yes.
 22    Q.    And then what?
 23    A.    And then I moved to a position in retail doing
 24          employee relations.
 25    Q.    Who did you report to there?
```

Page 15

```
 1   A.   My first manager when I moved to that role was Kath

 2        Critchfield.

 3   Q.   And who did Ms. Critchfield report to?

 4   A.   David Haines.

 5   Q.   And who did Mr. Haines report to?

 6   A.   Shelly Cerio.

 7   Q.   And who was your next supervisor after

 8        Ms. Critchfield?

 9   A.   Yeah, Kath left the company and I started reporting

10        to Mark Wenrick.

11   Q.   And did Wenrick report to Haines who reported to

12        Cerio?

13   A.   Yes.

14   Q.   And when did that occur, approximately?

15   A.   I don't recall.

16   Q.   Give it your best estimate.

17   A.   Meaning when did I start reporting to Mark?

18   Q.   Yeah.  Give me a time -- narrow it to a timeframe.

19   A.   Spring, summer 2015.

20   Q.   Okay.

21   A.   I guess spring 2015.

22   Q.   When you did the report concerning Mr. Haydar, the

23        investigation, who was your boss?

24   A.   Katherine Mark (ph).

25   Q.   Who approached you about doing the investigation?
```

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

                                                                    Page 16

 1    A.    Shelly.

 2    Q.    She was your boss' boss' boss, correct?

 3    A.    Yes.

 4    Q.    How was it you had a relationship with your boss'

 5          boss' boss or did you not have a prior

 6          relationship?

 7    A.    Well, I don't know if I would call it a

 8          relationship.  I would say that -- so Shelly was

 9          the HR lead for Consumer and under Consumer there

10          were multiple business organizations.  I was in

11          Retail, which was led by David Haines, but what was

12          unique about my role, as I was the first employee

13          relations hire in Retail, but also all of Consumer,

14          so I was the only person in the org that was

15          devoting my time to workplace investigations.  So I

16          would only be speculating on what caused Shelly to

17          reach out to me based on the unique role that I

18          had.

19    Q.    Had you met Ms. Cerio prior to this?

20    A.    I don't recall.

21    Q.    Were you aware of her status in the hierarchy as

22          your boss' boss' boss when she asked you to perform

23          this task?

24    A.    Yes.

25    Q.    Did she approach you by email or in person or by

Abdullah Haydar v. Amazon Corporate, LLC                                          90
Anne DeCleene 2/1/2018

---

Page 17

1         telephone?

2    A.   I believe that she contacted me first by email.

3    Q.   Were you working in the same building as Ms. Cerio?

4    A.   I was not.

5    Q.   You were both in Seattle?

6    A.   Yes.

7    Q.   And did you meet in person to discuss the

8         parameters of the investigation and her

9         expectations?

10   A.   We met in person to discuss the investigation.

11   Q.   I would like you to tell me from memory everything

12        you can about that meeting.  Was it in her office?

13   A.   It was in her office.

14   Q.   Do you remember what the weather was like that day?

15   A.   I do not.

16   Q.   You had to go from your building to her building,

17        right?

18   A.   Which in the course of Seattle Amazon, I probably

19        did a half a dozen times every day for meetings.

20   Q.   Okay.  So you went to her office.  Do you remember

21        if it was morning or afternoon?

22   A.   I do not.  I do not remember.

23   Q.   Had you seen Shelly Cerio previous to that in

24        person?

25   A.   I don't recall.

---

```
                                                      Page 18
 1   Q.   So it was either the first or second or third time
 2        you'd seen her, she was not someone you had spent
 3        much time with certainly?
 4   A.   I would definitely say she's not someone I spent
 5        much time, if any, with.
 6   Q.   Prior to the investigation?
 7   A.   Yes.
 8   Q.   Did you report to Ms. Cerio during the course of
 9        the investigation?
10   A.   I kept Shelly abreast of the investigation
11        progress.
12   Q.   Did she give you suggestions about how to complete
13        it in a timely fashion?
14   A.   No, she did not.
15   Q.   How about people she thought it was important for
16        you to interview or talk to?
17   A.   I don't recall whether she said people that may be
18        good or useful to talk to.  I --
19   Q.   Did she give you any kind of indication -- after
20        the first meeting.  We're going to talk about the
21        first meeting, but after the first meeting, did she
22        give you any kind of indication about -- before
23        your final report to her, right, you gave her a
24        final report of your conclusion?
25   A.   Yes.
```

Page 19

1   Q.   And before that --

2   A.   The final report.

3   Q.   After the first meeting and before the final

4        report, did you give her any interim feedback about

5        how it was looking?

6   A.   I don't recall giving her any interim feedback

7        prior to sending her the final report.

8   Q.   You know how with some fair employment agency

9        investigations, after the respondent provides a

10       summary of an account, the complainant is given an

11       opportunity to respond?

12  A.   Sure, I am familiar with that.

13  Q.   Did you reach a point in this investigation --

14       well, first, do you think that's a good process to

15       do that?

16               MR. WOLFF:  In the FEP context?

17               MR. NACHT:  Yes.

18               THE WITNESS:  Do I think it's a good

19       practice?  It sounds like too general of a

20       question for me because -- is it a good practice

21       for an agency?  Is it a good practice for an

22       internal company investigation?  Could you ask me

23       more specifically?

24  BY MR. NACHT:

25  Q.   In your experience doing that -- you did that kind

                                                            Page 20

 1          of thing yourself, right, when you worked for a

 2          government agency, or no?

 3    A.    When I worked for the government, specifically the

 4          city and the state, after we got an answer from the

 5          respondent, we would review all of the information

 6          and oftentimes send out a request for information;

 7          sometimes that may be the complainant, sometimes

 8          that may be the respondent.  We wouldn't -- am I

 9          answering your question?

10    Q.    You are indeed.

11    A.    Okay.

12    Q.    So did you do anything like this with Mr. Haydar

13          after getting some information from some of your

14          interviews, did you come back to Mr. Haydar and

15          say, "Here's what I'm hearing, I have some

16          additional questions," or, "Would you like to

17          comment?"  Did you give him that opportunity?

18    A.    During the course of an investigation, I do not

19          hesitate to reach out to any party, whether that's

20          a complainant or whether that's accused, or whether

21          that's a witness, to ask additional questions or

22          and/or request additional information.

23    Q.    At any point did you get the impression that you

24          were being asked to pursue this investigation by

25          Ms. Cerio because Ms. Cerio had concerns that

Abdullah Haydar v. Amazon Corporate, LLC                                90
Anne DeCleene 2/1/2018

Page 21

1        possibly protected activity was occurring or

2        unlawful activity was occurring?  And when I say

3        protected, I mean within the meaning of Title VII.

4                    MR. WOLFF:  Objection.  Foundation.  You

5        can answer.

6                    THE WITNESS:  I do not recall getting

7        such indication or message from Shelly.  I recall

8        the messaging being very limited to the email that

9        Abdullah sent her and raised his concerns.

10   BY MR. NACHT:

11   Q.   At any point did you ask Abdullah, "Are you

12        complaining about national origin or religious

13        discrimination?"

14   A.   No.

15   Q.   Did you ask him -- I used specific words.  Did you

16        ask him about whether he was inquiring about or

17        expressing concerns about any activity that's

18        prohibited under Title VII?

19   A.   No.

20   Q.   Why not?

21   A.   Because what I recall about the concerns being

22        raised and the subsequent investigation, Abdullah

23        was very clear in outlining his concerns and the

24        reasons why he felt the way he did.

25   Q.   Did it cross your mind that when Abdullah was

Abdullah Haydar v. Amazon Corporate, LLC                                        90
Anne DeCleene 2/1/2018

Page 22

1       complaining about Peter Faricy making comments

2       about Abdullah's relationship with his wife that

3       Mr. Faricy might have been making a pejorative

4       comment about Mr. Haydar based upon his religious

5       or national origin background?

6   A.  No.

7   Q.  So it's fair to say that your investigation was

8       not looking at whether Mr. Haydar was a victim of

9       national origin discrimination, correct?

10  A.  I would say that was not the foundation or the

11      catalyst of the investigation, but when I proceed

12      through any investigation, I would say that I --

13      there is always a keen ear to whether there may

14      be a policy violation of any kind or type, so I'm

15      confident that the investigation would have

16      proceeded the same.

17  Q.  So you acknowledge that the purpose of the

18      investigation was not to investigate national

19      origin discrimination, correct?

20  A.  Correct.

21  Q.  And the purpose of the investigation was not to

22      investigate religious discrimination, correct?

23  A.  Correct.

24  Q.  But you believe that the nature of your

25      investigation, the way you conducted it, its

Page 23

```
 1          thoroughness, the people you spoke to and all

 2          other issues that go into how you did this

 3          investigation, would have uncovered any

 4          discrimination based on national origin or

 5          religion; is that correct?

 6                    MR. WOLFF:  Do you want to hear that

 7          again?

 8                    MR. NACHT:  Or you're not sure?

 9                    THE WITNESS:  Well, I guess I would like

10          to hear that question again.

11                    (Whereupon the question was read

12                    back by the court reporter.)

13                    MR. NACHT:  And the answer is, "Yes,"

14          "No," or, "I'm not sure."

15                    THE WITNESS:  I'm not sure.  And I say

16          that because had that been an allegation, there are

17          some different questions I would have asked of

18          witnesses.

19     BY MR. NACHT:

20     Q.   What kinds of questions would you have asked?

21     A.   Let's say, for example, Abdullah was alleging

22          religious discrimination or discrimination on

23          the basis of religion.  I would have asked the

24          interviewee his or her religion, I would have

25          asked if they had ever managed or known to have
```

Abdullah Haydar v. Amazon Corporate, LLC                              90
Anne DeCleene 2/1/2018

```
                                                    Page 24
 1        managed an employee of Abdullah's religion.

 2                    With that, I would have asked more

 3        detailed questions, so with that being said, have

 4        you ever promoted an employee of that religion?

 5        Have you ever performance managed an employee of

 6        that religion?  What was the outcome?  As an

 7        example.

 8   Q.   What is a comparator in the context of

 9        discrimination law based on your experience?

10                    MR. WOLFF:  Objection.  Seeks a legal

11        conclusion.  You can answer.

