UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ABDULLAH HAYDAR,

    Plaintiff,

v.

AMAZON CORPORATE, LLC,
GARRET GAW,
PETER FARICY, and
JOEL MOSBY,

    Defendants.

Case No. 2:16-cv-13662
Honorable Laurie J. Michelson
Magistrate Judge Stephanie Dawkins Davis

---

**OPINION AND ORDER
GRANTING IN PART PLAINTIFF'S MOTION TO EXCLUDE EVIDENCE
RELATING TO PLAINTIFF'S POST-AMAZON EMPLOYMENT [103]**

In 2015, Amazon terminated Abdullah Haydar's employment. Haydar sued alleging discrimination and retaliation. Remaining for trial is Haydar's claim that Amazon discriminated against him because of his religion and national origin. Amazon says the legitimate, non-discriminatory reason that it fired Haydar was because he could not satisfy Amazon's "leadership principles." These principles include earning trust from other Amazonians and disagreeing but once a decision is made, committing. After Haydar left Amazon he got a job at FarmLogs; that employment ended. After the FarmLogs job, Haydar got a job at Criteo; that employment also ended. Amazon says that the reason—or at least part of the reason—those jobs ended is because Haydar exhibited the very same conduct that he exhibited at Amazon. Because Haydar will likely argue at trial that the leadership deficiencies that Amazon identified are false or, at least, exaggerated, Amazon seeks to admit evidence of Haydar's similar issues at FarmLogs and Criteo. Amazon also argues that the evidence from Criteo and FarmLogs is relevant to whether Haydar

has mitigated his damages. Haydar has filed a motion *in limine* to exclude this evidence. For the reasons that follow, the Court will largely grant Haydar's motion.

**I.**

**A.**

In 2012, Amazon hired Abdullah Haydar as a senior technology manager.

Early in his tenure at Amazon, Haydar attended an offsite event that was also attended by Peter Faricy, the head of Amazon Marketplace. Haydar asserts that during the offsite event, Faricy made discriminatory remarks about his relationship with his wife. After the offsite, Haydar emailed Faricy to follow-up on a conversation they had during the event. (R. 68-75, PageID.8130–8131.) Faricy responded to Haydar's email, "[In my opinion], any focus you have on advising others across the team is premature at this point. To quote a famous football coach 'keep your head down, your mouth shut and do your job'." (R. 68-75, PageID.8130.)

In April 2014, Joel Mosby provided Haydar with his first annual evaluation (covering April 1, 2013 to March 31, 2014). Although Haydar's performance was rated "Achieves," his growth potential was rated at "Limited" and his leadership was rated at "Development Needed." This resulted in a "Least Effective" overall rating, a rating that corresponds to the bottom 10% of Amazonians.

Although Haydar's supervisors saw improvement for a time, toward the end of 2014 they again expressed concern about Haydar's ability to satisfy Amazon's leadership principles. The parties dispute the motivation for this. Amazon points to, among other things, Haydar's handling of an employee transfer and interactions with a business partner, Stephen Haney. In contrast, Haydar claims that his supervisors' dissatisfaction was at least partly attributable to his national origin and religion. Some evidence supports Amazon's claim. For example, one Amazonian stated,

"[Haydar] can easily plow through conversations where nobody else can get a word in. This is a miss on earn trust because (myself included) don't always want to engage with him because they know what the communication will be like." (R. 68-112, PageID.8504.) And some evidence supports Haydar's claim. For example, Haydar testified that Faricy "made references to you people, to you people need to learn how to treat your wives better." (R. 68-1, PageID.6327.)

Whatever the cause—Haydar's leadership deficiencies, Faricy's animus, or some of both—Haydar was given a second "Least Effective" rating in February 2015. That led to a performance improvement plan. As part of that plan, Haydar was to "openly voice opinions with peers and leadership, using data to thoughtfully explain counter-arguments, if any, while actively listening to the opposing view." (R. 68-32, PageID.6629.) In the opinion of Haydar's then supervisor, Garrett Gaw, Haydar instead "kep[t] his distance from conversations or professional debates" and did not engage during certain meetings. (R. 68-32, PageID.6629–6630.) Haydar saw his conduct differently: "I have received positive feedback in allowing others to speak more and dominating conversations less." (R. 68-143, PageID.8946.)