12                    THE WITNESS:  I don't understand the

13        question.

14   BY MR. NACHT:

15   Q.   What is a comparator?

16   A.   So are you -- I still don't understand what you're

17        asking me.  So are you asking me if Abdullah was

18        alleging religious discrimination, what is a

19        comparator?

20   Q.   I'm not asking about Abdullah, just generally.

21        What's a comparator, in your understanding, based

22        on your understanding as a civil rights

23        investigator?

24   A.   You're not using language that I feel comfortable

25        responding.  I need a better explanation of what a
```

Abdullah Haydar v. Amazon Corporate, LLC                                90
Anne DeCleene 2/1/2018

```
                                                        Page 25
 1        comparator is.
 2   Q.   Okay.  So when you compare a plaintiff or a
 3        complainant to other individuals who are in a
 4        similar situation, is that something you ever look
 5        into when you do investigations?  "How is this
 6        person treated compared to other people?"
 7   A.   Yes.
 8   Q.   Okay.  And you've never heard the term "comparator"
 9        used to describe the other people?
10   A.   That's not --
11                  (Video interruption.)
12                  (Discussion off the record.)
13   BY MR. NACHT:
14   Q.   Okay.  So what is the word you use when you think
15        about people who are not the complainant, but in a
16        similar position to the complainant?
17   A.   I would use the words similarly situated.
18   Q.   Okay.  Did you think that Curt Ohrt was similarly
19        situated to Abdullah Haydar when you did your
20        investigation?
21   A.   No.
22   Q.   Have you reviewed your report in preparation for
23        today?
24   A.   Yes.
25   Q.   Do you remember in your review of your report that
```

Abdullah Haydar v. Amazon Corporate, LLC                                90
Anne DeCleene 2/1/2018

Page 26

1          you mentioned that Peter Faricy treated Curt Ohrt

2          well even though he didn't like him, or words to

3          that effect?

4    A.    I remember noting that Curt got a promotion despite

5          tension between him and Peter.

6    Q.    And what was your basis for thinking that there was

7          tension between -- between Faricy and Haydar?

8    A.    Tension between Faricy and Haydar?

9    Q.    I'm sorry, Faricy and Ohrt.

10   A.    Multiple witnesses.

11   Q.    Okay.  What did you hear specifically?

12   A.    What's that?

13   Q.    What did you hear specifically?

14   A.    That Peter and Curt were not necessarily on

15         friendly terms, yet Curt still got a promotion.

16   Q.    Okay.  And what did that signify to you?  Because

17         you included -- because you included it in your

18         report.

19   A.    That you don't have to be part of Peter's favorite

20         club, should there even be one, to advance in the

21         organization.

22   Q.    Okay.  Is Curt Ohrt Muslim?

23   A.    I don't know.

24   Q.    Is Curt Ohrt of Arab national origin?

25   A.    I don't know.

Page 27

```
 1   Q.   Would you agree that if Mr. Haydar had raised a

 2        complaint to you of national origin or religious

 3        discrimination, that if, in fact, Mr. Ohrt were not

 4        Arab nor Muslim, the fact that Peter promoted him

 5        even though he didn't like him would not lead to a

 6        finding of an unsubstantiated allegation?

 7                  MR. WOLFF:  Objection.  Calls for

 8        speculation.  Lack of foundation.  Incomplete

 9        hypothetical.  Go ahead.  You can answer.

10                  THE WITNESS:  There are a lot of ifs

11        in that question.  If Abdullah had raised

12        different concerns, and accordingly, if a

13        different investigation had been conducted into

14        those different concerns, I don't know what the

15        outcome would have been.

16   BY MR. NACHT:

17   Q.   I understand that.  But since Ohrt, in this

18        hypothetical, is not Arab nor Muslim --

19   A.   I don't know if he -- I don't know Curt's protected

20        class statuses.

21   Q.   In my hypothetical he's not, okay?

22   A.   Okay.

23   Q.   Which, frankly, seems likely if we're living in

24        the real world and not living in pretend

25        deposition, I-only-know-exactly-what-I-know world,
```

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

                                                        Page 28

 1        but --

 2                    MR. WOLFF:  Objection.

 3                    MR. NACHT:  -- then what is the meaning

 4        of a non-Arab Muslim getting promoted whereas an

 5        Arab Muslim doesn't get promoted?

 6                    MR. WOLFF:  Same objection.  Foundation.

 7        Incomplete hypothetical.  Foundation.

 8                    THE WITNESS:  Abdullah did not raise

 9        complaints or concerns of national origin and/or

10        religious-based discrimination.  Had he done that,

11        a different investigation would have been conducted

12        and I don't know whether Curt would have been

13        similarly situated in anything.  I don't know.

14                    MR. WOLFF:  I must say -- halt for a

15        moment.  We have somebody who perhaps can help us

16        here.

17                    (Discussion off the record.)

18                    MR. NACHT:  Hi.  Back on.

19   BY MR. NACHT:

20   Q.    So you go to Shelly Cerio's office to get

21        directions for an investigation of Mr. Haydar?

22   A.    I wouldn't say -- I wouldn't say direction.  She

23        gave me the directive to do the investigation, but

24        I do the investigation as I see fit.

25   Q.    I understand that it's your understanding that

Abdullah Haydar v. Amazon Corporate, LLC                                  90
Anne DeCleene 2/1/2018

                                                              Page 29

 1        Mr. Haydar never raised religious or national

 2        origin concerns with you or with Ms. Cerio.  Are

 3        you aware that he's testified that he raised these

 4        concerns with Ms. Cerio?

 5                  MR. WOLFF:  So don't share what you and I

 6        discussed, but you can share what you know from any

 7        non-privileged source.  So other than my telling

 8        you, did you know that?

 9                  THE WITNESS:  No.

10   BY MR. NACHT:

11   Q.   Would you agree that if Mr. Haydar had shared his

12        concerns that he was being discriminated against

13        by Mr. Faricy and people who wanted to please

14        Mr. Faricy on the grounds of religion or national

15        origin to Ms. Cerio prior to Ms. Cerio retaining

16        you to perform this investigation, that Ms. Cerio

17        should have shared that information with you?

18   A.   Yes.

19                  MR. NACHT:  Mr. Wolff, I don't want to

20        draw your objection, but it's my memory that

21        Ms. Cerio testified that it is the job of human

22        resources people to ask questions about whether

23        concerns raised issues that are unlawful under

24        Title VII or -- is that your memory as well,

25        Mr. Wolff?

```
                                                      Page 30
 1                    MR. WOLFF:  I'm not sure I share the

 2          exact memory, but I'm fine for you using that as a

 3          predicate for a question.

 4                    MR. NACHT:  Okay.  Thank you.

 5   BY MR. NACHT:

 6   Q.     Whether or not Ms. Cerio said that, is that your

 7          view as well?

 8   A.     Are you asking me whether it's HR's responsibility

 9          to ask questions that -- whether someone believes

10          they're being discriminated against?

11   Q.     When an HR person has a suspicion or concern that

12          a potential complaint of unfairness may embrace

13          unlawful activity within the meaning of Title VII,

14          is it the job of an HR professional at Amazon to

15          ask questions to determine whether such unlawful

16          activity is occurring?

17   A.     Yes.

18   Q.     And when you performed this investigation, you were

19          an HR professional at Amazon, correct?

20   A.     Yes.

21   Q.     And you never asked questions of religion or

22          national origin discrimination, correct?

23   A.     Abdullah provided me with --

24                    MR. NACHT:  I'm sorry, can you just

25          answer that question?
```

Abdullah Haydar v. Amazon Corporate, LLC
Anne DeCleene 2/1/2018                                                      90

                                                              Page 31

 1                      THE WITNESS:  What was the question?

 2                      MR. NACHT:  Could you ask the witness the

 3          question, please?

 4                      (Whereupon the question was read

 5                      back by the court reporter.)

 6                      THE WITNESS:  No.

 7     BY MR. NACHT:

 8     Q.    Of any witness?

 9     A.    Of any witness in any investigation I've ever done?

10     Q.    No, in this investigation.  You spoke to a lot of

11           witnesses --

12     A.    No.

13     Q.    -- but you never asked a single person anything

14           about national origin or religious discrimination

15           in the Haydar investigation, correct?

16     A.    I did not, correct.

17     Q.    And you personally never suspected that religious

18           discrimination or national origin discrimination

19           was occurring, correct?

20     A.    Correct.

21     Q.    And if you had, you would have broadened your

22           investigation to include those questions?

23     A.    Yes.

24     Q.    Would you have had to seek permission from

25           Ms. Cerio to do that or did you believe you had

Page 32

1          the authority to do that on your own once you

2          were commissioned to initiate the investigation?

3    A.    I had authority to do a full thorough investigation

4          on my own.

5    Q.    And so the investigation could have led into

6          potential unlawful activity under Title VII?

7                    MR. WOLFF:  Objection.

8                    MR. NACHT:  What's the objection?

9                    MR. WOLFF:  You mean she had the scope of

10         authority to have done that?  I'm sorry.

11                   MR. NACHT:  Yes.  You withdraw your

12         objection?

13                   MR. WOLFF:  I withdraw my objection.

14                   THE WITNESS:  The investigation could

15         have gone in that direction.

16   BY MR. NACHT:

17   Q.    How many investigations have you performed since

18         you've been at Amazon?

19   A.    A hundred, approximately.  I'm estimating.  I don't

20         know.

21   Q.    This is what you do, huh?

22   A.    This is what I do.

23   Q.    You're constantly performing investigations?

24   A.    Yes.

25   Q.    How many times have you substantiated

Page 33

1          discrimination in 2017?  Unlawful discrimination

2          or retaliation or harassment in 2017.

3   A.     I will add the caveat that I did take two and a

4          half months off this year, and I cannot recall

5          exactly without going back and pulling my records

6          open, but I would say at least a couple.

7   Q.     How about 2016?

8   A.     I would say at least a couple.

9   Q.     The Haydar investigation was performed in the

10          spring of 2015, correct?

11   A.     Yes.

12   Q.     The first time that you substantiated unlawful

13          discrimination or harassment or retaliation, do you

14          remember that?  At Amazon.

15   A.     I have an instance that comes to mind, but I cannot

16          say definitively if it was the first one or just

17          the most memorable.

18   Q.     Okay.  What was the nature of the unlawful conduct?

19   A.     It was discrimination on the basis of disability

20          and an accommodation claim.

21   Q.     What was the unit in Amazon?

22   A.     The unit?

23   Q.     Marketplace, AWS?

24   A.     Oh.

25   Q.     Within Consumer?

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