On September 22, 2015, Amazon terminated Haydar's employment. Gaw explained, "we had worked with Abdullah on finding—providing him more and more opportunities to show that he can earn trust with folks and be vocally self-critical, and . . . at that point it had turned into more sulking and just not participating in meetings." (R. 68-54, PageID.7446.)

**B.**

About two months after his last day at Amazon, on November 13, 2015, Haydar accepted employment at FarmLogs (sometimes referred to as AgriLogic).

On his first day at FarmLogs, November 23, 2015, Haydar sent an email to the entire team. It directed that all those who had a "red or yellow status task" to be ready "with a plan for a 'path

3

to green.'" (ECF No. 103, PageID.10944.) In response, the CEO at FarmLogs, similar to Faricy at Amazon, indicated to Haydar that he should "first focus on building relationships with the team before taking a directive tone" and that "the biggest concern" in hiring Haydar was that Haydar would "come in and prescribe solutions before taking the time to learn and understand [FarmLogs'] environment and create alignment with the team." (ECF No. 103, PageID.10944.)

In December 2015, several of Haydar's team members at FarmLogs expressed concern over Haydar's "communication style." (ECF No. 103, PageID.10944.) For instance, some engineers thought that during one-on-one meetings, Haydar would appear to be "just waiting for [them] to finish so that he c[ould] talk and tell [them] what he th[ought]." (ECF No. 103, PageID.10944.)

In January 2016, someone on FarmLogs' customer-service team "mentioned [Haydar's] tendency to interrupt conversations between two people to extract what he needed from someone without ever acknowledging his interruption." (ECF No. 103, PageID.10945.)

In February 2016, FarmLogs sent a survey to its engineers. After the survey results, the following was entered into Haydar's "Performance Documentation": "Tyler can tell [Haydar] is trying but there is still a major disconnect between Abdullah and the rest of the eng team. He doesn't feel like Abdullah accurately represents their needs; he doesn't even seem to care about gathering their feedback in the first place." (ECF No. 103, PageID.10948.)

Haydar's last day at FarmLogs was exactly 90 days after his first. (ECF No. 103, PageID.10948.) FarmLogs paid Haydar the severance package that was agreed to at the time of his hire. (*Id.*) Haydar later testified, "I started to sense a very strong resistance to the changes I was implementing and a notion that, you know, they felt that I wasn't supporting them because I wasn't vouching for things such as getting them first dibs on the new office when they expanded our

4

office." (ECF No. 68, PageID.6424–6425.) Haydar further recalled, "Jesse, the CEO, and I sat down and we agreed that, you know, he no longer was going to move forward with the expansion of the engineering organization and the formalization that I was implementing and that, you know, we would separate ways and that they would pay me the preagreed severance to make that happen." (ECF No. 68, PageID.6425.)

Haydar's last day at FarmLogs was February 23, 2016.

## C.

About five months later, in July 2016, Haydar was hired at HookLogic which later became Criteo. (ECF No. 103, PageID.11003.)

Haydar's "Perf & Promo—EOY17," which is apparently a performance review for 2017, includes feedback from Criteo employees. Some of the feedback was positive. One employee wrote, "Abdullah over-saw the Scalable Feed Process project, which is a major project that has been in development for several months." (ECF No. 103, PageID.11110.) Another Criteo employee wrote, "I believe Abdullah has made progress on making room for his reports in meetings." (*Id.*) And another wrote, "good communication skills." (*Id.*) But other feedback was not positive. One employee wrote that Haydar needed to do a better job of "stay[ing] on topic in meetings as to not waste time." (ECF No. 103, PageID.11111.) Another wrote, "He shares personal information about people and is overall abrasive. He does not know how to tailor communication to different scenarios or audiences and is always running on high." (ECF No. 103, PageID.11112.)

On March 21, 2018, Haydar was terminated from Criteo. The next day, Haydar wrote to Tom Aurelio at Criteo. In part, Haydar wrote, "At my office in Ann Arbor yesterday, I was suddenly and unexpectedly terminated from my employment with Criteo due to a pretextual 're-org'. The facts below clearly show this was actually illegal retaliation by Mohsin Hussain after he

5

recently received my accurate peer feedback which I wrote for his EOY2017 review." (ECF No. 103, PageID.11024.) Haydar also accused Hussain of discrimination: "1. Mohsin has repeatedly mocked me in front of small and large groups due to my being the only person not consuming alcoholic beverages during team events (both in the office and externally), due to my religious practices. 2. In these situations, Mohsin has referred to me as 'handicapped' in terms of my social participation with the team due to my lack of knowledge of various alcoholic beverages. 3. He has also made comments on a couple of occasions regarding my beard length and undesirably shared his views with me on what that represents in terms of religiosity." (ECF No. 103, PageID.11027.)