```
                                                           Page 34
 1   A.    It was in Consumer, but it was not in Retail.
 2         I don't recall which business org, but it wasn't
 3         under David Haines, so it wasn't in my predominant
 4         group.
 5   Q.    When is the next time or any other time you can
 6         remember finding or substantiating unlawful
 7         discrimination, harassment or retaliation?
 8   A.    Are you asking me for the amount of time that
 9         lapsed between the case I'm recalling and the next
10         one?
11   Q.    No, I just -- give me -- I mean, it's only happened
12         a couple times a year for the last couple years.
13         These are the only times it's happened, right?
14   A.    It probably happens a couple to several times a
15         year where a case of discrimination, harassment,
16         retaliation is substantiated.
17   Q.    Okay.  Tell me another you can remember.
18   A.    Okay.  I remember another.
19   Q.    Tell me about it.
20   A.    There is an instance of an employee complaining
21         that an investigation was conducted and several
22         months thereafter a retaliation claim was brought
23         forward that the manager was essentially trying
24         to manage the employee out due to that previous
25         complaint and retaliation was substantiated.
```

Abdullah Haydar v. Amazon Corporate, LLC                                90
Anne DeCleene 2/1/2018

Page 35

1   Q.    What unit?

2   A.    AWS.

3   Q.    Who was the manager?

4   A.    That's confidential.

5               MR. WOLFF:  We're not -- I see the

6         relevance of generally exploring whether she ever

7         made such findings at Amazon in her investigations,

8         but we're not going to share the individuals

9         involved.

10              MR. NACHT:  What's the --

11              MR. WOLFF:  If the judge says we have to,

12        we will.

13              MR. NACHT:  What's the basis for the

14        objection, Rob?

15              MR. WOLFF:  That these are confidential

16        investigations involving other business units,

17        other people, other times, and the high degree

18        of confidentiality and the importance of that

19        confidentiality being protected outweighs the

20        relevance of the names of the players involved.

21        If we're wrong, we'll supplement.

22  BY MR. NACHT:

23  Q.    Ms. DeCleene, have you ever done other

24        investigations within Marketplace besides the

25        Haydar investigation?

Abdullah Haydar v. Amazon Corporate, LLC                                        90
Anne DeCleene 2/1/2018

Page 36

```
 1    A.    I don't recall.  I would have to go back and look
 2          at the records.
 3    Q.    Have you done other investigations involving an L7
 4          or higher as the complainant?
 5    A.    Yes, yes.
 6    Q.    Have you ever substantiated discrimination,
 7          harassment or retaliation for an L7 or higher?
 8    A.    Yes.
 9    Q.    In what unit?
10    A.    The one that I can think of in my head right now is
11          an AWS.
12    Q.    What was the nature of the violation?  Is this one
13          you've spoken about already?
14    A.    No, this was a religious discrimination complaint.
15    Q.    What was the religion?
16    A.    Messianic Jew.
17    Q.    What were the questions you asked in that
18          investigation concerning religious-specific
19          issues?
20    A.    I would have to go back and look at that
21          investigation report and those transcripts to
22          answer specifically.
23    Q.    Your report acknowledges that Mr. Haydar alleged
24          biased treatment, correct?
25    A.    Yes.
```

Page 37

 1   Q.   Did you ask Mr. Haydar what kind of bias?

 2   A.   I'm sure I asked a question along those lines, as I

 3        wanted to know why he felt that way, on the basis

 4        of what.

 5   Q.   Well, there's a way to ask the question which

 6        elicits examples of treatment and there was another

 7        way to ask the question which is seeking motivation

 8        or animus behind the bias.  Do you acknowledge the

 9        distinction?

10   A.   Yes.

11   Q.   As you sit here today, having reviewed your notes

12        and your records of this investigation, under oath,

13        can you remember specifically asking Mr. Haydar,

14        "What do you believe animated the bias?" or words

15        to that effect?

16   A.   I would have to open the interview transcript to

17        look to see what questions that I asked, but I can

18        say confidently that in every investigation that

19        eludes to bias, I want to know the root of where

20        and why they feel that is coming from.

21   Q.   Do you have your notes of your interview with

22        Mr. Haydar present?

23   A.   If you've provided it as an exhibit.

24             MR. WOLFF:  We're looking.

25             MR. NACHT:  I don't think we gave it to

```
                                                    Page 38
 1        you.  I'm going to have Mickey send this to you.

 2                    MR. WOLFF:  Okay.

 3                    (Discussion off the record.)

 4                    MR. WOLFF:  The document is in front of

 5        the witness.  This will be Anne DeCleene --

 6                    MR. NACHT:  You ready?

 7                    MR. WOLFF:  Yeah, give her a chance to

 8        review it.

 9                    THE WITNESS:  Do you want me to take time

10        to read it?

11                    MR. NACHT:  I want you to look at

12        Exhibit 3 -- which is Bates stamped 376 through

13        380, correct?

14                    THE WITNESS:  Correct.

15   BY MR. NACHT:

16   Q.   Okay.  First, looking at the top of 377, does this

17        document appear and the subject of 376 at the very

18        top -- 376, the front page, very top.  Does this

19        document appear to be your notes of your interview

20        with Abdullah Haydar?

21   A.   Yes.

22   Q.   Okay.  I would like you to find for me in this

23        document the closest you can get to you asking

24        Abdullah Haydar a question about what animated his

25        bias or his view of Mr. Faricy's bias.  Let me ask
```

Page 39

1          the question a little more clearly.

2                    Please identify for me in Exhibit 3 the

3          closest you can come to you asking a question of

4          Mr. Haydar, "What do you believe animated or was

5          the cause of Mr. Faricy's bias?"

6                    MR. WOLFF:  Dave, she's writing on the

7          document.  Is that okay, Dave?

8                    MR. NACHT:  Sure.  We lost you.

9                    (Discussion off the record.)

10   BY MR. NACHT:

11   Q.    Have you completed reviewing the document?

12   A.    Yes, I have.

13                    THE WITNESS:  Could you please repeat the

14          question for me?

15                    (Whereupon the question was read

16                    back by the court reporter.)

17                    THE WITNESS:  I don't see in my notes

18          here that I asked that question.  My questions

19          were very much based on the email or emails that

20          Abdullah had already sent Shelly where there was

21          explanation for why he felt the way he did.

22   BY MR. NACHT:

23   Q.    Did you review 360s of Abdullah Haydar?

24   A.    I reviewed 360 feedback as part of the

25          investigation.

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

Page 40

1    Q.    How do you know?

2    A.    How do I know?

3    Q.    You've done over 100 investigations.  How do you

4          know you did that?

5    A.    I would have to check, but I think I even attached

6          the feedback.  I'm sure I referred to it in some of

7          the content in the investigation.

8    Q.    Well, some 360 feedback is included in OLRs,

9          correct?  Performance reviews, comments?

10   A.    Are you asking me generally about OLRs?  I'm

11         generally not in OLRs.

12   Q.    In other words, in 2014, in 2013, there was a lot

13         of 360 feedback that an L7 would receive, correct?

14   A.    Are you asking if an L7 would receive a lot of

15         feedback via Evolution, the 360 tool?

16   Q.    Yes.

17   A.    It depends on the L7.

18   Q.    Okay.  You did not methodically review all 360 data

19         from that Evolution tool for Mr. Haydar from 2013

20         and 2014, did you?

21   A.    I reviewed all Evolution feedback that was

22         available for review.

23   Q.    And what was available for review?

24   A.    Anything that I have attached as an exhibit is what

25         was available in the system as it expires after --

Page 41

 1          or expired after a certain period of time.

 2    Q.    Did you ask Mr. Haydar for -- whether he had

 3          records of additional 360 feedback that hadn't

 4          expired, but would support his position?

 5    A.    I do not recall specifically asking him for that

 6          potential exhibit; however, I did state multiple

 7          times that I wanted to see anything and everything

 8          that may be relevant or insightful.

 9    Q.    Did you tell Mr. Haydar that you would be

10          conducting interviews of many people and reviewing

11          lots of data?

12    A.    The general process of an investigation is

13          explained with people.  Most investigations

14          include investigatory interviews as well as any

15          other review, should that be documentation, email,

16          video surveillance, whatever would pass an

17          investigation.

18    Q.    Mr. Haydar was objecting to his evaluations,

19          correct?

20    A.    Abdullah was objecting to his ratings.

21    Q.    And the ratings were based upon an assessment of

22          his performance under three different leadership

23          principals, correct?

24    A.    His ratings were based on an assessment of a

25          multitude of different things.  One of those input

Abdullah Haydar v. Amazon Corporate, LLC                                      90
Anne DeCleene 2/1/2018

                                                              Page 42

 1        ratings is the leadership principles of which there

 2        are 14.

 3   Q.   Yes.  But his particular concern was that he was

 4        facing criticism for not being sufficiently vocally

 5        self-critical for failing to disagree and commit

 6        adequately and failing to earn trust; isn't that

 7        so?

 8   A.   I recall there being a trend of those being the

 9        predominant areas of opportunity.

10   Q.   Did you look at the number of feedback comments

11        Haydar had received in the 360s on those subjects?

12   A.   I read every piece of feedback that was available

13        for review.

14   Q.   You never shared with Mr. Haydar that you did not

15        have access to all of his 360s, did you?

16   A.   If it came up in conversation how the tool operated

17        and everyone's feedback disappears after a certain

18        period of time, I'm --

19   Q.   Excuse me, I'm not asking you to speculate --

20   A.   I don't recall.  I don't remember.

21   Q.   Okay.  And you never went back to Haydar with your

22        preliminary assessment of what you were finding

23        based upon interviews and data you looked at,

24        correct?

25   A.   No.

Page 43

```
 1    Q.    And you didn't tell Haydar, "You've said to me in

 2          our initial interview that most people have a

 3          different view of me than a few people who are

 4          slamming me, but I'm not seeing the data that

 5          supports your position."  You never said anything

 6          like that, right?