This prompted Criteo to look into Haydar's allegations. On April 6, 2018, Criteo responded to Haydar's email. In part, the email stated,

> The decision to eliminate a role was based on the fact that there were too many managers to support such a small team. This decision was made as far back as October of 2017, which is several months before Mohsin received the peer feedback.
>
> The decision to select you was made by Jean Baptiste, not Mohsin. You had the least seniority, a number of performance issues, and numerous complaints were made about you from individuals that you worked with. These are all legitimate and lawful reasons to terminate your employment. Many employees provided constructive feedback regarding Moshin, and he was receptive to the feedback. He did not feel that your feedback was particularly harsh or noteworthy.
>
> Mohsin denies ever talking to you about alcohol or your lack of drinking alcohol during social events. Mohsin says you and he share the same religion and he would never discriminate against you for not drinking. He said he never mocked you, nor mentioned your physical appearance. Likewise, we are not aware of any other colleagues who have heard anyone, including you, being mocked for not drinking, their appearance or religion.

(ECF No. 103, PageID.11020.)

Haydar did not agree with Criteo's response. But Criteo was steadfast that "there was indeed a business rationale for eliminating one of the manager positions" and that Haydar had been "selected based on legitimate, nondiscriminatory reasons." (ECF No. 103, PageID.11016.)

6

After continued back and forth, Criteo and Haydar agreed to a severance of five months' pay. (ECF No. 103, PageID.11029.)

### D.

In August 2018, about five months after his last day at Criteo, Haydar started working at LinkedIn. (*See* ECF No. 103, PageID.11147.) As of today, Haydar remains employed at LinkedIn.

## II.

Amazon says there are several reasons for admitting evidence of Haydar's performance at FarmLogs and Criteo.

### A.

Amazon first argues that the jury should learn about what led to Haydar's termination from FarmLogs and Criteo because the jury must decide whether Haydar adequately mitigated the pay he lost upon termination from Amazon. (*See* ECF No. 104, PageID.11223.) And, it argues, Haydar's backpay must be tolled because he was terminated for cause (twice) after his termination from Amazon. (*See* ECF No. 104, PageID.1128.)

Amazon is correct that under both Title VII and the Elliott-Larsen Civil Rights Act, an employee who claims unlawful discharge has a duty to mitigate his damages. *See* 42 U.S.C. § 2000e-5(g) (Title VII); *Rasheed v. Chrysler Corp.*, 517 N.W.2d 19, 27 (Mich. 1994) (ELCRA). And, at least under ELCRA, Amazon is correct that the question of whether a former employee has done enough to mitigate damages is for the jury. *See Rasheed*, 517 N.W.2d at 27 (ELCRA); *see also Rasimas v. Michigan Dep't of Mental Health*, 714 F.2d 614, 623 (6th Cir. 1983) (stating,

in a Title VII case, that "[t]he finding that a claimant has exercised reasonable diligence in seeking other suitable employment following a discriminatory discharge is an issue of fact").[1]

And Amazon's particular tolling argument could be supported by *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269 (4th Cir. 1985). There, both Brady and Williams claimed they were terminated from Thurston Motor Lines in violation of Title VII. Brady got a job after Thurston Motor but was then terminated from that job for "violating stated company policy in the operation of the warehouse." *Id.* at 1272. And Williams got a job after Thurston Motor but was then terminated from that job "for failure to load freight on the right truck, which was his third violation." *Id.* The district court borrowed the "misconduct" standard for denying unemployment-benefits under North Carolina law and found that Brady's and Williams' terminations did not involve "misconduct." *Id.* at 1276. The Fourth Circuit found that the district court erred in