 7    A.    Are you referring to the interview notes?  If so,

 8          can you tell me where to look?

 9    Q.    No, I'm referring to your process.  In your initial

10          interview with him, as you decided what to

11          investigate, he shared with you that he was getting

12          slammed by a relatively small number of people and

13          that most people had a different perception of him,

14          right?  Wasn't that his take?

15    A.    Yes.

16    Q.    And you interviewed the people who slammed him, but

17          you didn't interview all of the people giving him

18          positive feedback that supported his position,

19          right?

20    A.    I would want to further explore the word slammed.

21          I don't feel like everyone slammed him.  I feel

22          like investigations proceed strategically to come

23          to a finding.

24    Q.    Did you interview a single person who reported to

25          Mr. Faricy?
```

```
                                                    Page 44
 1   A.    I would have to look at the reporting structure at

 2         the time.

 3   Q.    Did you interview a single person that reported to

 4         Mr. Haydar?

 5   A.    I do not recall doing so.

 6   Q.    Mr. Haydar ran a team in Romania and a team in

 7         Detroit, right?

 8   A.    At some point in time, yes.

 9   Q.    And to the best of your knowledge, you never

10         interviewed anybody who worked directly for the

11         man, did you?

12   A.    No.

13   Q.    Your interview reflected that Mr. Joudrey stated

14         that Mr. Joudrey and Mr. Saxena were inclined to

15         give Mr. Haydar a positive review for 2014; do you

16         remember that?

17   A.    If that --

18   Q.    I'm asking if you remember it.

19   A.    I would have to pull up the interview transcript

20         and read that.

21   Q.    In Haydar's account, Mr. Faricy is the one who

22         exhibits bias, correct?

23   A.    Yes.

24   Q.    In Mr. Faricy's account, there is an ORL process

25         which happens according to the normal process and
```

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

                                                              Page 45

1           Haydar is assessed to be weak on three different

2           leadership principles two years in a row and gets

3           bad reviews.  Is that a fair characterization of

4           the Faricy position?  Based on your interview.

5    A.     I would have to go back and look at the Peter

6           interview.  I feel like that question is coming

7           across more involved than I remember him being for

8           an L7 layers below him.

9    Q.     Okay.  What's your -- how do you remember

10          Mr. Faricy's take on this, that he was more

11          distantly removed and less involved?

12                  MR. WOLFF:  Do you just want to test her

13          general recollection without the document in front

14          of her?

15                  MR. NACHT:  Yes.

16                  MR. WOLFF:  Okay.  Go ahead.

17                  THE WITNESS:  I recall that ultimately

18          the direct manager owns the decision and owned the

19          decision in this case and Peter didn't direct

20          anyone to certain ratings.

21   BY MR. NACHT:

22   Q.     Did you have a chance prior to today to look at

23          Mr. Haydar's lawsuit, his complaint?

24   A.     I've never seen it.

25   Q.     Have you reviewed your interview notes from various

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

                                                                    Page 46

1          interview subjects prior to today?

2    A.    I've skimmed through interview notes.  I wouldn't

3          say I've done so thoroughly.

4    Q.    Do you have the Jim Joudrey interview notes there?

5                    MR. WOLFF:  Did you guys mark them?

6                    MR. NACHT:  No.

7                    MR. WOLFF:  If they're not there --

8                    THE WITNESS:  Here they are.

9                    MR. NACHT:  They are?  Okay.

10                   MR. WOLFF:  You gave them to us.

11                   THE WITNESS:  Okay.

12                   MR. WOLFF:  I figured you would give us

13         Joudrey.

14   BY MR. NACHT:

15   Q.    What does Joudrey say, according to your notes, in

16         Exhibit 4, what did Joudrey tell you -- and let's

17         mark Exhibit 4.  Is that 411 through 414 Bates

18         stamp?

19   A.    Yes.

20                   (Marked for identification:

21                   Deposition Exhibit No. 4.)

22   BY MR. NACHT:

23   Q.    Okay.  Take a look at your notes please and tell me

24         what Joudrey says Faricy's role was in Haydar's

25         review.

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

```
                                                       Page 47
 1                    MR. WOLFF:  David, while she's looking,
 2            I'm probably wrong, but you know why I think we're
 3            losing connection?  I think it's happened each time
 4            there's no verbal activity.  Maybe it automatically
 5            shuts off because it thinks the conference is over.
 6                    MR. NACHT:  Well, if that's true, then
 7            you can just --
 8                    MR. WOLFF:  We can chat during breaks.
 9                    MR. NACHT:  You can direct the court
10            reporter to go off the record and we can exchange
11            anecdotes.
12                    THE WITNESS:  Would you like me to read
13            the interview transcript?
14                    MR. NACHT:  No.  I would like you to
15            answer the question, please.
16                    Can you please repeat the question for
17            the witness?
18                    (Whereupon the question was read
19                     back by the court reporter.)
20                    THE WITNESS:  Regarding Peter's OLR,
21            Joudrey said that he argued for him -- "him" being
22            Abdullah -- not to be least effective.
23     BY MR. NACHT:
24     Q.    And does he say anything about Faricy's role?
25     A.    Peter -- he says, "Peter pushed and made the
```

Page 48

```
1          ultimate calls."

2     Q.   And on 4-12 -- I'm sorry.  On 412, Section 2(b)(x),

3          what does he say?

4     A.   2(b)(x)?

5     Q.   Yes, ma'am.  Page 412.

6     A.   There are seven points under 2(b)(x).  Would you

7          like me to read them all?

8     Q.   Start from the top.  And what does he say?

9     A.   "Then Peter's OLR, he got brought up.  Peter is not

10         a fan.  He wasn't an LE going into the OLR.  Avi

11         and I argued for him in the OLR to not be an LE.

12         If he really is an LE, why move him to Detroit?  We

13         had a big discussion.  I think he was on the

14         bubble.  Peter pushed and made the ultimate call.

15         He referenced meetings he had been in with

16         Abdullah.  He doesn't play favorites.  Abdullah was

17         not happy" --

18    Q.   Stop.  Thank you.

19              Now do you have an independent

20         recollection of those notes or not?

21    A.   I do not.

22    Q.   Okay.  Do you have any reason to doubt the accuracy

23         of your notes that you just read?

24    A.   I do not.

25              MR. NACHT:  Do you have your notes of
```

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

```
                                                     Page 49

  1          your interview with Mr. Faricy present?

  2                    MR. WOLFF:  Something tells me they're

  3          here, too.  Let's find them.

  4                    MR. NACHT:  Bates stamp 415 to Bates

  5          stamp 419.  We'll mark that as five.

  6                    (Marked for identification:

  7                    Deposition Exhibit No. 5.)

  8   BY MR. NACHT:

  9   Q.    I would like you to read this document to yourself,

 10          and I would like you to tell me, where in the

 11          document is there anything supporting the position

 12          that you remember Mr. Faricy taking from your

 13          general recollection that he was somewhat removed

 14          from the review?  I would like you to find evidence

 15          of that in this document, please.

 16   A.    I think -- first I want to make a clarification

 17          about the ratings.  So there are -- our input

 18          ratings --

 19                    MR. NACHT:  I'm sorry, there's not a

 20          question pending.  I would like you to answer my

 21          question.

 22                    MR. WOLFF:  Could you repeat the

 23          question, please?

 24                    (Whereupon the question was read

 25                    back by the court reporter.)
```

Abdullah Haydar v. Amazon Corporate, LLC                                          90
Anne DeCleene 2/1/2018

```
                                                          Page 50
 1                  THE WITNESS:  So Peter talked about how
 2         Jim and Joel weighed in on the ratings and came in
 3         with Abdullah in the lower right-hand corner.
 4                  MR. NACHT:  Sorry, what page?
 5                  THE WITNESS:  416.  The inputs that were
 6         brought into the OLR for Abdullah remained the same
 7         throughout and by the end of the OLR.
 8  BY MR. NACHT:
 9  Q.    I'm sorry, are you quoting from this document?
10  A.    No, I'm telling you where it says, "Joel Mosby
11         brought his ratings to the OLR.  Maybe Jim Joudrey
12         too."  In the lower right-hand corner --
13  Q.    Page 416, paragraph II, "Gather Facts," No. 2,
14         "Ratings," (a), "Were Abdullah's ratings determined
15         in your OLR?"  And then there are a series of Roman
16         numerals.  That's what your -- lower case.  That's
17         what you're reading from, correct?
18  A.    I'm reading Section II, "Gather the Facts," 2(a)(v)
19         as well as 2(a)(vi).
20                  Managers come to OLRs with ratings.
21         Ratings aren't finalized until after the OLR, but
22         they come to the table with ratings.
23  Q.    Okay.  Is there anything else in this document that
24         supports your memory that Faricy was somewhat
25         removed from the ultimate assessment of Mr. Haydar?
```

Abdullah Haydar v. Amazon Corporate, LLC                          90
Anne DeCleene 2/1/2018

```
                                                      Page 51
 1   A.    As part of the OLR process, OLRs happen at multiple

 2         levels, so Abdullah would have been discussed at a

 3         previous lower-level OLR to which those ratings

 4         were brought to the table with Peter's.  It was

 5         obviously a topic of conversation in the OLR being

 6         that he was in the bottom right-hand corner.

 7   Q.    So in fact, you interviewed Faricy on March 31,

 8         2015, correct?

 9   A.    Yes.

10   Q.    And based on your notes, Faricy said, "Well, his

11         managers would have brought in a prospective rating

12         and we'd discuss it," essentially, right?

13   A.    Yes.

14   Q.    And then a few days later, on April 2, 2015, you

15         interviewed Mr. Joudrey, right?

16   A.    Yes.

17   Q.    And Mr. Joudrey fleshed out that discussion with

18         the sections we discussed earlier, that he and

19         Mr. Saxena had come into Peter's OLR with a -- not

20         with an LE rating for Mr. Haydar, correct?

21              MR. WOLFF:  Objection.  Mischaracterizes

22         the evidence.

23              MR. NACHT:  How so?

24              MR. WOLFF:  Joudrey wasn't the manager at

25         the time of the OLR, it was Joel Mosby who came
```

```
                                                       Page 52
 1          into the rating, and he came into the rating with

 2          an LD.  That's the grounds.