---

[1] The Court notes that Amazon cites a number of cases for the proposition that backpay under Title VII is a question of fact for the jury to decide. (ECF No. 104, PageID.11223, 11226–11227, 11229.) But the cases Amazon cites involve Michigan law, California law, FMLA, or FLSA, or are cases that rely on FMLA or FLSA cases. As the Sixth Circuit has explained, some employment-discrimination statutes are worded more similarly to FLSA's legal remedy than others: "The District Court relied in part on Title VII and ERISA case law to conclude that the remedy of back pay under the FMLA is equitable. Because the FMLA's link to the remedial provisions of the FLSA is stronger than it is to Title VII or ERISA, we rely on case law under the FLSA rather than Title VII or ERISA." *Frizzell v. Sw. Motor Freight*, 154 F.3d 641, 644 (6th Cir. 1998). For claims under Title VII, which is the employment-discrimination statute at issue in this case, backpay is an equitable remedy. *See Equal Employment Opportunity Comm'n v. Baltimore Cty.*, 904 F.3d 330, 335 (4th Cir. 2018) ("[A] back pay award under Title VII is a discretionary equitable remedy that a court may select in awarding relief to a plaintiff."); *Bledsoe v. Emery Worldwide Airlines, Inc.*, 635 F.3d 836, 844 (6th Cir. 2011) ("Back pay under Title VII has been characterized by the courts of appeals as an equitable remedy for which there is no right to a jury trial[.]"). Indeed, the Third Circuit pattern jury instructions explain that backpay is a jury question in Title VII cases only if there is an advisory jury or the parties stipulate that a jury should decide backpay. Notably, however, where Title VII and ELCRA claims are tried together, it might be proper to give the jury the question of backpay. *See Kelmendi v. Detroit Bd. of Educ.*, No. 12-14949, 2017 WL 1502626, at *11 (E.D. Mich. Apr. 27, 2017). *The parties are to research and then meet and confer on this issue before providing proposed jury instructions*. The Court also notes the single-motive versus mixed-motive issue flagged in the summary-judgment opinion and the Ninth Circuit's jury instructions on that issue.

borrowing the state-law test to decide tolling under Title VII. The Fourth Circuit stressed that a Title VII claimant has an obligation to use "reasonable diligence" to maintain post-termination employment and that "reasonable diligence" demanded more of the plaintiff than just steering clear of "wilful or wanton" misconduct. *Id.* at 1277. Because both Brady and Williams "had been given instructions as to the behavior expected of them and failed to fulfill such expectations," Thurston Motor's obligation to pay lost wages under Title VII was tolled when Brady and Williams were terminated from their post-Thurston jobs. *Id.* at 1279. Arguably then, *Thurston Motor* could be read as holding that mere termination for cause is sufficient to toll Amazon's obligation to pay lost wages. And if that is the case, then perhaps a jury should hear evidence suggesting that Haydar was terminated from FarmLogs and Criteo for cause.

But *Thurston Motor* can be read differently. Thurston Motor Lines argued that because Brady and Williams had "chose[n] to violate employer rules," they had, in essence, voluntarily quit. *Id.* at 1276. And the Fourth Circuit explained, "It would be incongruous to hold that while Title VII claimants cannot voluntarily terminate suitable, interim employment without suffering a back pay reduction, they may choose without penalty to risk the loss of similar employment by engaging in misconduct." *Id.* at 1278. Thus, one reading of *Thurston Motor* is that Haydar's termination from FarmLogs or Criteo tolls Amazon's obligations to Haydar only if Haydar intentionally or, at least, recklessly did not comply with FarmLogs' and Criteo's standards for continued employment.

More importantly, that seems to be how the Sixth Circuit Court of Appeals has read *Thurston Motor*. In *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160 (6th Cir. 1996), Yellow Freight was found to have discriminated against Thurman and Thurman was awarded backpay. Yellow Freight appealed and claimed that "Thurman failed to mitigate his damages because Riggs

9

Trucking Company, his subsequent employer, fired him for cause." *Id.* at 1169. The Sixth Circuit explained, "If an employee suffers a 'wilful loss of earnings' . . . the employer's backpay liability is tolled." *Id.* at 1168–69. The Court explained that in an earlier case it had held that "discharge from interim employment will toll backpay liability only if the employee's misconduct was 'gross' or 'egregious.'" *Id.* at 1169. Then, citing the Fourth Circuit's decision in *Thurston Motor*, the Sixth Circuit stated, "Similarly, an employee's discharge for cause due to his *wilful* violation of company rules will toll backpay." *Id.* (emphasis added). And, in the case before it, there was no evidence that Thurman acted willfully at his post-Yellow Freight job: "Thurman drove a truck under an overpass that was too low. . . . Riggs discharged him due to the accident. *There was no evidence that Thurman acted intentionally. Thus, Yellow Freight failed to establish that Thurman acted wilfully or committed a gross or egregious wrong. Backpay should not be tolled.*" *Id.* at 1169 (emphasis added).