 3                   MR. NACHT:  I'm looking at --

 4                   MR. WOLFF:  Manager between September and

 5          December of the prior year.

 6                   MR. NACHT:  I'm looking at page 412 in

 7          the Joudrey.  Do you have Joudrey in front of you?

 8                   THE WITNESS:  Yes.

 9  BY MR. NACHT:

10  Q.   Okay.  Page 412, No. 2, subparagraph (b)(x)(1).

11       What does it say?

12  A.   "He wasn't an LE going into the OLR."

13  Q.   Keep going.

14  A.   "Avi and I argued hard for him in the OLR to not be

15       an LE."

16  Q.   Okay.  And then if we skip down to (6), what does

17       it say?

18  A.   "Peter pushed, made the ultimate call."

19  Q.   Okay.  Based upon your interviews in the Exhibit 4

20       and Exhibit 5, did you come to an opinion as to

21       whether Peter Faricy was a decision-maker in Haydar

22       getting the LE ratings in 2014?

23  A.   Peter influenced the output, but not the input.

24  Q.   Why don't you give me a yes or no to this question

25       and then I'll let you explain.
```

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

Page 53

1   A.   Peter influenced the LE.

2   Q.   Now this was an investigation where Mr. Haydar was

3        arguing that Mr. Faricy exhibited bias towards

4        Mr. Haydar, correct?

5   A.   My recollection is the OLR occurred well before

6        this investigation was initiated.

7   Q.   Yes.  The purpose of your investigation was to

8        review, in part, this determination that Haydar got

9        an LE, right?  That Haydar was complaining about

10       that, correct?

11  A.   Okay.  Yes.

12  Q.   And so in looking at the process by which Haydar

13       ended up with an LE, you interviewed Joudrey and

14       Faricy, among others, right?

15  A.   Yes.

16  Q.   And in conducting those interviews, you determined

17       Faricy pushed to end up with Haydar getting an LE

18       rating in 2014, correct?

19  A.   That was Jim's recollection.

20  Q.   Right.  Did you conclude that there was some reason

21       why that was not accurate?

22  A.   No.

23  Q.   There's nothing in your investigation that

24       contradicted that, right?

25  A.   I would guess that if you -- if we were to --

Abdullah Haydar v. Amazon Corporate, LLC                              90
Anne DeCleene 2/1/2018

```
                                                    Page 54
 1   Q.    I don't want you to guess.  I don't want you to

 2         guess.

 3                  As you sit here today, based on your

 4         recollection, there's nothing in your investigation

 5         that contradicted Mr. Joudrey's account of

 6         Mr. Faricy's role, right?

 7   A.    I would have to look at the interview transcripts

 8         more closely.  I don't know if people recalled it

 9         the same way as Jim did it as Peter pushing.

10   Q.    Okay.  I would like to direct your attention to

11         Exhibit 1.  And is that dated April 15, 2015?

12   A.    Yes.

13   Q.    And is it, "Summary of Investigation RE: Abdullah

14         Haydar"?

15   A.    Yes.

16   Q.    And the first big heading is "Reason for

17         Investigation"?

18   A.    Yes.

19   Q.    And it begins on page Bates stamp 358 and ends on

20         Bates stamp 375?

21   A.    Yes.

22   Q.    And (1), after, "Reason for Investigation," is, "I

23         have been given two unfair ratings in a row,"

24         correct?

25   A.    Yes.
```

Abdullah Haydar v. Amazon Corporate, LLC                                      90
Anne DeCleene 2/1/2018

```
                                                            Page 55
 1    Q.    And then (2) and (3) specifically identify Faricy

 2          as the bad actor, right?

 3    A.    Yes.

 4    Q.    Page 360.  "Issue & Analysis."  This is where you

 5          get into the meat of your analysis, correct?

 6    A.    Yes.

 7    Q.    "Issue 1.  Whether Abdullah received biased and/or

 8          unfair ratings since joining Amazon?

 9          Uncorroborated," correct?

10    A.    Yes.

11    Q.    Read to yourself that section and tell me where,

12          if anyplace, you identify that Joudrey supported a

13          higher rating for Haydar than an LE.

14    A.    I see a reference to the Jim interview notes.  Is

15          that what you're asking me, why I didn't explicitly

16          call out Jim's comment?

17    Q.    I'm just asking you if you can find anyplace where

18          you -- in your Issue & Analysis of Section 1, where

19          you raise and grapple with the issue that Joudrey

20          wanted to give a higher rating than LE and Faricy

21          overruled him.

22    A.    That's not in my analysis.

23    Q.    Okay.  In paragraph -- or Issue 2 or page 364,

24          "Whether Peter Faricy and/or his direct exhibit

25          bias in the promotion and/or reorg process?"
```

Page 56

```
 1                    That would not be a place where we would

 2          expect Mr. Joudrey's comments about the LE rating

 3          in the OLR to be discussed, fair?

 4     A.   It just depends.

 5     Q.   Okay.

 6     A.   Fair for this analysis.

 7     Q.   Okay.  Is there anything -- anywhere in your

 8          analysis of Issue 2 where you see your discussion

 9          of Mr. Joudrey wanting to give Mr. Haydar a higher

10          rating?

11     A.   Not that I see, no.

12     Q.   Issue 3, "Whether Peter Faricy has made any

13          comments that illustrate bias against Abdullah?"

14                    This section seems to be limited to

15          Haydar's notes about Faricy's comments in public,

16          correct?

17     A.   Yes.

18     Q.   So we wouldn't expect that analysis to include

19          Mr. Joudrey's comments about what rating to give

20          Mr. Haydar in that section, right?

21     A.   Right.

22     Q.   Issue 4.  "Whether HR failed to respond or address

23          Abdullah's concerns?"

24                    That's also not a place where we would

25          have expected you to discuss Mr. Joudrey's initial
```

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

Page 57

1          preliminary review of Mr. Haydar being higher than

2          an LE, correct?

3   A.     Right.

4   Q.     As you sit here today, can you explain why your

5          investigation analysis did not grapple with this

6          fact that you found?

7   A.     As part of the OLR process, multiple leaders

8          weigh in on that discussion and it's rare, if ever,

9          everyone is on the same page, so I would -- it's

10         quite common for there to be disagreement, and Jim

11         was Abdullah's manager for a very short period of

12         time.

13                 MR. NACHT:  Page 366, Exhibit 1.

14                 MR. WOLFF:  I'm sorry, we're not

15         follow --

16                 MR. NACHT:  This is Exhibit 1.

17                 MR. WOLFF:  We are looking for Exhibit 1

18         to Exhibit 1.  We're there.

19   BY MR. NACHT:

20   Q.     Please read the first sentence of your

21         recommendation.

22   A.     "In light of the investigative findings, I would

23         generally recommend proceeding with a performance

24         improvement plan for Abdullah."

25   Q.     Did Ms. Cerio ask you to investigate whether a

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

```
                                                       Page 58

 1            Performance Improvement Plan for Abdullah Haydar

 2            was justified?

 3    A.      No.

 4    Q.      All right.  Let's go back to that meeting that

 5            we've not talked about, the very first meeting

 6            where she gave you your commission.  Tell me

 7            everything you can remember about that meeting.

 8    A.      I recall sitting down with Shelly, Shelly showing

 9            me the email she had received from Abdullah, I

10            believe the month before, and her asking me if I

11            had the bandwidth and felt comfortable taking over

12            the investigation.

13    Q.      What else?

14    A.      I don't remember anything else.

15    Q.      What was it, in the course of your investigation of

16            Mr. Haydar's complaint to Ms. Cerio, that prompted

17            you to make a recommendation that Mr. Haydar be

18            subject to a Performance Improvement Plan?

19    A.      It is normal for me to include a recommendation and

20            investigation report.  This was included because

21            the business was considering it before any of this

22            got escalated, so --

23    Q.      How did you know that?  Let's start with that.  How

24            did you know that?

25    A.      I don't remember.
```

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

                                                                    Page 59

1    Q.    So Cerio didn't tell you that?

2    A.    I don't remember how I found that out.

3    Q.    She might have told you that?

4    A.    I would just be speculating on who told me that.

5          I would -- I wouldn't guess her, but it's possible.

6          I would guess his HR VP.

7    Q.    Who would that have been?

8    A.    Kaitlin McVey.

9    Q.    So McVey and you spoke separately from your

10         investigation notes of her?

11   A.    We have spoken separate from the interview notes.

12   Q.    During the course of the investigation of Abdullah

13         Haydar, you had separate conversations with

14         Ms. McVey about Mr. Haydar besides what's in the

15         interview notes?

16   A.    As part of the typical interview process --

17   Q.    Stop, stop.  I'm not asking for the background or

18         the context.

19   A.    I don't remember.  I don't remember.

20   Q.    Okay.  Now you may continue.

21   A.    I don't remember.  Now you want -- you want me to

22         talk about my general interview process?

23   Q.    Yes.  I just wanted a clear answer of your

24         recollection of whether you had spoken to Kaitlin

25         McVey about Haydar during the investigation and

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

```
                                                     Page 60
 1           now I'm happy to hear your discussion of your

 2           process.

 3   A.      So generally when an escalation is raised, I will

 4           reach out to the HR business partner to introduce

 5           themselves and provide an appropriate amount of

 6           information as far as what I will be doing.

 7   Q.      And do you ask that person's assessment of the

 8           situation?

 9   A.      Not outside of the interview in this case.

10   Q.      But how do you remember that if you don't remember

11           whether you spoke to her?

12   A.      Because in an investigation, an HR business

13           partner is not always interviewed, it's not

14           always relevant, so in that case, I may have the

15           conversation with an HR business partner, which

16           isn't relevant in here.

17   Q.      Just a minute ago you testified that you don't

18           remember whether you spoke to Ms. McVey separately

19           from the formal interview which you took notes.

20                  Is it fair to say that since you don't

21           remember if such a conversation occurred, you can't

22           testify as to, if a conversation occurred, what was

23           said?