Ultimately, the Court need not decide the legal standard governing backpay tolling. Even assuming in Amazon's favor that mere termination for cause is enough to toll backpay, or similarly assuming in Amazon's favor that a rational jury could find that Haydar acted with reckless disregard for his FarmLogs and Criteo jobs, that would carve out a mere ten months from Amazon's obligation to pay: the five-month period of unemployment between FarmLogs and Criteo and the five-month period of unemployment between Criteo and LinkedIn. As the First Circuit has explained, "back pay is not permanently terminated when an employee is fired for misconduct or voluntarily quits interim employment. . . . Had there been no discrimination at employer A, the employee would never have come to work (or have been fired) from employer B. The discriminating employer (employer A) should not benefit from the windfall of not paying the salary differential when the employee is re-employed by employer C." *Johnson v. Spencer Press*

*of Maine, Inc.*, 364 F.3d 368, 382 (1st Cir. 2004). Other circuits are in agreement. *See E.E.O.C. v. Delight Wholesale Co.*, 973 F.2d 664, 670 (8th Cir. 1992); *Thurston Motor*, 753 F.2d at 1278.

And the First Circuit's rule does not mean that if Amazon is found liable it will have to provide Haydar with backpay until the day he retires no matter how many times he is fired. After all, Amazon's obligation to pay is contingent upon reemployment and, at some point, the market will not be kind to an employee with repeat terminations for cause. As for the possibility that Haydar's pay at a job he obtains after being fired is less than his pay at the one he could have kept, that might be accounted for by discounting the amount Amazon owes (if found liable) by the higher of the two salaries. *See Johnson*, 364 F.3d at 383 n.16.

In short, even if Haydar's performance at FarmLogs and Criteo should be presented to the jury because it could toll backpay, it could at most toll 10 months of backpay. And that is a tiny sliver of the backpay Haydar seeks; Haydar claims lost wages from the day he was terminated at Amazon through the day he would have retired from Amazon. Thus, the evidence that Amazon seeks to admit is not particularly probative for this reason. Indeed, after the briefing on this issue was complete, Haydar has stipulated that he "he will not seek wage loss damages for his two periods of unemployment between his subsequent employers." (ECF No. 112, PageID.11509 (emphasis omitted).) Given that concession, the Court fails to see how the reasons for Haydar's termination from FarmLogs and Criteo is relevant to Amazon's claim that Haydar has not adequately mitigated his damages.

To summarize, to the extent Amazon seeks to admit evidence of Haydar's performance at FarmLogs or Criteo to show that Haydar failed to mitigate damages as is required by Title VII, the Court finds that Rule 403 bars admission of the evidence.

So far, the Court has focused exclusively on Title VII. But for reasons unclear to the Court, Haydar apparently still wants to pursue his ELCRA claims too. And maybe there is a different tolling standard under ELCRA—perhaps the termination-for-cause standard Amazon wants. But if there is such a standard under Michigan law, Amazon has not pointed to any case establishing it. And this Court's review of the case law indicates that Michigan courts considering tolling of backpay under ELCRA simply ask if the employee engaged in reasonable efforts to obtain and maintain employment. *See Rasheed v. Chrysler Corp.*, 517 N.W.2d 19, 27 (Mich. 1994); *Morris v. Clawson Tank Co.*, 587 N.W.2d 253, 258 (Mich. 1998). And reasonable efforts to obtain and maintain employment is the same standard under Title VII. *See Thurman*, 90 F.3d at 1168; *Brady*, 753 F.2d at 1273.

**B.**

Amazon also seeks to admit evidence of Haydar's performance at FarmLogs and Criteo to show that it terminated Haydar for non-discriminatory reasons. (*See* ECF No. 104, PageID.11234.) It appears that Haydar will attempt to establish that Gaw, Mosby, or others at Amazon made up or exaggerated his leadership deficiencies. And if that is so, Amazon argues, evidence that people "wholly separate from Amazon" identified similar deficiencies undercuts Haydar's claim of pretext. (ECF No. 104, PageID.11234.)