24   A.      Oh, no.

25   Q.      No what?
```

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

Page 61

1   A.    I couldn't tell you what was said should a

2         conversation have even occurred.

3   Q.    Okay.  Thank you.

4               Do you think that an escalation over a

5         concern of a performance review itself can violate

6         the disagreeing leadership principle?

7               THE WITNESS:  Can you repeat the

8         question, please?

9               (Whereupon the question was read

10              back by the court reporter.)

11              THE WITNESS:  What do you mean by

12        escalation?

13              MR. NACHT:  I'm using the Amazon term.

14        Does the term escalation have a meaning within

15        Amazon, to the best of your knowledge?

16              THE WITNESS:  Definitely not a

17        universally accepted definition.

18              MR. NACHT:  Okay.  Raising the issue

19        above a particular person to another person higher

20        up.

21              MR. WOLFF:  Does doing that to complain

22        about an evaluation violate disagreeing?

23              MR. NACHT:  Yes.

24              THE WITNESS:  I don't --

25              MR. NACHT:  Let's take it one step at a

Abdullah Haydar v. Amazon Corporate, LLC                                     90
Anne DeCleene 2/1/2018

```
                                                          Page 62

  1        time.

  2   BY MR. NACHT:

  3   Q.   Ms. McVey was the HR person for Mr. Haydar at the

  4        time of this investigation, correct?

  5   A.   Yes.

  6   Q.   Who was her boss, Madonna Cole?

  7   A.   I don't know.

  8   Q.   If I tell you it was Madonna Cole, does that sound

  9        right to you?

 10   A.   No.  I would guess Derek Oehler, but I don't

 11        know.

 12   Q.   I believe Derek Oehler replaced Ms. McVey as the HR

 13        person for --

 14   A.   I think she was reporting to him.

 15   Q.   You do?  Okay.

 16             Who was Oehler reporting to?

 17   A.   I believe Madonna.

 18   Q.   Madonna Cole?

 19   A.   Yes.

 20   Q.   Who was Cole reporting to?

 21   A.   I believe Shelly.

 22   Q.   Haydar complained to Cole and then he complained to

 23        Cerio, correct?

 24   A.   Yes.

 25   Q.   When I use the term "escalation," I mean that, that
```

Abdullah Haydar v. Amazon Corporate, LLC                                   90
Anne DeCleene 2/1/2018

Page 63

```
 1         he's going up the chain of command, he's escalating

 2         his complaints to people with -- higher up in the

 3         hierarchy.  That's what I mean.  Does that make

 4         sense to you?

 5    A.   Yes.

 6    Q.   Okay.  What's the term you would use?

 7    A.   I guess raise the complaint that warrants an

 8         investigation.

 9    Q.   Okay.  At Amazon, is it ever permissible to label

10         someone as violating the disagree and commit

11         leadership principle because they have escalated

12         their concerns about their own reviews?

13                   MR. WOLFF:  Objection.  Foundation.  You

14         can answer based on your understanding.

15                   THE WITNESS:  If I understand your

16         question, no, Abdullah should not have felt any

17         repercussion for raising a concern.

18    BY MR. NACHT:

19    Q.   Do you believe that he should have been free from

20         retaliation under Amazon's policies for raising the

21         concerns that he raised in this investigation?

22    A.   Yes.

23    Q.   Were you sensitive to that when you performed the

24         investigation?

25    A.   Yes.
```

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

Page 64

1   Q.    If you were not Haydar's HR person and you were

2         called in simply to investigate his complaint --

3         those two things are both correct, right?

4   A.    Yes.

5   Q.    Why would you express an opinion about whether his

6         management and his HR people should put him on a

7         performance improvement plan?

8               MR. WOLFF:  Objection.  Asked and

9         answered.  You can answer.

10  BY MR. NACHT:

11  Q.    I understand you answered before that, "Well, I

12        believe that I knew that the business was planning

13        that performance improvement plan anyway," correct?

14  A.    Yes.

15  Q.    Right.  So my question is, why is it within the

16        scope of your investigation about Haydar's

17        complaint to comment on anything involving proposed

18        managerial decision-making about Haydar other than

19        to find that you could not substantiate his

20        allegations?

21  A.    It is a normal part of the process.  As an

22        objective person stepping in, if I felt like we

23        weren't -- the PIP was not appropriate, for

24        example, perhaps there wasn't sufficient

25        progressive performance management up to that

Page 65

1        point, I would have similarly called that out as

2        well as an objective fact-finder.

3   Q.   You did not talk to anyone who worked for Haydar,

4        correct?

5   A.   Correct.

6   Q.   You were limited in the 360 reviews you were able

7        to see, correct?

8               MR. WOLFF:  Objection.

9               MR. NACHT:  What's the objection?

10              MR. WOLFF:  I think she said she might

11       have been.  I'm not sure she said for sure, but

12       it's a perfectly appropriate question to ask her

13       again.

14              THE WITNESS:  I reviewed all of the

15       feedback available in the system at the time.

16  BY MR. NACHT:

17  Q.   I understand that you believe your investigation

18       was thorough enough to review particular complaints

19       made by Mr. Haydar.  Let's put your belief about

20       that to the side.  I understand it.

21              What makes you believe that your

22       investigation of Haydar's performance gave you

23       sufficient information for you to make a

24       recommendation that he be put on a Performance

25       Improvement Plan?

Page 66

 1   A.   The business was considering their Performance

 2        Improvement Plan before I walked into the picture.

 3        I walked into the picture and that's put on pause

 4        during my process.  I completed the investigation

 5        and found legitimate reasons for the ratings and

 6        performance management that Abdullah had received

 7        to date.

 8   Q.   Are you familiar with the idea that there can be

 9        abusive feedback in 360s, sort of outlier feedback?

10   A.   I would need an example of what you mean by abusive

11        feedback.

12   Q.   Well, have you ever looked at a situation where you

13        felt one person's feedback was sufficiently out of

14        line or personally driven that it shouldn't be

15        considered?

16   A.   Yeah, yes.

17   Q.   Did it occur to you that Mat Philipsen's feedback

18        about Abdullah Haydar might fall into that

19        category?

20   A.   I do not recall.

21   Q.   You did not review Abdullah Haydar's

22        self-evaluation to see where his actual goals --

23        performance was?

24   A.   I'm sure I read his portion of the annual review,

25        if that's what you're asking me.

Abdullah Haydar v. Amazon Corporate, LLC                                          90
Anne DeCleene 2/1/2018

Page 67

1   Q.   Based on your normal procedure or based on your
2        specific recollection?
3   A.   Based on my normal procedure.  If it's included
4        as an attachment, I have read every last word.
5   Q.   Were you involved in drafting Haydar's Performance
6        Improvement Plan?
7   A.   I recall after our draft was complete it being
8        emailed to me and asked if I have any thoughts.
9   Q.   Do you believe that's appropriate?
10  A.   Yeah, yes.
11  Q.   Why?
12  A.   Because I don't see why it's inappropriate.
13  Q.   Do you remember that Mr. Mosby initiated a
14       performance improvement process in 2014 which was
15       not actually accepted by HR?
16  A.   I recall learning that as part of the
17       investigation.
18  Q.   How did that affect your assessment about Mosby's
19       perspective on Haydar?
20  A.   I don't recall.
21  Q.   What conclusions, if any, did you draw from
22       learning that fact?
23  A.   That he needs to be more patient in the performance
24       management process.
25  Q.   "He," meaning Mosby?

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

Page 68

```
 1   A.   Yes.

 2   Q.   Were you ever shown a document by Derek Oehler in

 3        July 2015 that Haydar had exceeded his goals?

 4   A.   I don't remember.

 5   Q.   Would that have affected your decision about

 6        whether he should be removed from a Performance

 7        Improvement Plan?

 8   A.   I would have to see the document that you're

 9        referring to.

10   Q.   Did it ever occur to you that it would be good for

11        Haydar to work for other people, to transfer to a

12        different group?

13   A.   Did that -- did it occur to me that it may be

14        beneficial for him to transfer?

15   Q.   Yes.

16   A.   It was definitely an option.

17   Q.   You didn't do anything to block that, did you?

18   A.   No.

19   Q.   You knew that Haydar was interested in trying to

20        transfer because he shared that with you, right?

21   A.   Yes.

22   Q.   And you shared that information with people who

23        wanted him fired?

24   A.   Well, I wouldn't jump to the conclusion that there

25        were people that wanted him fired, and I would
```

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

Page 69

```
 1         recall asking more of a general question in

 2         whether -- when I interviewed people -- in whether

 3         they support a transfer.

 4                 MR. WOLFF:  David, when you come to a

 5         natural stop, a break.  It doesn't need to be now.

 6                 MR. NACHT:  Now's a good time.

 7                 (Whereupon a break was taken

 8                 from 1:43 p.m. to 1:49 p.m.)

 9                 MR. NACHT:  Back on the record.

10    BY MR. NACHT:

11    Q.    When I read your notes of Haydar interviewing

12          with you, I saw some comments which gave me the

13          impression that you found him tendentious or

14          repetitive or annoying.  Do you have a recollection

15          of that?

16    A.    I do.

17    Q.    What's your recollection?

18    A.    My recollection is Abdullah talked a lot and it was

19          challenging for me to ask questions.

20    Q.    Is it fair to say that your own personal experience

21          in interviewing Abdullah lent credence, in your

22          mind, to the allegations about Abdullah's failure

23          to adhere to the leadership principles?

24    A.    Well, you word that interesting in that there

25          were allegations against him with regard to the
```

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

```
                                                      Page 70
 1           leadership principles.  I would say people

 2           expressed similar sentiments about him talking

 3           over others in meetings and I'm sure my one-on-one

 4           experience with him provided some level of me being

 5           able to relate.

 6    Q.     And do you remember talking about that with Kaitlin

 7           McVey, that you both found him trying and

 8           difficult?

 9    A.     I do not remember.

10    Q.     Okay.  Have you ever, in the course of your career,

11           interviewed victims of sex harassment?

12    A.     Yes.

13    Q.     Or victims of really egregious race discrimination?

14    A.     Yes.

15    Q.     Is it fair to say that some victims of harassment

16           or discrimination are affected by the experience in

17           terms of how they come across?

18    A.     Sure.

19    Q.     What steps did you take to determine that Abdullah

20           Haydar wasn't being difficult because he's a

21           difficult guy, but he was being difficult with you,

22           that is, frustrated and talking over you, because

23           he was bursting with the stuff that victims of

24           discrimination sometimes burst with?