Amazon's proposed use of Haydar's performance record from FarmLogs and Criteo runs right into Rule 404's prohibition on the use of character evidence. A lead opinion on this issue is *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507 (D.C. Cir. 1995). There, Cathy Neuren claimed that she was terminated from the law firm AAM&S because she was female. AAM&S claimed Neuren was terminated because she had "difficulty in meeting deadlines and getting along with fellow employees." *Id.* at 1509. At trial, AAM&S admitted evidence that Neuren had

12

"difficulty in getting along with staff and meeting deadlines" at the firm where she worked before AAM&S. *Id.* at 1510. On appeal, AAM&S argued that the evidence "demonstrated that Neuren had displayed similar work-related problems in her former employment." *Id.* at 1510–11. The D.C. Circuit rejected this argument, finding that "the district court admitted the evidence for the purpose specifically prohibited by Rule 404—as evidence that [Neuren] acted in conformity with her behavior at [her prior firm] while working for AMM&S." *Id.* at 1511.

Many courts have either explicitly followed *Neuren* or reasoned similarly. For instance, in *Zubulake v. UBS Warburg LLC*, the court followed *Neuren* and stated, "no matter how defendants try to frame their intended use [of plaintiff's performance at another company]—whether to rebut plaintiff's contention that she was not insubordinate and uncooperative or whether to prove that she was insubordinate and uncooperative outright—they are seeking to introduce inadmissible propensity evidence." 382 F. Supp. 2d 536, 542 (S.D.N.Y. 2005). And in *Mines v. Capital Grp. Companies*, the court also followed *Neuren* and stated, "It could not be clearer that defendant, if it sought to defend itself against the claim of discrimination on the grounds that plaintiff's poor performance was the reason for her termination, could not offer into evidence proof of her poor performance in a previous job upon the theory that her current behavior was in conformity with her past behavior." No. 08-1118, 2009 WL 3336068, at *2 (D.D.C. Oct. 15, 2009). And, most recently, the court in *Stevenson v. Johnson Bros Corp.* applied Rule 404 to exclude the plaintiff's "disciplinary records and reasons for termination from former employers." *See* No. 2:18-CV-1702, 2019 WL 1083781, at *5 (N.D. Ala. Mar. 7, 2019); *see also Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 536–537 (6th Cir. 2005) (finding—where defendant wanted to introduce evidence of plaintiff's post-termination employment history to show that plaintiff was properly disciplined for conduct issues, such as having a bad attitude, sleeping on the job, misappropriating company

13

property, and failing to report to work—"[t]he district court correctly ruled that the evidence . . . was offered to show a propensity for bad acts which is inadmissible under Federal Rule of Evidence 404(b)").

This Court will follow this precedent. Rule 404(b)(1) provides, "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Here, Amazon claims it is not offering evidence of Haydar's performance at FarmLogs and Criteo to establish that Haydar has a propensity to act a certain way. Instead, says Amazon, it is only offering that evidence to show that it terminated Haydar for non-discriminatory reasons. But the FarmLogs and Criteo evidence would only support a claim that Haydar's termination from Amazon was legitimate if the jury infers (1) that the FarmLogs and Criteo records reflect certain character traits and (2) that Haydar acted in conformity with those traits while at Amazon. That is exactly what Rule 404 is meant to prohibit.

Resisting this conclusion, Amazon cites *Penn v. Heitmeier*, No. 99-0528, 2000 WL 297685 (E.D. La. Mar. 17, 2000). But that case is materially different. There, Leon Penn's former employer claimed it fired Penn not because of his race but because "he refused to navigate the vessel in inland waters." *Id.* at *1. Penn's former employer sought to introduce evidence that at Penn's next job, he had "expressed reservations handling [the vessel] in inland waters." *Id.* The district court found that this post-termination evidence was not barred by Rule 404: "Plaintiff's subsequent job performance . . . is not character evidence, i.e., the mental and ethical traits marking and individualizing a person, but fact based, eye-witness evidence of how he performed in similar jobs." *Id.* at *2. That ruling makes sense on the facts before the *Penn* court: Penn's desire or ability to drive a boat on inland waters was not a "mental and ethical trait[] marking and individualizing

14

a person" but instead a particular skill associated with a particular job. In contrast, Haydar's issues at Amazon, FarmLogs, and Criteo are closely related to his personality. Amazon has accused Haydar of talking too much without knowing enough, not genuinely listening to others, not being self-critical, and not committing to a decision once made. (*See* ECF No. 104, PageID.11218–11219.) Sure, good communication and introspection are job skills—but they are also life skills. Thus, unlike the evidence of Penn's inability to drive on inland waters, the assessments by Haydar's peers and supervisors and FarmLogs and Criteo are evidence of Haydar's character.