25                   MR. WOLFF:  Objection.
```

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

                                                        Page 71

 1                    THE WITNESS:  Do you still want me to

 2          answer?

 3                    MR. WOLFF:  Oh, you can answer if you

 4          understand the question.

 5                    MR. NACHT:  Can you repeat the question,

 6          please?

 7                    (Whereupon the question was read

 8                     back by the court reporter.)

 9                    THE WITNESS:  I want to give -- and in

10          every complainant, including Abdullah -- the

11          opportunity to be heard and listened to.  I

12          listened and heard him out at that point.  If I'm

13          not answering the question, if you could rephrase

14          it, please.

15     BY MR. NACHT:

16     Q.   Well, you've acknowledged that your discussion with

17          him affected your sense that he exhibited some of

18          the characteristics that other people talked about,

19          right?

20     A.   Yes.

21     Q.   So I'm asking, what steps, if any -- and it might

22          be none -- you took to sort of check yourself about

23          your reaction to him to say, "Well, wait a minute,

24          maybe he's just a very frustrated guy because he's

25          been complaining about discrimination, escalating

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

Page 72

```
 1           it up different levels and no one is really

 2           listening to him and taking him seriously and

 3           that's what I'm hearing, I'm hearing the

 4           frustration of discrimination," as compared to --

 5    A.     The investigation -- the investigation could have

 6           gone in that direction.  That could have been

 7           proven.  He can -- as most complainants to a

 8           certain level really -- and I can't recall anyone

 9           that I have ever hung up on or cut off.  They can

10           talk over me as much as they want, they can be as

11           frustrated as they want, they can cry, we can meet

12           as many times as they want.

13    Q.     But I'm not talking about you being a listener that

14           makes a complainant feel good, I'm talking about

15           you being an adjudicator, a determiner as to

16           whether the complaint has validity.  And so if your

17           assessment is influenced by a particular style, are

18           there any steps that you can remember taking to

19           slow yourself down in having that reaction?  I

20           mean, you wrote in your interview notes with him,

21           you wrote -- what did you write?  "He droned on;

22           he's repetitive."  What did you write in here?

23           Those kinds of things, right?

24    A.     Yes.

25    Q.     Right.  So your frustration is palpable, it's in
```

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

```
                                                   Page 73
 1          your report, it's in your interview notes, and so

 2          my question is --

 3   A.     Yes.

 4   Q.     -- what steps, if any, did you take as a

 5          professional investigator who was ultimately going

 6          to make an adjudication, a decision, to ensure that

 7          you were not unfairly evaluating a victim of

 8          discrimination who is having an emotional reaction

 9          to the discrimination?  That's my question.

10   A.     Multiple investigatory measures were taken over

11          the course of almost three weeks after that

12          interview.

13   Q.     Name one that responds to that particular point.

14   A.     Reviewing 360 feedback, reviewing annual reviews,

15          conducting a multitude of investigatory interviews.

16   Q.     If you wanted to conduct a truly fair investigation

17          and give him a chance of being successful, along

18          with a couple others that you found substantiated

19          in 2016 and 2017 out of the 100 you've done, if he

20          was going to have a shot of making it into that

21          group, why didn't you talk to the people who worked

22          for him?

23   A.     I did not see that having any bearing on the

24          concerns that he raised.

25   Q.     Why didn't you grapple with in your analysis -- I
```

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

```
                                                        Page 74
 1          mean, maybe reject it, but at least grapple with
 2          the data you found that Joudrey, the manager in the
 3          2014 OLR with Peter, wanted to give him a higher
 4          review?
 5    A.    That was obviously not hidden from the
 6          investigation and it's clearly attached in an
 7          exhibit.  Why it wasn't included in the analysis,
 8          I'm sure it was considered, but I could only
 9          speculate what I was thinking.
10    Q.    I would like you to go to Exhibit 1, page 365,
11          Issue 3.  I would like you to read the last
12          sentence of your analysis of Issue 3.
13    A.    "Accordingly, while Peter's comment was not
14          tasteful, the investigation failed to show that
15          there was any discriminatory animus in such
16          comments.  There is no evidence of Abdullah being
17          subjected to any comments, decisions, treatment
18          and/or actions that would be in violation of any
19          Amazon policy."
20    Q.    Now you have admitted that you asked no questions
21          about national origin or religious discrimination,
22          correct?
23    A.    Yes.
24    Q.    And you have admitted that it didn't even occur to
25          you that Mr. Faricy's comments about my client, a
```

Abdullah Haydar v. Amazon Corporate, LLC                                   90
Anne DeCleene 2/1/2018

Page 75

```
 1           Syrian national origin, Muslim American man, about

 2           his -- the way he treats his wife, that it didn't

 3           even occur to you that that was made in violation

 4           of national origin or religious discrimination,

 5           right?  Didn't you testify it didn't even occur to

 6           you?

 7   A.      National origin and race discrimination --

 8   Q.      I'm sorry, national origin or religious

 9           discrimination.  It never even occurred to you,

10           right, that these comments were made in that vein?

11   A.      Abdullah never raised those issues.

12   Q.      I know that.  Did it occur to you?

13   A.      As part of an investigation, of course

14           discrimination would occur to someone like me with

15           my background, and honestly, if someone raised

16           these comments, what would go on in my head is

17           familial status concerns.

18   Q.      Okay.  And you felt comfortable concluding that

19           there was no discriminatory animus in Mr. Faricy's

20           comment, right, because you write that in your

21           report?

22   A.      Yes, yes.

23   Q.      When you wrote that the investigation failed to

24           show that there was any discriminatory animus,

25           the investigation did not look for discriminatory
```

Page 76

1          animus, right?  Isn't that your testimony?

2     A.   The investigation asked people, witnesses, about

3          the context in which those statements were made.

4     Q.   But I'm not interested in context or explanation,

5          I'm interested in yes and no questions right now

6          and then I'll give you a chance to explain.

7               Earlier you testified, "Cerio showed me

8          Haydar's email.  The email doesn't raise religion,

9          doesn't raise national origin.  All I'm doing is

10         investigating what his email says," basically,

11         isn't that what you said today under oath?

12    A.   The investigation looked into the concerns that he

13         raised.

14    Q.   Right.  Now ultimately the investigation went

15         beyond that to make recommendations that he go on

16         a Performance Improvement Plan, right?

17    A.   Yes.

18    Q.   And in between we have the analysis of the findings

19         and in the analysis you make the summary statement

20         that there is no discriminatory animus in the

21         comment, or rather the investigation failed to show

22         that there's a discriminatory animus in the

23         comment, but I understood you earlier to be

24         testifying, "I wasn't looking for discriminatory

25         animus because he didn't complain about it."  So

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

                                                             Page 77

1        were you looking for it or weren't you looking for

2        it?

3    A.   I'm sure in asking people about the context of

4         Peter allegedly making these comments --

5                    MR. NACHT:  I'm sorry, could I have a yes

6         or no to the question under oath?  And then you can

7         provide an explanation.

8                    Could you please give the witness the

9         question?

10                   And please consider your answer

11        carefully.

12                   (Whereupon the question was read

13                   back by the court reporter.)

14                   MR. WOLFF:  Objection.  If you can answer

15        it yes or no, do it.

16                   MR. NACHT:  The question calls for

17        answering it whether you were looking for it or you

18        weren't looking for it.

19                   THE WITNESS:  Of course I'm always keen

20        to that being a potential possibility regardless of

21        the concerns raised by a complainant.

22   BY MR. NACHT:

23   Q.   And that was true in this case?

24   A.   I am -- that is always on my radar.

25   Q.   But in this particular case, did it occur to you --

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

Page 78

1   A.   I --

2   Q.   Hang on.

3   A.   I obviously had a sentiment.

4   Q.   Did you have a sentiment that the allegation about

5        Faricy's comment was potentially unlawful

6        discriminatory animus?

7   A.   No.

8   Q.   If you didn't -- if it didn't occur to you that you

9        had such a sentiment, why did you feel the need to

10       deny it in this report?

11  A.   Because I deal with a multitude of complainants and

12       oftentimes they'll throw out explanations of this

13       that causes me to think about, I don't want anyone

14       being treated differently on the basis of familial

15       status, for example, that it would be considered in

16       the context in which it was made, whether it's been

17       made to anyone else.  People can make comments all

18       the time that are not tasteful; that doesn't mean

19       they're discriminatory.

20  Q.   Did you pull this language from some other report?

21       Is that why it's in there?

22  A.   No, but I have written hundreds of reports, so I'm

23       sure that I could identify a report that I've

24       written there's -- a language.

25  Q.   Okay.  Do you -- as you sit here today, and

Page 79

```
 1            obviously your recollection is going to be affected

 2            by the course of the deposition because I'm

 3            challenging you, right, and you're looking at your

 4            document and you're thinking about stuff, and so I

 5            just want your best recollection.

 6                   Did it ever occur to you when you --

 7            during the course of a couple weeks you did this

 8            investigation, that there was an allegation here of

 9            either national origin or religious discrimination?

10    A.      No.

11    Q.      But it did occur to you that there was a violation

12            of family status or marital status?

13    A.      No, there was not an allegation of any of those

14            three potentially protected statuses.

15    Q.      That's not my question as to whether you believed

16            Mr. Haydar was making the allegation.  My

17            question -- was that my question?

18    A.      I thought your question was about the allegations.

19    Q.      My question is about what was in your head when you

20            did the investigation.  I apologize if I misspoke.

21            Let me try it again.

22    A.      I don't remember what was in my head.  I can just

23            comment generally how I approach concerns raised in

24            investigations.

25    Q.      So you've commented that you're always attuned to
```

Abdullah Haydar v. Amazon Corporate, LLC                                        90
Anne DeCleene 2/1/2018

```
                                                         Page 80
 1         unlawful discriminatory animus, fair?

 2    A.   Fair.

 3    Q.   And you commented that that was not the purpose of

 4         this investigation, fair?

 5    A.   Fair.

 6    Q.   But that you were keeping your eye out for it, as

 7         you always do, right?

 8    A.   Yes.

 9    Q.   And the thing which came closest to that issue in

10         your mind were Faricy's comments and that's why you

11         directly addressed it in Issue 3?

12    A.   I don't remember why I specifically decided to

13         write that in Issue 3.