Recently, Judge Mark Goldsmith of this District drew the line in a similar place. There, the plaintiff sought to introduce a positive performance review from her prior employer. *Sommers-Wilson v. Samsung SDI Am., Inc.*, No. 16-CV-14259, slip op. at 5 (E.D. Mich. Dec. 27, 2018). Parts of the favorable review had to do with an "ethical dimension of the job," such as the plaintiff's "integrity." *Id.* at 6. But other parts of the review had to do with "objective specific skill sets that relate specifically to the operative issue in a case," such as the plaintiff's "budgetary skills." *Id.* at 6–7. Judge Goldsmith found that evidence pertaining to the employee's budgetary skills did "not fit within the traditional definition of character evidence, which encompasses broad-based descriptions of a person's personality or disposition." *Id.* at 7. Here, as stated, Haydar's communication and inter-personal problems at Amazon, FarmLogs, and Criteo are likely linked to his personality or disposition.

In short, to the extent that Amazon seeks to offer the FarmLogs and Criteo evidence to show that it terminated Haydar for legitimate business reasons, Rule 404 bars admission.

## C.

Amazon additionally claims that the jury should be able to hear evidence of Haydar's performance at FarmLogs and Criteo because it undercuts his credibility. Amazon says that during

15

his deposition, Haydar first suggested that he was let go from FarmLogs because the company had elected not to expand the engineering department that Haydar was leading. (*See* ECF No. 104, PageID.11237; ECF No. 62, PageID.2907–2908, 2911.) But at a later point in his deposition, Haydar acknowledged that he was let go for a "combination of factors," including not being "a fit for their culture." (*See* ECF No. 62, PageID.2915.) As for Criteo, Amazon asserts that in response to a discovery request, Haydar said, "Reason for leaving: Plaintiff and others were offered a severance package due to reorganization and current financial situation at Criteo." (ECF No. 103, PageID.11001.) But, says Amazon, the Criteo records in fact show that Haydar was let go because of "his poor performance and his inability work well with others." (ECF No. 104, PageID.11239.) Although Amazon's brief is not entirely clear, it appears that Amazon seeks admission under Rule 608(b) and Rule 613(b). (ECF No. 104, PageID.11234–11235.)

Rule 608(b) does not apply. That rule of evidence allows Amazon to cross examine Haydar by asking him about specific instances of truthfulness or untruthfulness. *See* Courtroom Handbook Fed. Evid., Rule 608 (2019 ed.). But, as far as this Court can tell, the FarmLogs and Criteo records do not document any acts of dishonesty.

Amazon also cites a case applying Rule 613(b). (ECF No. 104, PageID.11235.) That rule of evidence allows admission of "[e]xtrinsic evidence of a witness's prior inconsistent statement" so long as certain conditions are met. If, at trial, Haydar admits that part of the reason his employment ended at FarmLogs was his inability to communicate and listen to his team, then the Court *might* allow Amazon to point out that, at his deposition, Haydar at first stated that his employment ended because FarmLogs decided it was not going to "expan[d] . . . the engineering organization" that Haydar had been hired to lead. (*See* ECF No. 62, PageID.2908.) Or if Haydar testifies at trial that he was let go from FarmLogs for reasons completely unrelated to his

16

performance, the Court *might* permit Amazon to point out that, at his deposition, Haydar conceded that he could have "been less prescriptive" and was let go from FarmLogs in part because he was not "a fit for their culture." (ECF No. 62, PageID.2911, 2915.) As for Criteo, if Haydar tells the jury that part of the reason he was terminated was his communication and performance issues, then Amazon *might* be allowed to point out that in response to written discovery, Haydar merely stated he was "offered a severance package due to reorganization and the financial situation of Criteo." (ECF No. 103, PageID.11001.) At this time the Court will not permit admission under Rule 613, but Amazon may move for admission under Rule 613 depending on Haydar's testimony.