14    Q.   Okay.  Do you believe you did a good thorough job?

15    A.   I did.

16    Q.   Do you think you were fair to Abdullah Haydar?

17    A.   I do.

18    Q.   When you said you were strategic in conducting your

19         investigation, you certainly didn't mean to suggest

20         that you were strategic in slanting the outcome of

21         the investigation, right?

22    A.   Definitely not.

23    Q.   Okay.  And one way to be fair and thorough is to

24         grapple with the strongest points raised by someone

25         on the opposite side, right, of the position you're
```

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

```
                                                    Page 81

 1          coming down, right?

 2                    MR. WOLFF:  Calls for speculation.

 3                    MR. NACHT:  No, no, no.

 4   BY MR. NACHT:

 5   Q.   You've done over 100 investigations at Amazon,

 6        you've done many, many others in HR, you're a law

 7        school graduate.  You agree that to conduct a fair

 8        and thorough investigation, you should grapple with

 9        the strongest piece of evidence to the contrary of

10        the direction where your analysis is leading,

11        right?

12                    MR. WOLFF:  Objection.

13                    MR. NACHT:  What's the objection, Rob?

14                    MR. WOLFF:  I think it's hard to

15        generalize among all the investigations she's done.

16        I think your terms are ill-advised.  If she can

17        talk about a general pattern of practice, that's

18        fine, I just think it's not providing her quite

19        enough substance to answer your question, but maybe

20        I'm wrong.

21                    MR. NACHT:  Let's limit it.

22   BY MR. NACHT:

23   Q.   When you do your investigations at Amazon, you try

24        to grapple with the strongest piece of evidence --

25        if you're leaning towards the respondent, you
```

Abdullah Haydar v. Amazon Corporate, LLC
Anne DeCleene 2/1/2018

90

```
                                                    Page 82

 1          grapple with the strongest piece of evidence that

 2          the complainant brings to the table before you go

 3          for the respondent, right?

 4   A.     In talking about evidence, assuming it's

 5          relevant -- and it depends on the claims; it's all

 6          case specific -- yes, I want to -- I want to

 7          evaluate every piece of relevant evidence.

 8   Q.     Okay.  Let's look at Exhibit 2.  So after Abdullah

 9          got the report of your investigation, he complained

10          about it, right, to Shelly Cerio?

11   A.     I would be surprised if he got a copy of the report

12          at that time.

13   Q.     Okay.  So he just knew it was rejected, he

14          discussed the outcome with Shelly and he knew it

15          was rejected?

16   A.     I don't know what happened during his conversation

17          with Shelly.

18   Q.     Well, take a look at what you wrote in the first

19          paragraph under, "Reason for Investigation -

20          Addendum," on Bates stamp 666.

21   A.     Okay.

22   Q.     And what does that tell you?

23   A.     An initial investigation report was written; Shelly

24          had a conversation with Abdullah thereafter.

25   Q.     Now your initial investigation report is Exhibit 1,
```

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

                                                                 Page 83

 1         dated April 15, 2015, correct?

 2    A.   Yes.

 3    Q.   And this is Exhibit 2, dated April 27, 2015,

 4         correct?

 5    A.   Yes.

 6    Q.   And you wrote this addendum, which consists of

 7         Bates stamp 666 through 675, correct?

 8    A.   Yes.

 9    Q.   And that's Exhibit 2, right?

10    A.   Yes, yes.

11    Q.   And even though you don't follow at Amazon the

12         practice of the fair employment practices, you're

13         not like the EEOC and the state agencies where you

14         give some points to the respondent to reject -- to

15         the complainant to reject before your report is

16         issued, in this case, Shelly Cerio shared the gist

17         of the report with Abdullah Haydar and he was able

18         to raise some points in rebuttal and you then

19         grappled with his points, right?

20    A.   Yes.

21    Q.   Okay.  So Issue 5.  What's the point that he's

22         grappling with?  Could you read it out loud,

23         please?

24    A.   "There was a mutually understood clear record of my

25         performance throughout the entire past year with

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

                                                         Page 84

 1          expectation setting and ongoing performance

 2          evaluation by my management chain as exceeding

 3          expectations and being solid in my leadership

 4          principles.  I'm not exaggerating when I say that

 5          I have been told by all sources that I have

 6          exemplified Amazon's leadership principles by

 7          delivering strongly on a continuous basis."

 8    Q.    And you found that uncorroborated, right?

 9    A.    Yes.

10    Q.    Page 667?

11    A.    Yes.

12    Q.    Why did you not grapple with -- lost you.

13                (Discussion off the record.)

14  BY MR. NACHT:

15    Q.    Why did you not include Mr. Haydar -- in addressing

16          Mr. Haydar's concerns, why did you not include

17          Mr. Joudrey's comments that he was going to give

18          Mr. Haydar a higher review going into the final

19          OLR, Peter's OLR, maybe not technically the final,

20          but Peter's OLR in 2014?

21    A.    I don't remember.

22    Q.    Well, your notes from the Joudrey interview show

23          that Joudrey said that Joudrey and Saxena had

24          gone into that OLR with Abdullah getting a higher

25          review, right, exceeding expectations and solid in

Abdullah Haydar v. Amazon Corporate, LLC                                    90
Anne DeCleene 2/1/2018

                                                                    Page 85

 1          his leadership principles?

 2   A.     Abdullah was alleging that he had no idea he was

 3          underperforming and he had only been told he was

 4          exceeding, so the analysis included examples where

 5          he had been informed otherwise.

 6   Q.     But why just provide contrary examples that

 7          supported your prior position, why not directly

 8          grapple with his best evidence that you

 9          uncovered -- he was not aware of it -- but evidence

10          you uncovered that supported his position?

11                     MR. WOLFF:  Objection.

12                     MR. NACHT:  What's the objection, Rob?

13                     MR. WOLFF:  You can answer.  Asked and

14          answered and I think you're mischaracterizing.

15                     MR. NACHT:  Well, not with regard to

16          Issue 5.  This is a different exhibit.  It's --

17          you wrote a different document a few weeks later

18          and I'm asking why you didn't include it here.

19          It seems directly relevant to this point, doesn't

20          it?

21                     THE WITNESS:  The allegation was that

22          he had never been informed that he was

23          underperforming or deficient in the leadership

24          principles, and I pointed out in my analysis that

25          he had been informed of such.  Of course, Jim's

```
                                                         Page 86

  1          interview was attached.

  2   BY MR. NACHT:

  3   Q.    So you have no explanation for why you didn't

  4         include it in this particular section, correct?

  5   A.    Correct.

  6                MR. NACHT:  Okay.

  7                MR. WOLFF:  Hey, David, to catch my

  8         current flight, I need to leave for the airport

  9         about quarter of two Denver time, so quarter to

 10         four.  Are you going to be done in a little over

 11         an hour, do you think, or should I change flights?

 12                MR. NACHT:  I think -- we've got McVey at

 13         3:00 our time, 1:00 your time, right?

 14                MR. WOLFF:  Yeah.

 15                MR. NACHT:  I see no reason to alter that

 16         schedule.

 17                MR. WOLFF:  Thank you.  I just wanted to

 18         make sure.  Thank you.

 19                MR. NACHT:  Thank you for checking.

 20                I'm done.

 21                MR. WOLFF:  We would like to review.

 22                David, thank you.

 23

 24                (Deposition concluded at 2:23 p.m.)

 25
```

1  STATE OF MICHIGAN)

2  COUNTY OF OAKLAND)

3

4                    Certificate of Notary Public

5        I do hereby certify the witness, whose attached

6  testimony was taken in the above matter, was first duly

7  sworn to tell the truth; the testimony contained herein

8  was reduced to writing in the presence of the witness, by

9  means of stenography; afterwards transcribed; and is a

10 true and complete transcript of the testimony given.  I

11 further certify that I am not connected by blood or

12 marriage with any of the parties, their attorneys or

13 agents, and that I am not interested directly, indirectly

14 or financially in the matter of controversy.

15       In witness whereof, I have hereunto set my hand

16 this day at Royal Oak, Michigan, State of Michigan.

17       I hereby set my hand this day, November 14, 2017.

18

19

20       *Karen Fortna*

21       _____

22       Karen Fortna, CRR/RMR/RPR/CSR-5067

23       Notary Public, Oakland County, Michigan

24       My Commission expires 4/30/2019

25

Abdullah Haydar v. Amazon Corporate, LLC
Anne DeCleene 12/10/2017

90

Page 88

1                    DEPOSITION ERRATA SHEET

2

3    Our Assignment No.:  5396

4    Case Caption:        Haydar v Amazon

5

6           DECLARATION UNDER PENALTY OF PERJURY

7    I declare under penalty of perjury that I have read

8    the entire transcript of my deposition taken in the

9    captioned matter or the same has been read to me,

10   and the same is true and accurate, save and except

11   for changes and/or corrections, if any, as indicated

12   by me on the DEPOSITION ERRATA SHEET hereof, with the

13   understanding that I offer these changes as if still

14   under oath.

15

16   Signed on the  _10th_ day of _December_ , 20_17_.

17

18   _____

19   ANNE DECLEENE

20

21

22

23

24

25

Abdullah Haydar v. Amazon Corporate, LLC
Anne DeCleene 12/10/2017                                            90

```
                                                        Page 89
  1                    DEPOSITION ERRATA SHEET

  2

  3    Reason for change: _____

  4    Page No. 14   Line No. 16   Change to: Replace "management"

  5    with "notice"

  6    Reason for change: Incorrect word.

  7    Page No. 15   Line No. 24   Change to: Replace "Katherine

  8    Mark (ph)" with "Mark Wenrick"

  9    Reason for change: Incorrect name.

 10    Page No. 41   Line No. 16   Change to: Replace "would pass an"

 11    with "whatever is pertinent to that"

 12    Reason for change: Incorrect phrase transcribed.

 13    Page No. 58   Line No. 19   Change to: Replace "and" with

 14    "in an"

 15    Reason for change: Incorrect phrase transcribed.

 16    Page No. 59   Line No. 6   Change to: Replace "HR VP"

 17    with "HRBP"

 18    Reason for change: Typographical error.

 19    Page No. ____ Line No. ____ Change to: _____

 20    _____

 21    Reason for change: _____

 22

 23    SIGNATURE: _____ DATE: 12/10/2017

 24           ANNE DECLEENE

 25
```