In a related argument, Amazon seeks to admit a smaller slice of Haydar's employment record. In particular, Amazon wants the jury to see emails showing that the day after Criteo terminated him, he accused his supervisor of retaliation and religious discrimination, but, upon investigation, Criteo determined that his supervisor was not offended by Haydar's feedback and that his supervisor practiced the same religion as Haydar. (*See* R. 103, PageID.11020–11021, 11024–11027.) Amazon says this evidence would "help the jury evaluate the veracity of [Haydar's] claims to have been discriminated against. The jury can ask itself whether or not what [Haydar] perceived to be discriminatory was so, or is this the claim of someone who sees everything through the lens of discrimination." (ECF No. 104, PageID.11236.)

Even if Haydar's assertion of religious discrimination at Criteo was not grounded in fact, any probative value of that assertion is substantially outweighed by unfair prejudice. *See* Fed. R. Evid. 403. The main issue for trial is whether Amazon was motivated to fire Haydar because of his protected characteristics. So what was going on in Amazon's head is what the jury must determine; what was going on in Haydar's head is largely irrelevant. Indeed, in some Title VII cases the employee may have been wholly unaware of his employer's discriminatory animus but

17

if that animus in fact motivated an adverse action, liability exists. The employee's perception of what was occurring is not at issue. In briefing related to Haydar's attempt to admit the New York Times article, Amazon seems to admit as much: "Plaintiff's supposed 'motive' or 'intent' are not on trial, Defendant's is." (ECF No. 109, PageID.11493.) Accordingly, to the extent that Amazon seeks to admit Haydar's assertion that Criteo discriminated to show that Haydar perceives his employer's actions through the lens of discrimination, Rule 403 bars admission.

## D.

Lastly, Amazon claims that evidence of Haydar's termination from FarmLogs and Criteo and the alleged discrimination that Haydar faced at Criteo should be admitted so the jury can properly assess Haydar's claim of emotional distress. (ECF No. 104, PageID.11229.) Apparently, Haydar will inform the jury that both his termination from Amazon and the discrimination he experienced at Amazon caused him emotional distress. Amazon argues that if Haydar testifies that way, it should be able to tell the jury that he was terminated twice after his Amazon employment and that he was allegedly discriminated against after his Amazon employment. (ECF No. 104, PageID.11230.) In Amazon's view, this evidence would allow the jury to find that Amazon is not solely responsible for Haydar's emotional distress. (*Id.*)

At this point, the Court believes that Haydar's terminations from FarmLogs and Criteo and any discrimination Haydar experienced at Criteo is not probative of whether Haydar's emotional distress is attributable to Amazon. At trial, Haydar might concede that his emotional distress from the Amazon termination had ended before he was terminated from FarmLogs. And if that is what the evidence shows, then Haydar's emotional-distress damages would be based on events before his termination from FarmLogs and Criteo and so those terminations would not be relevant to emotional-distress damages. On the other hand, if Haydar attempts to show that his emotional

18

distress from Amazon lingered past his termination from FarmLogs or past his termination from Criteo, any emotional distress from those terminations (or the alleged discrimination at Criteo) may be relevant to damages. So if Haydar claims still ongoing emotional distress from Amazon, the Court might allow Amazon to inquire, at a high level of generality, into other stressors that have adversely affected Haydar's emotional state. The Court thus denies admission at this time, but if the emotional-distress evidence at trial gives Amazon a basis to do so, Amazon may again seek admission.

### III.

For the reasons stated, Haydar's motion to exclude evidence pertaining to his employment at FarmLogs and Criteo is GRANTED IN PART. Amazon may not introduce that evidence to show that Haydar failed to make a reasonable effort to mitigate his damages, to show that Amazon's reasons for placing Haydar on a performance improvement plan or terminating his employment were legitimate, or to show Haydar's character for untruthfulness under Rule 608(b). Depending on the testimony, the Court might permit Amazon to show that Haydar's prior characterizations of why he was let go from FarmLogs and Criteo are inconsistent with his trial testimony. Also depending on the testimony, the Court might permit Amazon to, at a high level of generality, introduce Haydar's terminations from FarmLogs and Criteo and claim of discrimination at Criteo to show that Amazon was not the sole cause of claimed emotional distress.

SO ORDERED.

Dated: July 3, 2019                                                   s/Laurie J. Michelson
                                                                                    Laurie J. Michelson
                                                                                    U. S. District Judge

I hereby certify that on July 3, 2019, the document above was served on counsel and/or the parties

of record via electronic means and/or First Class Mail.

                                                                                             s/Jennifer McCoy
                                                                                             Case Manager